# Exhibit C



# Transcript of Sameh Elrahimy, Corporate Designee

**Date:** July 6, 2023
**Case:** Go Pro Construction, LLC -v- Ipasumi

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

## Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2            Civil Action No. 1:22-cv-01643-RCL
 3  GO PRO CONSTRUCTION, LLC,        )
 4        Plaintiff/Counter-Defendant,  )
 5    v.                              )
 6  VALSTS NEKUSTAMIE IPASUMI,        )
 7        Defendant/Counter-Plaintiff.  )
 8  ------------------------------------)
 9
10         Deposition of GO PRO CONSTRUCTION, LLC,
11               by and through SAMEH ELRAHIMY
12                   Baltimore, Maryland
13                   Thursday, July 6, 2023
14                        9:57 a.m.
15
16
17
18
19
20  Job No.: 498513
21  Pages: 1 - 178
22  Transcribed by: Jerome E. Harris
```

## Page 2

```
 1      Deposition of GO PRO CONSTRUCTION, LLC, by and
 2  through SAMEH ELRAHIMY, held at the offices of:
 3
 4         ROLLINS, SMALKIN, RICHARDS & MACKIE, L.L.C.
 5         300 East Lombard Street
 6         Suite 900
 7         Baltimore, Maryland 21202
 8         (410) 727-2443
 9
10
11
12     Pursuant to agreement, before Bri Slack,
13  Notary Public in and for the State of Maryland.
```

## Page 3

```
 1                    A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF/COUNTER-DEFENDANT:
 3      RODERICK R. BARNES, ESQUIRE
 4      ROLLINS, SMALKIN, RICHARDS & MACKIE, L.L.C.
 5      300 East Lombard Street
 6      Suite 900
 7      Baltimore, Maryland 21202
 8      (410) 727-2443
 9
10
11  ON BEHALF OF THE DEFENDANT/COUNTER-PLAINTIFF:
12      ZACHARY S. GILREATH, ESQUIRE
13      BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ PC
14      100 Light Street
15      Suite 1900
16      Baltimore, Maryland 21202
17      (410) 685-1120
18
19
20  ALSO PRESENT:
21      Matty Megee, law student
22
```

## Page 4

```
 1                    C O N T E N T S
 2  Examination of SAMEH ELRAHIMY                    PAGE
 3    By Mr. Gilreath                                  5
 4
 5              EXHIBITS (Retained.)
 6  GO PRO'S
 7  Exhibit 1      Notice of Deposition               8
 8  Exhibit 2      Work Progress Report #3           19
 9  Exhibit 3      Letter of Invitation to Tender    39
10  Exhibit 4      Proposal Bid                      41
11  Exhibit 5      Complaint                         48
12  Exhibit 6      Email                             50
13  Exhibit 7      Contract Latvian Project          52
14  Exhibit 8      Plaintiff's Production            55
15  Exhibit 9      Email Thread                      62
16  Exhibit 10     Response Request for Production   66
17  Exhibit 11     Work Schedule                     74
18  Exhibit 12     Work Progress Report #1           83
19  Exhibit 13     Corrected Invoice                 87
20  Exhibit 14     Work Progress Report #2           89
21  Exhibit 15     Work Progress Report #4           97
22              (Continued on next page.)
```

Page 5

| | | | |
|---|---|---|---|
| 1 | Exhibit 16 | Invoice #2 | 101 |
| 2 | Exhibit 17 | Email November 2nd, 2021 | 105 |
| 3 | Exhibit 18 | Handrail Drawing Document | 108 |
| 4 | Exhibit 19 | 504 Architect Drawing | 110 |
| 5 | Exhibit 20 | Letter December 13th, 2021 | 115 |
| 6 | Exhibit 21 | Email to Marcis | 121 |
| 7 | Exhibit 22 | Emails Priscilla and Marcis | 123 |
| 8 | Exhibit 23 | Termination of Contract Letter | 131 |
| 9 | Exhibit 24 | Email May 25th, 2022 | 134 |
| 10 | Exhibit 25 | List of Materials | 152 |
| 11 | Exhibit 26 | Quotation | 154 |
| 12 | Exhibit 27 | Value of Work Completed | 156 |
| 13 | Exhibit 28 | Answer to Counterclaim | 157 |
| 14 | Exhibit 29 | Answers to Interrogatories | 158 |
| 15 | Exhibit 30 | Expert Report | 174 |

Page 6

P R O C E E D I N G S

Whereupon,

SAMEH ELRAHIMY,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT/COUNTER-PLAINTIFF:

BY MR. GILREATH:

Q Good morning. My name is Zach Gilreath, I am from the law firm of Baker, Donelson. I have Matty Megee, summer assist to my office, sitting here in on the deposition. I'm counsel representing the Defendant/Counter-Plaintiff in this suit, Valsts Nekustamie Ipasumi. I may refer to him as VNI throughout the deposition.

Before we start, can you please state your name for the record.

A Sameh Elrahimy.

Q And Mr. Elrahimy, have you ever been deposed before?

A Yes.

Page 7

Q And under what circumstances were you deposed?

A As a witness in another case.

Q What was the subject matter of that case?

A Construction.

Q Construction. And when you say witness, you were not a party to the lawsuit?

A No.

Q Before we get started, I just want to go over some ground rules. I'm sure that they were touched on in previous deposition. But we're here today, I can see you, you can see me. For the purposes of the transcript that's going to be put together, everything that is going to be said needs to be said verbally. So try to avoid head nods, yes or no, try to articulate your answers.

Try to allow me to finish my question before you start answering. Try not speak over me. I'll try to do the same for you, let you complete your answer before I move on to my next question.

If at any point in time you don't understand a question that I have asked, please let me know; I'll try my best to rephrase it. But if you do answer a

Page 8

question, it will be assumed that you understood the question.

Does that make sense?

A Yes.

Q Okay. At any point in time today you want to take a break, it's fine, just let me know, we can take a break. Bathroom, to get food, whatever. The only thing I'd ask if there's question pending, that you answer the question before we take any break. Okay?

I'm going to start with what has been premarked as Go Pro number 1. This is a copy of the Amended Notice of Rule 30(b)(6) Deposition.

(Go Pro Exhibit 1, Amended Notice, was marked for identification, and is retained by counsel.)

Q Have you reviewed this document before your deposition today?

A Yes.

Q And you understand that you are here today to provide testimony on behalf of Go Pro Construction, LLC?

A Yes.

Q In addition to reviewing the Deposition Notice, did you review any other documentation in preparation

Page 17

1  Q  Do the laborers maintain -- do laborers
2  maintain time in any way?
3  A  Sorry?
4  Q  Do the laborers when working on a
5  construction-related activity, such as the Latvian
6  Embassy project, do they monitor -- maintain their time
7  in any way?  Do they keep timecards to let you know when
8  they were onsite when they were working on a certain
9  project?
10  A  Yes.
11  Q  And how is that time maintained?
12  A  Through according to the office.
13  Q  When you say, According to the office, is there
14  an online site that you use, a service?
15  A  It would depend on the crew we're using on
16  site.
17  Q  For the Latvian project, how was time
18  maintained?
19  A  I don't recall.
20  Q  Does Go Pro, prior to the Latvian Embassy
21  project, have other experience with embassy, embassy
22  construction projects?

Page 18

1  A  Yes.
2  Q  What previous experience does Go Pro have?
3  A  Can you be more specific.
4  Q  What other countries' embassies has Go Pro
5  worked said for prior to the Latvian?
6  A  Many countries.
7  Q  Can you name them?
8  A  Spain.
9  Q  Is Spain the only one you can recall right now?
10  A  Yes.
11  Q  What is Go Pro's relationship with Optimum
12  Construction?
13  A  So the owner of Optimum is my brother.
14  Q  And you're testifying on behalf of Go Pro, so
15  if you don't know this answer, let me know.  But do you
16  know the nature of Optimum Construction's business.
17  A  I don't.
18  Q  It's my understanding that Optimum served as a
19  project management service as it relates to the Latvian
20  Embassy project;  is that correct?
21  A  Is -- can you repeat that question.
22  Q  In some of the documentation that's been

Page 19

1  produced in this case, Optimum Construction was
2  identified as being retained by Go Pro to serve as a
3  project management company; is that correct?
4  A  Can you show me that document?
5  Q  Absolutely.
6     (Pause.)
7  Q  Let me step back further in the documents.
8     Do you know an individual by the name of
9  Jason Kirk?
10  A  Yes.
11  Q  Is Jason Kirk employed by Optimum?
12  A  I'm not sure.
13  Q  Was Jason Kirk employed by Optimum at the time
14  of the Latvian Embassy project?
15  A  I believe so, yes.
16  Q  Has Jason Kirk ever been employed by Go Pro?
17  A  No.
18  Q  I'm going to show you -- I'm going to show you
19  what has been marked as Go Pro number 2.  This is a copy
20  of the Work Progress Report Number 3.
21     (Go Pro Exhibit 2, Work Progress Report Number
22  3, was marked for identification, and is retained by

Page 20

1  counsel.)
2     Do you recognize this document?
3  A  Yes.
4  Q  Turning your attention to number 14 on the
5  second page, it states, As per the Embassy's request for
6  construction meeting via video conference, please be
7  advised that your project manager, Mr. Jason Kirk, and
8  the site supervisor, Mr. John Grindes, will --
9  A  Brian.
10  Q  -- be attending -- Brian Grindes, will be
11  attending the biweekly video meeting.
12     You stated that Jason Kirk was not an employee
13  of Go Pro, correct?
14  A  Correct.
15  Q  He's being identified as quote, unquote, Our
16  project manager, Mr. Jason Kirk.
17  A  Okay.
18  Q  So if he wasn't an employee of Go Pro, was he
19  -- how was he, Our project manager on the site?  Was he
20  retained as a subcontractor to Optimum?
21  A  No, he works for Optimum.
22  Q  Okay.  And to -- and part of his services were

Page 21

1 serving as a project manager for the Latvian Embassy --
2   A   Sure.
3   Q   -- project?
4   A   Yes.
5   Q   In -- did Go Pro enter a contract with Optimum
6 Construction as it related to the Latvian Embassy
7 project?
8   A   No.
9   Q   Was there ever an exchange of payment between
10 Go Pro and Optimum related to --
11  A   I don't recall.
12  Q   Did Optimum Construction provide laborers for
13 the Latvian Embassy project?
14  A   I don't recall.
15  Q   Do you recall if there were any laborers on the
16 project that were not employees of Go Pro?
17  A   I don't recall.
18  Q   So Go Pro never paid Optimum for any services
19 provided as it relates to the Latvian --
20  A   No, I said I don't recall.  I didn't say we
21 didn't.
22  Q   How does Go Pro typically make payments to

Page 22

1 subcontractors on construction-related projects?
2   A   It varies.  It depends.
3   Q   Do you sometimes write checks?
4   A   Sure.
5   Q   Sometimes wire transfers?
6   A   Sure.
7   Q   Does Go Pro maintain a bank account to issue
8 payments to subcontractors?
9   A   Can you elaborate on that question.  I'm not
10 sure.
11  Q   When Go Pro writes a check, that check
12 typically draws from a checking account, savings
13 another, or another type of account maintained with a
14 banking institution, correct?
15  A   Of course.
16  Q   Go Pro had a bank account in its name for
17 purposes of making payments to subcontractors in the
18 past?
19  A   Specific bank account?
20  Q   A bank account?
21  A   We have a bank account.  Go Pro does have a
22 bank account.

Page 23

1   Q   Has it changed over the last seven to eight
2 years of Go Pro doing business?
3   A   I don't recall.
4   Q   Do you have access to the banking records that
5 would indicate whether or not a payment was issued to
6 Optimum Construction?
7   A   Do I have access to my bank account?  If I --
8   Q   Yeah.
9   A   -- if I review, I can -- if I review the
10 record, I can find out.
11  Q   In reviewing the discovery requests in this
12 case, did you ever review your banking records to
13 determine whether or not any payments were issued to
14 Optimum Construction as it relates to --
15  A   I did not.
16  Q   What is Go Pro's relationship with Raouf
17 Elrahimy?
18  A   He's my father.
19  Q   Last week, we conducted a deposition of
20 Priscilla Winters, and during the course of her
21 deposition, she stated that Mr. Raouf Elrahimy assisted
22 in a consultant role as it related to preparing the bid

Page 24

1 for the Latvian Embassy project.  Is that correct?
2       MR. BARNES: Is it correct that she stated that?
3   Q   Is it correct that Mr. Raouf Elrahimy assisted
4 Go Pro as a consultant in preparing --
5   A   Is that based on what Priscilla said or are you
6 asking me -- I'm not sure if I understand.
7   Q   Testifying on behalf of Go Pro, did Mr. Raouf
8 Elrahimy assist Go Pro in preparing the proposal for the
9 Latvian Embassy project?
10  A   Yes.
11  Q   And how did he assist in preparing the
12 proposal?
13  A   I don't recall.
14  Q   Did he review the bid documents that were
15 provided by the Embassy?
16  A   Yes.
17  Q   Did he prepare any cost estimations as it
18 related to the project?
19  A   I'm -- actually, I'm not sure.  I can't speak
20 for him.
21  Q   Have you had any conversations with your father
22 regarding what he did or did not do in assisting with

25

1 preparing the bid proposal?
2  A  A specific question, no.
3  Q  How many times in the seven to eight years that
4 Go Pro has been in business has Go Pro prepared bid
5 proposals for construction-related projects?
6  A  I don't recall.
7  Q  Do you have an estimated number of times?
8  A  How -- last what?  Seven years you said?
9  Q  In the existence of Go Pro.
10  A  How many contracts we have done?
11  Q  That specifically bid proposals.  So receiving
12 a letter of invitation to bid and bidding on that
13 project?
14  A  In the last seven years?
15  Q  Correct.
16  A  I don't know.  More 300.
17  Q  More than 300?
18     And when preparing a bid proposal, can you walk
19 me through that process, what it entails?
20  A  Can you be more specific.  I --
21  Q  Do you review the bid documents provided with
22 the letter of invitation to ver bid?

26

1  A  Depends on the project.  If we have estimators
2 and --
3  Q  How does Go Pro determine ultimately the cost
4 attributed to the bid proposal?
5  A  Every job is different.
6  Q  Do you make a determination how much it will
7 cost you versus how much you want to be paid?
8  A  Can you -- I don't understand the question.
9  Q  Let's say you want to bid on a project, and
10 your bid proposal says we'll do the work for $1.5
11 million.  Just a hypothetical.  Am I correct in assuming
12 that Go Pro does has not calculated that their cost to
13 complete the work will also be $1.5 million?  I'm
14 assuming that there's profit and overhead included in
15 the determination of the bid proposal amount?
16  A  In all honesty, I'm not sure I understand your
17 question.
18  Q  When entering into an agreement for a
19 construction-related project, does Go Pro try to make a
20 profit on their jobs?
21  A  Of course, yes.
22  Q  How do you go about trying to ensure that you

27

1 make a profit?
2  A  There would be the means and method of
3 estimating the project.
4  Q  Did you complete any estimating activities as
5 it relates to the Latvian Embassy project?
6  A  Yes.
7  Q  What estimating activities?
8  A  I don't recall.
9  Q  Did you prepare any sort of cost valuation
10 reports?
11  A  Can you be more specific.  Before, after,
12 during?
13  Q  Before.  In preparing the bid proposal, dd you
14 calculate this is the number of man hours we'll need,
15 this is the cost of equipment, materials, things to that
16 nature to --
17  A  I don't recall.
18  Q  If you were to put together a cost estimation
19 documentation, would that be maintained through an Excel
20 sheet, online database, how would Go Pro typically --
21  A  Some documents are Word documents.  So it
22 depends on the project.  Every project is a specific and

28

1 unique.
2  Q  Did Go Pro undergo any sort of review or
3 inspection of their records to determine whether or not
4 any such documentation existed as it relates to the
5 Latvian Embassy project?
6  A  I don't recall.
7  Q  How does Go Pro typically pay its employees?
8  A  Can you be more specific.
9  Q  Does Go Pro pay its employees through direct
10 deposit?
11  A  No.
12  Q  Does Go Pro pay its employees through checks?
13  A  Yes.
14  Q  Were these checks drawn from the same bank
15 account that we previously discussed relating to
16 payments made to subcontractors?
17  A  Not necessarily.
18  Q  So it's possible Go Pro maintains two separate
19 bank accounts; one for payroll and one for paying
20 subcontractors?
21  A  Yes.
22  Q  How about purchasing equipment and materials

Page 29

1  for a project, how does purchases typically take place?
2  Is it drawn on a bank account, credit card?
3      A   It depends.
4      Q   Does Go Pro document purchases made for
5  equipment or materials on projects?
6      A   Document?  Can you elaborate.
7      Q   Do you keep receipt -- do you keep receipts?
8      A   Yes.
9      Q   And how are those receipts maintained?  Where
10 do you keep the receipts after purchase?
11     A   It's specific to each project.
12     Q   For the Latvian Embassy project, how were
13 receipts maintained?
14     A   I don't recall.
15     Q   Has Go Pro inspected its records to try to
16 identify any receipts for purchases, equipment, or
17 materials for the Latvian Embassy project?
18     A   I don't recall.
19     Q   Who at Go Pro underwent the inspection for
20 documents in this case?
21     A   I don't recall.
22     Q   Does Go Pro Construction have any sort of

Page 30

1  retention policy relating to documents for construction
2  projects?
3      A   Can you elaborate on that question.
4      Q   Some companies have retention policies that say
5  they will not dispose of documents for three years,
6  let's say.  Does Go Pro have any similar policy relating
7  to the maintaining documents?
8      A   I'm not sure of that question.
9      Q   You are the owner of Go Pro, correct?
10     A   Correct.
11     Q   Do you have some decisionmaking powers in
12 determining whether or not a retention policy exists?
13     A   You said that some companies have a retention
14 policy, and I said I'm not aware of that policy.
15     Q   Are you aware that Go Pro has one?
16     A   No.
17     Q   Go Pro does not have one?
18     A   It -- the answer to that question is no.
19     Q   Does Go Pro prepare financial statements
20 annually?
21     A   No.
22     Q   In the seven to eight years that you estimated

Page 31

1  Go Pro has been in existence, has Go Pro ever prepared a
2  said a financial statement?
3      A   I don't recall.
4      Q   Are you aware of whether or not Go Pro has ever
5  been audited or reviewed by any --
6      A   Not that I recall.
7      Q   -- tax authority.
8          Does Go Pro have an accountant?
9      A   Yes.
10     Q   Who is your accountant?
11     A   Name or business name or --
12     Q   Both.
13     A   It's Fadi, F-A-D-I, Salah.  And his company is
14 -- I don't recall the name of his company.
15     Q   And where is he located?
16     A   I'm not sure.
17     Q   How long has he served as Go Pro's accountant?
18     A   I don't recall right now.
19     Q   Was he the accountant for Go Pro at the time of
20 the Latvian Embassy project?
21     A   I don't recall.
22     Q   Do you have any estimated timeline for how long

Page 32

1  he has served as your accountant?
2      A   If I were to take a guess, it would be three to
3  four years.
4      Q   In serving as your accountant, have you ever
5  provided him with any financial information to assist in
6  his accounting services?
7      A   Yes.
8      Q   And what documentation have you provided him?
9      A   Can you be more specific.
10     Q   You stated you provide him certain financial
11 information.  I'm asking what you provide him?
12     A   Bank account.
13     Q   Just bank account information?
14     A   Yes.
15     Q   Does that include bank statements?
16     A   Yes.
17     Q   And how often do you provide him with these
18 bank statements?
19     A   He has access to the bank account.
20     Q   Are you aware of whether or not he's prepared
21 any financial statements on behalf of Go Pro?
22     A   I'm not.

**Page 45**

1 your assumption.
2  Q  I'm asking -- this is Go Pro's document.
3  A  Yes.
4  Q  What did Go Pro mean by the Payment Terms?
5  A  So demo stage, as I said, I don't recall
6 preparing this, but the demo stage doesn't have the
7 word, Start, next to it. So this would mean that once
8 the demo was completed, we would receive a payment.
9  Q  Okay. And then, turning to the Price, it says,
10 Total price from all work including labor and materials
11 from the original Scope of Work for the base bid,
12 $1,150,000. Do you see that?
13  A  Yes.
14  Q  Do you recall how Go Pro reached that amount
15 for this Bid Proposal?
16  A  I don't.
17  Q  And you do not remember whether or not that
18 involved any sort of internal cost estimation prepared
19 by Go Pro?
20  A  I don't.
21  Q  Have there been instances where Go Pro has not
22 conducted any cost evaluation or estimation in preparing

**Page 46**

1 a bid proposal?
2  A  Can you be more specific with your question.
3  Q  Are there times where Go Pro simply comes up
4 with a number out of thin air without doing any sort of
5 review or calculation in preparing a bid proposal?
6  A  No.
7  Q  So there's always some sort of assessment or
8 evaluation taken into consideration in preparing the bid
9 proposal?
10  A  Yes.
11  Q  You have not reviewed or located any documents
12 as it relates to the Latvian Embassy Bid Proposal?
13  A  I believe my answer was I don't recall.
14  Q  But you have not looked for any documentation
15 as to any sort of cost assessment or cost valuation in
16 preparing the Bid Proposal?
17  A  I don't recall.
18  Q  It's my understanding in reviewing complaint
19 filed by Go Pro that there was a dispute over the Scope
20 of Work under the Contract for the Latvian Embassy
21 project, correct?
22  A  Is that correct that this is your

**Page 47**

1 understanding?
2  Q  That what Go Pro contends in its complaint?
3  A  Can you repeat that question.
4  Q  Does Go Pro contend that there was a dispute
5 over the Scope of Work related to the Latvian --
6  A  What does contend mean?
7  Q  Allege, assert, argue. Is it your position
8 there was a dispute?
9  A  Regarding the Scope of Work?
10  Q  Correct.
11  A  I'm not sure I understand the question. Can
12 you repeat.
13  Q  Was VNI's position that the Scope of Work under
14 the Contract was broader and included more work than Go
15 Pro believed it included?
16  A  I cannot speak for VNI's position. I don't
17 know.
18  Q  Did you ever have any conversations with VNI as
19 it relates to the Scope of Work?
20  A  Can you be specific. Who is VNI?
21  Q  The company that hired Go Pro to complete the
22 construction.

**Page 48**

1  A  But to be specific to that person that I spoke
2 to or --
3  Q  Individuals at VNI would have included Rihards
4 Nikiforovs or Marcis -- Marcis Grivins.
5  A  The only person I met on site is Marcus.
6  Q  Okay.
7  A  Yes.
8  Q  Separate and apart from meetings in-person,
9 were there any communications ever regarding the Scope
10 of Work that took place via email?
11  A  I don't recall.
12  Q  Showing you what's been marked Go Pro number 5.
13 It's a copy of the Complaint that was filed by Go Pro
14 Construction in the United States District Court for the
15 District of Columbia on June 8th, 2022.
16      (Go Pro Exhibit 5, Complaint, was marked for
17 identification, and is retained by counsel.)
18  Q  Do you recognize this document?
19  A  Yes.
20  Q  I want to turn your attention to paragraph
21 number 14. It's on the third page -- fourth page. It
22 states, Go Pro pointed out to VNI that the agreement

Page 65

1 A Yes.
2 Q And then, it says, If the Owner and Contractor
3 cannot agree to a change in the Contract sum, the Owner
4 shall pay the Contractor its actual costs plus
5 reasonable overhead and profits.
6     You see that?
7 A Yes.
8 Q Any discussion over the dispute over the Scope
9 of Work for this agreement. Was there ever any
10 discussion with VNI regarding any change orders in the
11 Scope of Work?
12 A I don't recall.
13 Q Do you recall whether or not Go Pro ever
14 prepared any change orders related to the Scope of Work?
15 A I don't recall.
16 Q In other construction projects that Go Pro has
17 been involved in, has Go Pro prepared change orders?
18 A Yes.
19 Q Has Go Pro typically maintained documentation
20 related to those change orders?
21 A Yes.
22 Q Have you reviewed Go Pro's documents to

Page 66

1 identify whether or not any change orders exist as it
2 relates to the Latvian Embassy project?
3 A I haven't.
4 Q Can you walk me through Go Pro's process for
5 identifying documents in response to the request for
6 documents?
7 A Can you be more specific.
8 Q During the litigation in this case, Go Pro was
9 served with Request for Production of Documents. I'm
10 handing you what's been marked Go Pro number 10.
11     (Go Pro Exhibit 10, Response to Request for
12 Production of Documents, was marked for identification,
13 and is retained by counsel.)
14 Q Go Pro number 10 is titled Response to Request
15 for Production of Documents. These were responses
16 provided by Go Pro Construction in response to VNI's
17 Request for Production of Documents. Have you reviewed
18 this document previously?
19 A Yes.
20 Q I want to turn your attention to Request number
21 10 on page 3. Request number 10 states, All change
22 proposals, request for equitable adjustment and/or claim

Page 67

1 submitted by you to the Defendant, and all change laws
2 maintained by you in connection with the project and
3 concern or related to the work performed by you.
4     Do you recall Go Pro reviewing its documents to
5 identify whether any such documents exist?
6 A I don't.
7 Q Turning your attention to Request number 18 on
8 page 5. It says, All internal costs estimates take-offs
9 bid worksheets, bid summaries, bid papers and pricing
10 documents provide -- prepared by or for you concerning
11 the project.
12     Did Go Pro review its records to in an attempt
13 to identify any internal costs estimates take-offs, bid
14 worksheets, bid papers and pricing documents?
15 A Go Pro or me?
16 Q Go Pro.
17 A I don't recall.
18 Q You do understand that you're here to testify
19 on behalf of Go Pro today, correct?
20 A Yes.
21 Q During the course of this litigation, Go Pro
22 has produced an estimated 240 pages of responsive

Page 68

1 documents. Did you participate in gathering those
2 documents for production?
3 A I don't recall
4 Q Do you recall sending your attorney documents
5 relating to this project?
6 A Yes.
7 Q Do you recall, do you know if anyone else at Go
8 Pro was involved in providing documents to Mr. Barnes?
9 A I don't recall.
10 Q Turning your attention to Request number 24.
11 It says you --
12 A Which page are you referring to?
13 Q Go to page 10. Your yearly audited financial
14 statement for 2021 and 2022, including all appendices,
15 exhibits, notes and accountant's letters.
16     Would your accountant have access to any
17 financial statements for 2021 or 2022?
18 A I don't know.
19 Q Did Go Pro file taxes in 2021?
20 A Yes.
21 Q Did Go Pro file taxes in 2022?
22 A We have an extension.

### 137

1  Q  Okay. Do you know the names of the employees
2  of Go Pro?
3  A  I don't.
4  Q  Maintain site, would that be Go Pro employees?
5  A  Yes.
6  Q  Would that also include Optimum?
7  A  No, all the laborers work for.
8  Q  So Install temporary handrails, that would be
9  Go Pro?
10  A  Yes.
11  Q  Items 4 through 7 under General, would each of
12  those -- I guess items 4 through 6, would that be Go
13  Pro?
14  A  Maybe Optimum.
15  Q  In regards to the items 1 through 3, Remove
16  debris, maintain site, install temporary handrails, you
17  stated that Go Pro laborers performed that work?
18  A  Yes.
19  Q  Did Go Pro laborers that worked on those three
20  items, did they maintain their time in any way, keep
21  their time, timecards?
22  A  Yeah, they would usually clock in or report the

### 138

1  hours to Cindy at the office.
2  Q  How would they quote, unquote, Clock in?
3  A  TimeStation with use their phone.
4  Q  Is that an app?
5  A  Yes. Or -- or if they are working under a crew
6  leader, he would report their hours.
7  Q  Do you know the names of any crew leaders for
8  the Latvian Embassy project?
9  A  Angel Reyes, Gabriel Flores.
10  Q  What was the last name?
11  A  Flores. F-L-O-R-E-S. That would be to the
12  best of my recollection right now.
13  Q  And are Angel Reyes and Gabriel Flores
14  employees?  Were they employees of Go Pro at the time of
15  this Latvian Embassy project?
16  A  Yes.
17  Q  Were they hourly or salaried employee?
18  A  Hourly.
19  Q  So they were paid in part based on the time
20  they spent on the Latvian Embassy project?
21  A  Yes.
22  Q  Do you have access to their timesheets or time

### 139

1  records as it relates to the Latvian Embassy project?
2  A  I would have to check, look into that.
3       MR. GILREATH: Counsel, I --
4  A  Is that --
5       MR. GILREATH: -- request copies of the --
6  A  -- yeah, I don't know if the clock-in or outs
7  differentiates where they clocked in or out.
8       MR. BARNES: Yeah, I'll look for it. My
9  recollection is that there is nothing but --
10      MR. GILREATH: Okay.
11      MR. BARNES: -- we will make another look at it.
12  Q  Turning to the Exterior portion 1, 2, 3 and 4,
13  were those items completed by Go Pro employees?
14  A  Yes.
15  Q  All four?
16  A  Yes.
17  Q  Did Optimum have any involvement in any of
18  those four items?
19  A  Labor?  Is that -- you're asking in terms of
20  labor or --
21  Q  In terms of power wash interior.
22  A  Okay.  In terms of the -- of the labor and the

### 140

1  construction, no.
2  Q  So Optimum provided no labor --
3  A  No laborers --
4  Q  -- for this project?
5  A  -- yeah, no labor for that project.
6  Q  All labor was provided by Go Pro?
7  A  By -- that's correct, yes.
8  Q  Who did Angel Reyes and Gabriel Flores report
9  to?
10  A  Go Pro.
11  Q  They didn't report in any way to anyone from
12  Optimum?
13  A  No.
14  Q  Did they report to your father?
15  A  When you say report, can you elaborate on that?
16     If he calls them, they would answer. If he
17  gives them an order, they would, you know.
18  Q  So your father had authority to instruct Go Pro
19  employees to do some work?
20  A  He did but he never did it. It was always
21  through someone. Either me or someone at the office.
22  Q  Looking at the Basement, 1 through 6, was that

141

1 work that was all completed by Go Pro laborers?
2  A  Yes.
3  Q  Did Optimum have any involvement in any of the
4 laborers associated with 1 through 6 on the basement?
5  A  No.
6  Q  First floor, 1 through 15 on the second page.
7 Was this all work that was completed by Go Pro laborers?
8  A  Yes.
9  Q  Did Optimum have any involvement in any of the
10 laborers associated with 1 through 15?
11  A  No. Mark Armstrong with from Optimum would
12 sometime come to the project to manage, but not to -- to
13 do construction.
14  Q  When you say manage, oversee the laborers as
15 they completed certain work?
16  A  Yes.
17  Q  The second page, First floor change order work,
18 1 through 5, was that work that was completed by Go Pro
19 laborers?
20  A  Yes.
21  Q  When it says, Change order work, was that a
22 change order submitted by Go Pro to VNI or from VNI to

142

1 Go Pro?
2  A  I'm not exactly sure, but I would say that this
3 work was not included in our Scope of Work, but we still
4 did it anyways because we were in the middle of the
5 joist supports and it had to be done immediately. So
6 just for the document, it's identified as a change
7 order, but I do not believe we submitted any change
8 orders to do work at the Latvian Embassy.
9  Q  On the second floor, items 1 through 11, is
10 that work that was completed by Go Pro laborers?
11  A  Yes.
12  Q  Third floor, 1 through 8, was that work that
13 was completed by Go Pro laborers?
14  A  Yes.
15  Q  For the items from General on the first page,
16 through the items listed on the third floor, 1 through
17 8, it seems to include the removal and installation of
18 certain materials. Did Go Pro maintain records relating
19 to the purchase or acquisition of any of the materials
20 installed as listed on this document?
21  A  Yeah, we keep record of all the materials
22 purchased?

143

1  Q  And were these materials purchased by Go Pro?
2  A  Yes.
3  Q  And these would have been purchased from using
4 the money in one of the two Capital One accounts?
5  A  Not necessarily.
6  Q  How else would they have been purchased?
7  A  Some items would go on a company credit card
8 and --
9  Q  Okay.
10  A  -- after that, the credit card would be paid.
11  Q  Do you recall the name of the credit card
12 company utilized during the Latvian Embassy?
13  A  American Express. I wouldn't know if that was
14 used for the Latvian Embassy, but typically we use
15 American Express for all our purchases and paid then.
16  Q  So if a credit were -- would have been used, it
17 would have been the American Express credit card?
18  A  Yes.
19  Q  And then, the balance of the American Express
20 card would have been paid off from the Capital One --
21 the two Capital One accounts?
22  A  Correct.

144

1  Q  Under General, number 7 on the first page, it
2 says, No work contracted for the fabrication of wooden
3 elements.
4     MR. BARNES: Where is that, Counsel?
5     MR. GILREATH: The first page under General
6 number 7. It says, No work contracted for fabrication
7 of wooden elements.
8  Q  Do you see that?
9     MR. BARNES: Okay. Yeah. Bates labeled 253?
10     MR. GILREATH: Yes.
11  Q  Who was the millwork contracted to?
12  A  I don't recall that off the top of my head.
13  Q  Would it have been to Optimum or another third
14 party?
15  A  This one, probably, yes, third party.
16     Millwork is wood, lumber.
17  Q  Was there a physical written contract relating
18 to the millwork?
19  A  Not that I recall.
20  Q  Did Go Pro ever make any payments related to
21 the millwork that it contracted with third party?
22  A  I wouldn't know that either.

145

1 Q On the second page, Plaintiff's Document
2 Production 254, the very bottom under Mechanical. It
3 says, number 1, Hired mechanical subcontractor. Who was
4 the subcontractor hired?
5 **A That was managed through Optimum Construction,**
6 **so I wouldn't per se know exactly who the subcontractor**
7 **for this was.**
8 Q Do you know whether Optimum entered a contract
9 with this mechanical subcontractor?
10 **A I don't.**
11 Q Do you know whether Optimum ever paid the
12 mechanical subcontractor?
13 **A I don't.**
14 Q And you previously stated that you've never
15 paid Optimum for any of the work on the project; is that
16 correct?
17 **A I might have said I don't recall that. I don't**
18 **think I said I didn't, but that I did not recall that.**
19 Q But any payment to Optimum would likely be
20 reflected on one of two bank accounts through Capital
21 One?
22 **A I believe so.**

146

1 Q Number 3, under Mechanical, the very bottom
2 says, Order associated rough-end materials.
3 **A Yes.**
4 Q What materials does that include?
5 **A I'm not sure. But it would probably be HVAC**
6 **material.**
7 Q And is that similar to the documentation that
8 you stated may exist as the other items in terms of
9 maintaining records, keeping receipts, payments for
10 those materials either through --
11 **A No, this would be in -- in documents in**
12 **Optimum. So Optimum's document, not Go Pro.**
13 Q So Optimum would have ordered the rough-end
14 materials?
15 **A No, so this would probably be through the**
16 **subcontractor. Would be the one placing the orders?**
17 Q Do you know if the subcontractor paid for these
18 rough-end materials?
19 **A I'm not sure.**
20 Q And you never paid the subcontractor for any
21 purchases of these materials?
22 **A Not that I recall.**

147

1 Q Turn to the third page, Plaintiff's Document
2 Production 255. Under Electrical, it says, Hired
3 electrical subcontractor. Do you know the name of the
4 electrical subcontractor hired?
5 **A So that was again managed by Optimum**
6 **Construction. I don't know.**
7 Q So you're not aware of whether or not there was
8 a contract between the electrical subcontractor and
9 Optimum?
10 **A Not -- I'm not aware, no.**
11 Q You're not aware of whether or not any payments
12 were made to the electrical subcontractor?
13 **A Correct.**
14 Q Do your answers from the mechanical portion
15 number 3 related to the rough-end materials apply to the
16 electrical materials as well?
17 **A Yes.**
18 Q So a subcontractor would have ordered any of
19 those materials, paid for those materials themselves?
20 **A Correct.**
21 Q And you're not aware of whether or not Optimum
22 recouped those costs by paying the subcontractor?

148

1 **A I'm not aware.**
2 Q For plumbing, I'm assuming it's the same
3 answers, but I'll go through it.
4 Hired pluming subcontractor, would that have
5 been the subcontractor hired by Optimum?
6 **A Correct.**
7 Q Are you aware of any contract between Optimum
8 and the pluming subcontractor?
9 **A I'm not.**
10 Q Ordered associated rough-end materials, those
11 materials would have been purchased and ordered by the
12 plumbing subcontractor ?
13 **A Correct.**
14 Q And you're unaware of whether or not Optimum
15 paid the subcontractor for those materials?
16 **A Correct.**
17 Q Landscaping, hired landscaping contractor
18 number 1, same thing; Optimum would have hired the
19 landscaping contractor?
20 **A Yes.**
21 Q Are you aware of any Contract between Optimum
22 and the landscaping contractor?

161

1 Engineering and Drafting, Dayton Electrical Contracting,
2 Inc., 416 Mechanical Plumbing, and Powerlift Dumbwaiters
3 Corporation.
4      Did you provide this information for the
5 Answers to Interrogatories?
6   A  Yes.
7   Q  It states, however, that only Optimum
8 Construction performed work on the project; is that
9 correct?
10  A  Where is that?
11  Q  The second sentence of Answer to Interrogatory
12 number 18.
13  A  Yes.
14  Q  It also states that the following suppliers are
15 expected to supply equipment materials for the project:
16 TW Perry/LePage Millwork, Home Depot, Lowe's, and
17 equipment from Rental -- Rentals Unlimited. Do you see
18 that?
19  A  Yes.
20  Q  Were there any supplies, equipment, and
21 materials that were ultimately purchased and/or rented
22 from any of those suppliers as listed in the Answer to

162

1 Interrogatory number 18?
2   A  Yes.
3   Q  And from which of those suppliers it was?
4   A  TW Perry, Home Depot, Lowe's, Rental Unlimited.
5   Q  So what was supplied by TW Perry/LePage
6 Millwork?
7   A  I don't recall that.
8   Q  Do you recall what was supplied by Home Depot?
9   A  No, I don't.
10  Q  Do you recall what was supplied by Lowe's?
11  A  I don't.
12  Q  Do you recall what equipment was supplied by
13 Rentals Unlimited?
14  A  I don't, but I believe it was pertaining to the
15 exterior power washing and --
16     TW Perry, most likely lumber and materials.
17  Q  For TW Perry/LePage Millwork, was that lumber
18 material purchased by Go Pro?
19  A  Yes.
20  Q  And the materials --
21  A  Actually, I take that back. It was either by
22 Go Pro or Optimum. I don't recall.

163

1   Q  As for the materials supplied by Home Depot,
2 was that purchased by Go Pro or Optimum?
3   A  I -- it's hard to tell also. Either Go Pro or
4 Optimum.
5   Q  What about the equipment and materials supplied
6 by Lowe's?
7   A  Same answer, I don't know.
8   Q  Okay. And the exterior power wash and
9 materials from Rentals Unlimited, was that --
10  A  Yeah, same answer, I don't recall.
11  Q  As it relates to Go Pro, you have not been able
12 to locate any receipts relating to any equipment or
13 materials supplied by any four of those --
14  A  That is correct --
15  Q  -- entities?
16  A  -- yeah.
17  Q  Were there ever any payments issued to the
18 subcontractors listed in number 2, by Go Pro?
19  A  I know J Silcox was paid, but I'm not sure if
20 the others.
21  Q  What was J.H. Silcox paid for?
22  A  Engineering evaluation services.

164

1   Q  Do you recall how much they were paid?
2   A  I don't.
3   Q  Do you recall who paid them?
4   A  I want to say Go Pro. Yeah, I'd have to double
5 check my records.
6   Q  I believe I previously marked as Exhibit -- Go
7 Pro Exhibit number 10 Go Pro's Responses to Production
8 of Documents.
9   A  Yes.
10  Q  I'm going to turn your attention to Request
11 number 25 on page 6. It states, All documents that
12 constitute referral relate or pertains to the number of
13 man hours extended by you in the calculations of the
14 average monthly man hours necessary for the construction
15 of the project.
16     You previously stated that Go Pro laborers
17 maintain their time through TimeStation or provided it
18 to one of the crew leaders; is that correct?
19  A  Yes.
20  Q  In scheduling Go Pro laborers to participate in
21 the project, were there any work schedules prepared by
22 Go Pro as it relates to assigning laborers certain days,

165

1 certain hours on the project?
2 A Can you rephrase that question.
3 Q Did Go Pro prepare work schedules for their
4 laborers so they knew when to show up to the site, how
5 long they were --
6 A Yes.
7 Q -- expected to work?
8 And how were those prepared? Were they
9 monthly, weekly?
10 A Weekly.
11 Q And who were they prepared by?
12 A For that specific project, it would be a
13 combination. Me, Mr. Raouf, my father, and Paul Duenas.
14 Q Are you aware if Go Pro has retained the Work
15 Schedule prepared as it relates to the Latvian Embassy
16 project?
17 A Sorry?
18 Q Are you aware of whether or not Go Pro has
19 retained copies of the work schedules that were prepared
20 for the Latvian Embassy project?
21 A I don't think we have records of that.
22 Q You previously stated that the actual timecards

166

1 or time entries for laborers, you're unaware if you have
2 access to that information as well, correct?
3 A I don't think I said that. I said when you
4 asked me if I have access to TimeStation, I said yes, I
5 have.
6 Q So you have the ability to go back into
7 TimeStation to see if you can --
8 A I don't know how far back it goes. I don't
9 think it goes back that.
10 MR. BARNES: I think he also said he wasn't sure
11 if it would have been allocated by the project.
12 MR. GILREATH: By the project.
13 THE WITNESS: Yeah.
14 Q Did laborers vary from project to project
15 during a project? For example, while the Latvian
16 Embassy project was going on, would a laborer one day be
17 at the Latvian Embassy and the next day go to another
18 project before coming back to the Latvian Embassy
19 project?
20 A Typically, the same crew would be working. We
21 may increase the labor as needed, or decrease it
22 depending on that day specific amount of work.

167

1 Q Do you have any idea how many laborers per day
2 were typically at the Latvian Embassy project?
3 A I wasn't involved in the day-to-day operation,
4 but say maybe ten.
5 Q Ten?
6 In request number 26, it says, All documents
7 that constitute, refer, relate or pertain to your
8 payroll journals for the project.
9 Does Go Pro maintain payroll information for
10 its employees?
11 A Yes.
12 Q Did Go Pro maintain payroll information the
13 time of the Latvian Embassy project?
14 A I'm not sure.
15 Q How does Go Pro maintain its payroll
16 information?
17 A With the accountant.
18 Q Through the accountant?
19 A Yes.
20 Q Have you requested any information sought in
21 these document requests from the accountant --
22 A No.

168

1 Q -- to date?
2 Has Go Pro ever paid Optimum Construction to
3 assist on any of its construction-related projects?
4 A Not that I recall.
5 Q Are you aware that Optimum Construction
6 recently has filed for bankruptcy?
7 A Yes.
8 Q Is Go Pro listed as either a creditor or debtor
9 in Optimum Construction's bankruptcy filing?
10 A I believe so, yes.
11 Q Is it listed as a creditor?
12 A Yes. Creditor means I'm asking them for money?
13 Q Correct.
14 A Yeah.
15 Q What does Optimum Construction owe to Go Pro?
16 A Sorry?
17 Q What amount of money does Optimum owe to Go
18 Pro?
19 A I'd have to look through my records.
20 Q Does Optimum owe Go Pro any money as it relates
21 to the Latvian Embassy project?
22 A I'd have to -- probably, yes, but I would have