Exhibit A



# Transcript of Sameh Elrahimy

**Date:** January 29, 2024
**Case:** Go Pro Construction, LLC -v- Ipasumi

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3    ----------------------------x
4   GO PRO CONSTRUCTION, LLC,    :
5                 Plaintiff,  :
6       v.            : Civil Action No.:
7   VALSTS NEKUSTAMIE IPASUMI,   : 1-22-CV-01643-RCL
8               Defendant. :
9    ----------------------------x
10         Deposition of SAMEH ELRAHIMY
11            Conducted Virtually
12         Monday, January 29, 2024
13               2:31 p.m. EST
14
15
16
17
18
19
20  Job No.:  523435
21  Pages:  1 - 94
22  Reported by:  Stephanie L. Hummon, RPR
```

**Page 2**

```
1        Deposition of SAMEH ELRAHIMY, conducted
2   virtually.
3
4
5
6
7
8
9
10
11
12
13
14
15
16        Pursuant to Notice, before
17  Stephanie L. Hummon, Registered Professional
18  Reporter and Notary Public of the State of
19  Maryland.
20
21
22
```

**Page 3**

```
1             A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF:
3        RODERICK BARNES, ESQUIRE
4        BARNES LAW, PA
5        417 Dumbarton Road
6        Baltimore, Maryland 21202
7        (410)615-1911
8
9   ON BEHALF OF THE DEFENDANT:
10        ZACHARY S. GILREATH, ESQUIRE
11        BAKER, DONELSON, BEARMAN,
12        CALDWELL & BERKOWITZ, PC
13        100 Light Street
14        Suite 1900
15        Baltimore, Maryland 21202
16        (410)685-1120
17
18
19
20
21
22
```

**Page 4**

```
1              C O N T E N T S
2   EXAMINATION OF SAMEH ELRAHIMY          PAGE
3        By Mr. Gilreath                     5
4        By Mr. Barnes                      83
5        By Mr. Gilreath                    88
6        By Mr. Barnes                      94
7            E X H I B I T S
8        (Retained by counsel)
9   GO PRO DEPOSITION EXHIBITS
10  Exhibit 34  Optimum Construction, Inc.   20
11            records, 152 pages
12  Exhibit 35  Latvian Embassy Limited Scope   11
13            of Work (According with the Contract)
14  Exhibit 36  Spreadsheet - Letvian Embassy -  15
15            General Scope of Work Per Plans
16  Exhibit 39  Plaintiff's Supplemental Answers  75
17            to Interrogatories
18
19  P R E V I O U S L Y   M A R K E D   E X H I B I T
20   Exhibit 15 Work Progress Report #4        88
21
22
```

---

**5**

1    P R O C E E D I N G S

2  Whereupon,

3         SAMEH ELRAHIMY,

4  being first duly sworn or affirmed to testify to

5  the truth, the whole truth, and nothing but the

6  truth, was examined and testified as follows:

7     EXAMINATION BY COUNSEL FOR THE DEFENDANT

8  BY MR. GILREATH:

9     Q.   Mr. Elrahimy, nice to meet you again.

10        Before we get started, could you state

11  your name for the record, please.

12     A.   Yes.  Sameh Elrahimy.

13     Q.   So I've already introduced myself to you

14  in person.  My name's Zach Gilreath and I am

15  counsel for the defendant/counter-plaintiff in this

16  matter, Valsts Nekustamie Ipasumi, I'll refer to

17  them as VNI.

18        You were previously deposed on July 26,

19  2023, as a corporate designee for Go Pro

20  Construction; is that correct?

21     A.   Yes.

22     Q.   But you understand that you are here

---

**6**

1  today to testify in regard to Go Pro's additional

2  search efforts for responsive documents as set

3  forth in the court's August 21, 2023, court order;

4  is that correct?

5     A.   Yes.

6     Q.   Before we begin, I'm just going to go

7  through the ground rules that we went through the

8  first time.

9         I'm going to ask a question, please allow

10  me to finish my question before answering.  I'll do

11  my best not to talk over you, you do your best not

12  to talk over me.  It will make the court reporter's

13  job a lot easier.

14        Though I can see you today, everyone can

15  see you, try to avoid nonverbal responses.  If you

16  could state, yes, no, I don't know verbally, it

17  will be much appreciated.

18        If, at any point in time, you don't

19  understand one of my questions, would like me to

20  rephrase, please let me know and I'll do so.  If

21  you do answer a question, however, it will be

22  understood that you understood the question.

---

**7**

1        Do you have any questions for me before

2  we get started?

3     A.   No.

4     Q.   Okay.  Mr. Elrahimy, did you review the

5  court's August 21, 2023, court order, in regards to

6  VNI's motion to compel?

7     A.   Yes.

8     Q.   And you understood from that court order,

9  that Go Pro was to conduct an additional search for

10  documents responsive to VNI's Document Request 18,

11  23, 24, 25, 26, 27, and 30; is that correct?

12     A.   Yes.

13     Q.   And has Go Pro completed that additional

14  search as required by the court?

15     A.   Yes.

16     Q.   And who participated in that additional

17  search?

18     A.   Me and Cindy Conley, my assistant.

19     Q.   Cindy Conley's your assistant and an

20  employee of Go Pro?

21     A.   Yes.

22     Q.   Do you recall when the additional search

---

**8**

1  took place?

2     A.   I don't.

3     Q.   Did it take place over a series of days

4  or was it one day in particular?

5     A.   I would say two days, about a couple

6  weeks ago, or maybe a week ago.

7     Q.   And based on your review of Go Pro's

8  documents, do you now believe that Go Pro has

9  conducted a thorough and complete search of all

10  documents in its possession, custody, or control

11  responsive to the documents identified in the

12  court's August 21st order?

13     A.   Yes.

14     Q.   I'm going to try not to reiterate things

15  that we've previously talked about in your previous

16  deposition.  I'm going to focus predominantly on

17  the documents -- the additional documents that have

18  been produced in the search that took place after

19  August 21st.

20        The court order, as I previously stated,

21  stated that one of the requests for which Go Pro

22  was to conduct an additional search was Request

---

**9**

1  Number 18.  Request Number 18 requested all
2  internal cost estimates, takeoffs, bid worksheets,
3  bid summaries, bid papers, and pricing documents
4  prepared by or for Go Pro concerning the project.
5        And if you want me to pull up our
6  document request, so you can see it and read it, I
7  can do that.  Just for the sake of avoiding
8  exhibits as much as possible, I wasn't going to put
9  it on the screen, but if it would assist you, I can
10 do that.
11        But for Request Number 18, the cost
12 estimates, the takeoffs, what additional documents
13 did you identify in your search after August 21st
14 that were responsive to the request, if any?
15   **A.  I don't think there were any additional**
16 **documents.**
17   Q.  Can you detail your efforts to try to
18 find documents that were responsive to Request
19 Number 18 is.  Did that include searching through
20 an online file?  Hard copies of paperwork?  What
21 exactly did your search or Ms. Conley's search
22 entail?

**10**

1   **A.  Yeah.  So we've done search for all the**
2  **documents that we have in our possession that are**
3  **saved in our folders, drive, e-mail, receipts, and**
4  **submitted all that we have.**
5   Q.  And when you say, you've searched like
6  your -- any information of documentation on your
7  computer, how did you conduct that search?  Did you
8  go into individual files and look through
9  everything?  Did you conduct a search using search
10 terms?  How did that search take place?
11   **A.  Yeah.  I searched through e-mail, with**
12 **any name regarding to the Latvian Embassy or the**
13 **parties involved.  I've searched through our Google**
14 **Drive folder for any and all documents that we**
15 **have, and submitted everything that I have.**
16   Q.  During your previous deposition, you
17 testified that your father, Raouf Elrahimy, was
18 involved in the bid process and the contract
19 negotiation and execution; is that correct?
20   **A.  Yes.**
21   Q.  Did you speak with your father regarding
22 whether he had prepared any sort of internal cost

**11**

1  estimate, takeoff, bid worksheet, or pricing
2  documents, as it relates to the Latvian Embassy?
3   **A.  Yes.**
4   Q.  And did he tell you if he had anything in
5  his possession?
6   **A.  Everything that he also had was saved in**
7  **our Google Drive and that's -- I submitted whatever**
8  **I had in that Google Drive, we submitted that**
9  **paperwork.**
10   Q.  So as of today, to the best of your
11 knowledge, there is no cost estimate, takeoff, bid
12 worksheet, or pricing document that you found that
13 was prepared prior to execution of the contract?
14   **A.  Other than what I submitted, I don't have**
15 **anything else.**
16   Q.  So you say, other than you submitted.  I
17 haven't seen anything as it relates to an estimate,
18 a takeoff worksheet from prior to the contract.
19        MR. GILREATH:  Now, I can show you -- I'm
20 showing you what will be marked as Go Pro 35.
21        (Go Pro Exhibit 35 was marked for
22 identification and was retained by counsel.)

**12**

1        MR. GILREATH:  Madam Reporter, we used 30
2  exhibits during the initial deposition, so I'm
3  going to try to stay in line with the previous
4  marking of exhibits, continue forth with those.
5   Q.  Mr. Elrahimy, can you see what will be
6  marked as Go Pro Number 35?
7   **A.  Yes.**
8   Q.  It's titled, Latvian Embassy Limited
9  Scope of Work (According with the Contract)?
10   **A.  Yes.**
11   Q.  This is a document that was produced
12 subsequent to the court's August 21, 2023 order.
13 Do you recall when this document was prepared?
14   **A.  I don't.**
15   Q.  It's my understanding and discussions
16 with counsel that this was prepared during
17 litigation; is that correct?
18   **A.  I don't recall when it was prepared.**
19   Q.  So you couldn't say, one way or another,
20 whether or not this was prepared before or after Go
21 Pro filed a lawsuit?
22   **A.  I wouldn't be able to.**

13

1    Q.   Do you recall where you found this
2 document during your search?
3    **A.   This was on Google Drive.**
4    Q.   And does the Google Drive that you
5 reviewed provide date and time information of when
6 a document was either created or uploaded?
7    **A.   So any -- I'm not sure.  I'd have to go**
8 **back and check.  So, typically, any folder that is**
9 **saved, it would have a date and time, but also when**
10 **you open that folder, it renews the date as if the**
11 **document is saved that same date.  So if I have**
12 **something saved from a year ago and I go in and I**
13 **open it today, then it would renew the date to**
14 **today's date.**
15    So, typically, software services like
16 Google Drive will provide metadata which will
17 provide not only the last date it was modified,
18 which is what you're explaining, but also when
19 something was initially uploaded.  Have you
20 reviewed the metadata for this document on the
21 Google Drive?
22    **A.   I did not.**

14

1    Q.   Do you know if Ms. Conley had reviewed
2 the metadata for this document?
3    **A.   I don't believe she did.**
4    MR. BARNES:  Counsel, this is Barnes.
5 You accurately stated what I represented to you
6 about this document, and that's to the best of my
7 understanding also.  If you want us to go back and
8 look at metadata, I think it will confirm what I
9 told you.  I don't know if this witness knows how
10 to do that, but we certainly can make it available
11 to you in native format, if you want to do that,
12 just to check.
13    MR. GILREATH:  I would request the
14 metadata for both this and what I'll be marking as
15 Exhibit, I believe it will be 35.
16    MR. BARNES:  That one was 35.
17    MR. GILREATH:  36 then.  Can you see
18 this, a new document?
19    MR. BARNES:  Yep.
20    MR. GILREATH:  So I'll be marking this as
21 36.
22    MR. BARNES:  That's fine.  We'll do the

15

1 same.  One's a six-page document, one's a
2 three-page document.  We'll provide that to you,
3 but like I said to you, I think it was prepared, at
4 some point, after the document production was sent
5 to us originally.  Yeah.  I'm not sure this witness
6 actually prepared it, but --
7    (Go Pro Exhibit 36 was marked for
8 identification and was retained by counsel.)
9 BY MR. GILREATH:
10    Q.   Mr. Elrahimy, do you know who prepared
11 this document?
12    **A.   Mr. Raouf.**
13    Q.   You said Raouf.
14    **A.   Yeah, Mr. Raouf, my father.**
15    Q.   And so if I have questions about this,
16 would they he better directed towards your father?
17    **A.   Yes.**
18    Q.   Do you have any information regarding the
19 information that went in to preparing this
20 document?
21    **A.   Could you --**
22    Q.   Did you assist your father in any way in

16

1 preparing this document?
2    **A.   Yes, I worked with him on it.**
3    Q.   Can you explain how you worked with him.
4    **A.   Just the format and the Excel sheet**
5 **format.**
6    Q.   But as far as the information that's
7 included in the spreadsheet, that was information
8 that you did not participate in providing?
9    **A.   I did not provide it, he provided it, but**
10 **I did participate in the preparation of the**
11 **document.**
12    Q.   And then as far as Go Pro Number 36, the
13 Latvian Embassy General Scope of Work Per Plans,
14 was this document also prepared by your father?
15    **A.   Yes, I believe so.**
16    Q.   And other than formatting and assisting
17 him with the Excel program, did you provide any of
18 the substantive information provided in this
19 document?
20    **A.   Sorry, say that again.**
21    Q.   I said, other than helping him with
22 formatting and the Excel program itself, did you

17

1  provide him with any of the information included in
2  this document?
3      **A.  No.  He provided the cost amounts and the**
4  **dollar numbers, but I mean, I've seen the document.**
5  **I've reviewed it with him.**
6      Q.  You've previously spoken about having
7  conversation with your father about what
8  documentation he had in his possession and you
9  stated that everything he had, Go Pro had on its
10 own system; is that correct?
11     **A.  Yes.  He had some receipts and some other**
12 **items, paper, he brought into the office, we**
13 **scanned them, saved them to the Drive and submitted**
14 **them to you guys with all the documents that was**
15 **part of the documents we submitted.**
16     Q.  Do you have any information about whether
17 or not your father had any documentation that no
18 longer exists, either through accidentally being
19 deleted, thrown way, any documentation that existed
20 at the time of the project that no longer is in
21 either Go Pro's possession or Mr. Raouf's
22 possession?

18

1      **A.  I don't know.**
2      Q.  Court order also directed Go Pro to
3  conduct an additional search as it relates to
4  documents responsive to VNI Request Number 23.  VNI
5  Request Number 23 sought documents that, quote,
6  constitute, refer, or relate or pertain to actual
7  costs incurred by you in connection with the
8  project, including, but not limited to, a detailed
9  job cost report for the project and a journal
10 ledger for individual costs.
11     I have reviewed the supplemental document
12 production produced by Go Pro, and I have not
13 identified either a job cost report for the project
14 or a journal ledger for individual costs.
15     Were you able to locate either of those
16 types of documents?
17 **A.  No.**
18     Q.  Can you detail your efforts to locate
19 documents relating to actual costs incurred by Go
20 Pro.
21     **A.  Yeah.  At this point, I believe I**
22 **submitted everything that I have.**

19

1      Q.  I understand that.  I'm asking you the
2  process to identify documents.  I've got what you
3  produced.  I'm just trying to get a better
4  understanding of what you did to find things.
5      **A.  Just, yeah, I mean, that's everything we**
6  **have is in our Google Drive, and I submitted**
7  **every — I guess I'm not — maybe I'm not**
8  **understanding your question correctly.**
9      Q.  So during your deposition, you testified
10 that Go Pro maintained a bank account with Capital
11 One, I believe; is that correct?
12 **A.  Yes.**
13     Q.  And during your deposition, you had
14 stated that some payment would be made from that
15 Capital One account for supplies, materials,
16 payroll, other various costs associated with Go
17 Pro's works, not specifically the Latvian Embassy,
18 but Go Pro's work, construction work in general; is
19 that correct?
20 **A.  Yes.**
21     Q.  Did you, during your search, review Go
22 Pro's bank statements from the time the Latvian

20

1  Embassy project was ongoing to assess whether or
2  not any costs were incurred by Go Pro as it related
3  to the Latvian project?
4      **A.  I don't recall I've done that.**
5      MR. GILREATH:  Okay.  In Go Pro's
6  supplemental production it produced what I'm going
7  to mark as Go Pro Number 34.
8      (Go Pro Exhibit 34 was marked for
9  identification and was retained by counsel.)
10     Q.  Can you see Go Pro Number 34, titled,
11 Optimum Construction, Inc. that I'm showing you?
12 **A.  Yes.**
13     Q.  So this is a 152-page document that was
14 produced by your counsel subsequent to the
15 August 21st, 2023, court order.  It seems to me
16 that the first set of documents is payroll for
17 Optimum Construction; is that correct?  Pages 1
18 through 5, the first five pages of this document
19 set.
20 **A.  Yes.**
21     Q.  And Optimum Construction, Inc. is a
22 company that is owned and operated by your brother;

21

1  is that correct?
2     **A.  Yes.**
3     Q.  In looking at these documents, the
4  Optimum records specifically, are these -- is this
5  payroll information relating specifically to the
6  Latvian Embassy project?
7     **A.  I wouldn't say specifically to the**
8  **Latvian Embassy project.  It would be a mixture of.**
9     Q.  So this includes employees that were
10 involved in the Latvian Embassy project, but in
11 terms of the payroll information provided, it may
12 include employees who worked on the Latvian Embassy
13 project, but also other projects at the time?
14    **A.  Yes.**
15    Q.  So this wouldn't give us a complete and
16 accurate look at what time specifically was spent
17 by Optimum Construction employees on the Latvian
18 Embassy project specifically?
19    **A.  Is that a question to me or --**
20    Q.  Yes.  I'm asking you to confirm that, if
21 I were trying to assess how much time, hours, were
22 spent by Optimum Construction employees on the

22

1  Latvian Embassy project, I wouldn't be able to
2  assess that information from this document?
3     **A.  Correct.**
4     Q.  So this document includes payroll
5  information and gross totals and direct deposit
6  information for these employees.  Were these
7  employees paid by Optimum Construction or by Go
8  Pro?
9     **A.  Optimum.**
10    Q.  Did Go Pro ever reimburse or issue
11 payment to Optimum for use of its employees on the
12 Latvian Embassy project?
13    **A.  I believe that the main -- the main**
14 **payment came from -- to Latvian Embassy came in**
15 **to -- to Go Pro, then it was given to Mr. Raouf,**
16 **and Mr. Raouf paid for -- either paid Optimum or**
17 **paid directly to cover these costs for employees.**
18    Q.  So Go Pro issued a payment to
19 Raouf Elrahimy?
20    **A.  Correct.**
21    Q.  Do you recall what total amount was paid
22 to Raouf Elrahimy?

23

1     **A.  I don't.**
2     Q.  Do you recall how that payment was made?
3     **A.  I want to say it was online transfer, but**
4  **I would have to confirm.**
5     Q.  Would that payment be -- would that
6  payment show on Go Pro's bank account statements?
7     **A.  Yes.**
8     Q.  A little bit farther down this set of
9  documents, Go Pro Number 34, is a set of documents
10 beginning Bates number Plaintiff's Document
11 Production 267.  It looks like it's TimeStation
12 entries --
13    **A.  Yes.**
14    Q.  -- document.
15       Are these payroll -- are these time
16 entries for Go Pro employees or Optimum employees?
17    **A.  Could you scroll down a little bit more.**
18 **Yeah, just until we get to other names.**
19       **Yes, these would be Go Pro.**
20    Q.  So I scrolled down a little bit.  The
21 first few pages have names and then in parentheses,
22 Superior Contracting.  What is Superior

24

1  Contracting?
2     **A.  This is just how we label them, who they**
3  **work -- they work under.  It's one of our**
4  **subcontractors.**
5     Q.  Was Superior Contracting a subcontractor
6  for the Latvian Embassy project?
7     **A.  So they -- they are not a subcontractor.**
8  **They work directly for Go Pro, but they are labeled**
9  **as a subcontractor, yes, and they were part of the**
10 **Latvian Embassy work.**
11    Q.  So the individuals who are identified
12 with Superior Contracting next to their time
13 entries, was their time paid directly by Go Pro or
14 was it paid by Superior Contracting?
15    **A.  Their time was paid from Go Pro to**
16 **Superior Contracting, then Superior Contracting**
17 **paid them, but they are still employees that clock**
18 **in and out on daily basis for us to keep track of**
19 **their hours.**
20    Q.  But as far as the payments from Go Pro to
21 Superior Contracting, would those payments also be
22 reflected in Go Pro's bank account statements?

25

1    A.  Yes.
2         MR. BARNES:  You mean specifically for
3  this project or in general?
4    A.  I'm sorry?  In general.
5         MR. BARNES:  I'm asking Mr. Gilreath this
6  question, because it was vague enough.  I'm not
7  sure that these are all tied to this project, so --
8         MR. GILREATH:  I'll clarify that for the
9  record.
10        MR. BARNES:  Yeah, I don't want you to
11 leave with a false impression.
12 BY MR. GILREATH:
13    Q.  So we talked about the Optimum records
14 and how, while those employees were involved in the
15 Latvian Embassy project, the time entries may not
16 necessarily reflect the specific amount of time
17 spent on the Latvian Embassy, it could have
18 included other projects.  Are the records
19 maintained here by Go Pro similar in nature in the
20 fact that, for example, Alejandro entered 8 hours
21 of time on November 11th, 2021, it's possible he
22 spent some amount of time at Latvian Embassy

26

1  project and other time at another Go Pro project?
2    A.  Correct.
3    Q.  So it's -- you cannot ascertain from this
4  document what amount of time specifically was spent
5  on the Latvian Embassy project?
6    A.  I could, but it will take us some time to
7  prepare that.
8    Q.  When you paid Superior Contracting for
9  these employees' times, was payment made to
10 Superior Contracting per project, or was it a
11 monthly invoice generated by Superior Contracting?
12 How did Superior Contracting invoice you for time
13 spent by the --
14    A.  So they don't invoice us.  They clock in
15 daily, and every two weeks, they get a paycheck.
16 But instead of the paycheck coming out to every
17 individual person, we found it easier to have the
18 foreman have his own company, Superior Contracting,
19 and all the labor would be under him.
20    Q.  Did Go Pro undergo any sort of analysis
21 of these employees' time to determine how much was
22 spent on any specific project, or was everything

27

1  combined?
2    A.  Everything combined.
3    Q.  And likewise, for the individuals that
4  are identified without Superior Contracting, for
5  example, Angel Reyes Villegas, are these
6  specifically Go Pro employees?
7    A.  Yes.
8    Q.  And was their time kept as it
9  specifically related to a project, or was it also
10 bundled together and could have included work on
11 numerous projects on a given day?
12    A.  Correct, they could have included
13 different projects.
14    Q.  Did Go Pro maintain any sort of
15 accounting to determine how much labor, in terms of
16 man-hours was spent on the Latvian Embassy project?
17    A.  No, I haven't done -- done that.
18    Q.  So a little down, Go Pro Exhibit 34,
19 Bates Number Plaintiff's Document Production 383,
20 this looks like a customer receipt issued by
21 Home Depot; is that correct?
22    A.  Yes.

28

1    Q.  It states that the customer information
2  is Cindy Elrahimy, Go Pro Construction.  Am I
3  correct in my assumption that this was
4  Cindy Conley?
5    A.  Correct.
6    Q.  And is it Go Pro's position that this is
7  a customer receipt as it relates to materials used
8  on the Latvian Embassy project?
9    A.  Yes.
10    Q.  So this states that there was an order
11 total, 228.72, that was charged to American
12 Express, 3086.  Is that American Express card a
13 Go Pro account or was that Cindy Conley's
14 individual bank account?
15    A.  It's the Go Pro company card.
16    Q.  So in addition to the Capital One bank
17 account that you previously testified Go Pro used
18 to issue payments, they also maintained an
19 American Express credit card to make payments for
20 materials and supplies?
21    A.  Yes.
22    Q.  And have you reviewed your

29

1  American Express credit card statements to
2  ascertain payments related to the Latvian Embassy
3  project?
4      **A.  Yes.**
5      Q.  You have reviewed those bank statements?
6      **A.  Yes.**
7      Q.  And did those bank statements include
8  payments made for supplies and materials related to
9  the Latvian Embassy?
10     **A.  I would have to double-check because some**
11 **payments here are made, yeah, so...**
12         MR. GILREATH:  Mr. Barnes, I would
13 request that, in addition to the Capital One bank
14 accounts being reviewed, that the American Express
15 statements also be reviewed.
16         MR. BARNES:  Well, Counsel, I don't think
17 credit cards show what project, I think they just
18 show what the charges are, and this is the backup
19 for the charges that establish that it was this
20 project.  I think, just like your credit card, it's
21 not going to tell you what you were using the
22 expenditure for, it'll just tell you what amounts

30

1  went out and to what vendor, then you have to look
2  at stuff like this to see what project.
3         So I'm not sure what it is you're
4  actually looking for.  Are you looking for the
5  actual -- the statements for the American Express
6  and the Capital One cards during the period of time
7  that work was going on in this project?
8         MR. GILREATH:  If Mr. Elrahimy's going to
9  testify that he's reviewed those bank account
10 records and not been able to ascertain what those
11 payments relate to, that's fine.  But as he
12 previously testified, he hasn't looked at the
13 Capital One bank records yet to even make that
14 determination.  But he's testified that Raouf might
15 have been paid from that account or that employees
16 may have been paid from that account, that goes
17 directly to actual costs incurred by Go Pro for the
18 Latvian Embassy project, and I think are
19 discoverable and should be produced.
20         MR. BARNES:  So --
21         MR. GILREATH:  Or at the very least, the
22 information provided in an answer to interrogatory

31

1  so that we can discuss --
2         MR. BARNES:  Let me just make sure I have
3  this right.  So you want -- you don't want the
4  Capital One Bank -- or you want the Capital One
5  Bank account statements for the period of time when
6  work was going on, or payments were being made on
7  this project.  And then you would like the
8  American Express account statements for the same
9  period?
10         MR. GILREATH:  Specific -- if he is able
11 to ascertain from either set of those bank account
12 records what -- that it relates to the Latvian
13 Embassy project, I think it's discoverable and
14 should be produced, especially in light of the
15 court's August 21st order.
16         With that being said, the bank account
17 records show the same thing that the time entries
18 do, which is, here's a lump sum payment, but we
19 can't break it down per project, then it's not
20 going to do me any good, it's not going to do you
21 any good, it doesn't make sense.  But I'd like to
22 be at least be able to confirm, for example, the

32

1  time records show this is how much an employee
2  earned and should have been paid and subsequently,
3  they were paid that, because again, it's not an
4  actual cost until it's incurred by Go Pro and a lot
5  of these records show this is what's charged, but
6  I'd like confirmation that it was actually paid.
7         And the most important thing, I think, is
8  the payment to Mr. Raouf because during his first
9  deposition, I asked about who was paid, what they
10 were paid, and this is the first I'm hearing in our
11 conversations that Mr. Raouf was paid for his work,
12 separate and apart from --
13         MR. BARNES:  Okay.  Well, we'll take a
14 look and see what we can track down.  I mean, it
15 was my understanding that that wasn't the case, but
16 we'll go back and see and we'll verify that.  I
17 mean, I think it's a fair request.
18 BY MR. GILREATH:
19     Q.  Okay.  So, Mr. Elrahimy, turning your
20 attention to the court order also stating that
21 Go Pro was to conduct an additional search relating
22 to VNI's Document Request Number 24.  Document

33

1 Request Number 24 requested Go Pro's yearly audited
2 financial statement for 2021 and 2022, including
3 all appendices, exhibits, notes, and accountant's
4 letters.
5      In my review of the documents produced by
6 Go Pro today, I have not identified any financial
7 statement for Go Pro for either the year 2021 or
8 2022. Were you able to locate financial statements
9 for Go Pro for either of those years during your
10 search?
11 **A.  No.**
12    Q.   And when you conducted that search, what
13 did you do? How did you conduct that search? Was
14 that similar to the other searches, where you
15 looked on your computer, your hard copy paper,
16 where you couldn't find it, in fact?
17 **A.  I had Cindy Conley call our accountant,**
18 **Fadi Salah, and asked him, and he confirmed that we**
19 **did not have, obviously, the financial statements**
20 **for these years.**
21    Q.   When Ms. Conley contacted your
22 accountant, did she ask your accountant whether or

34

1 not any financial information had been provided
2 from Go Pro to your accountant in the calendar year
3 2021 or 2022?
4 **A.  Well, what do you mean any financial**
5 **information? I don't know — I don't understand**
6 **that question.**
7    Q.   So we've discussed the financial
8 information; actual cost reports, actual cost
9 incurred by Go Pro for the Latvian Embassy project.
10 You produced your man-hour payroll information.
11 You produced Home Depot receipts.
12      I'm asking, is there potentially anything
13 else that shows actual cost incurred by Go Pro in
14 2021 or 2022 relating to the Latvian Embassy
15 project that may have been given to your accountant
16 and not returned to Go Pro's possession?
17 **A.  The accountant is typically not involved**
18 **with the job breakdowns and — you know, so no.**
19    Q.   But would he have any information
20 relating to payments coming in and payments going
21 out on an annual basis?
22 **A.  Yes.**

35

1    Q.   So he may possess documentation that
2 relates to payments made either to or from Go Pro
3 and Optimum Construction or Raouf Elrahimy?
4 **A.  It would be the same information on the**
5 **bank statement.**
6    Q.   Okay. So there is no information that
7 your accountant may possess that Go Pro does not
8 also have access to?
9 **A.  Correct.**
10    Q.   The August 21st, 2023, court order also
11 directed Go Pro to conduct an additional search
12 relating to documents responsive to Request Number
13 25. Request Number 25 requested documents that
14 constitute, refer, relate, or pertain to the number
15 of man-hours expended by Go Pro and the calculation
16 of the average monthly man-hours necessary for the
17 construction of the project. We have your payroll
18 information.
19      Did Go Pro maintain any calculation of
20 the average monthly man-hours needed on the
21 Latvian Embassy project in particular?
22 **A.  Specific to the Latvian Embassy, I don't**

36

1 **have that information yet.**
2    Q.   When you say, yet, do you expect to come
3 into possession of that information?
4 **A.  No. We haven't closed the -- the**
5 **project. Typically, at end of every project, we**
6 **would close it out and we would have that**
7 **information, but we haven't closed that project**
8 **out, so I don't have that information yet.**
9    Q.   So when you say, when you close the
10 project out, you then have access to that
11 information, where is that information kept
12 currently?
13 **A.  No, it's not kept — it's not kept**
14 **anywhere. I don't have that information.**
15    Q.   So when you said, yet, you don't actually
16 expect to ever have access to the calculation of
17 average monthly man-hours needed for the
18 Latvian Embassy project?
19 **A.  No, I do not have it.**
20    Q.   Does Go Pro maintain any sort of, like,
21 quality control documentation relating to, this is
22 how much we've spent on the Latvian Embassy project

37

1  to date, this is how many man-hours we've spent on
2  the Latvian Embassy to date?  This is the work
3  we've completed to date?  Do you keep that
4  information, other than the project reports that
5  you issue to your client during a project?
6  **A.  No.  But if we need to calculate the**
7  **man-hours, we could sit with everyone in the office**
8  **and figure out exactly when and who was working at**
9  **that project.**
10  Q.  But there is no sort of paperwork
11  maintained that would show that information, it
12  would be --
13  **A.  Just the -- sorry.**
14  Q.  It would just be word of mouth from a
15  given employee telling you, this is how much time
16  I've spent at the Latvian Embassy in a given period
17  of time?
18  **A.  No.  So we -- we know where every -- each**
19  **person worked on -- on daily basis.**
20  Q.  Is that because Go Pro created a schedule
21  on a daily basis for employees?
22  **A.  Yes.  In the TimeStation, we would label**

38

1  **every person where they -- they worked.**
2  Q.  And did you do that for the Latvian
3  Embassy project?
4  **A.  For all projects, yes.**
5  Q.  You still have access to the schedules or
6  the PayStation information that would show where a
7  given employee was supposed to work on a given day?
8  **A.  Yes.**
9  Q.  Have you produced that documentation to
10  your attorney?
11  **A.  No, so it's the TimeStation that we -- we**
12  **have submitted.**
13  Q.  Well, we went through the TimeStation,
14  right?  And I can pull it back up.
15  Looking at, again, at Go Pro Number 34,
16  for example, Plaintiff's Document Production 280,
17  this is the PayStation documentation that you
18  produced.
19  So on here, it says, Brandon Smith,
20  April 12th, 2022, 6:31 Tuesday, 6:31 a.m. to
21  4:02 p.m., 9.5 hours.  And the calculation,
22  $237.50.  Correct?

39

1  **A.  Yes.**
2  Q.  Where on this entry does it identify what
3  given project -- what projects Brandon Smith was
4  assigned to on April 12th, 2022?
5  **A.  It does not on this entry.**
6  Q.  But you're saying that there is
7  documentation maintained by PayStation that would
8  show what projects Brandon Smith would have been
9  assigned to on this entry?
10  **A.  Yes, I believe so.  I just have to**
11  **confirm.**
12  MR. GILREATH:  Mr. Barnes, I'd request
13  that that documentation be reviewed.
14  MR. BARNES:  Yeah, this is the first I'm
15  hearing of that too.  I suspect that's not the
16  case, but he may be under a misapprehension, but
17  we'll look into it.  If there is, in fact,
18  something that indicates what project they worked
19  on, obviously, you will have it.
20  MR. GILREATH:  And if there are separate
21  work schedules, separate and apart from PayStation
22  that were produced on a daily or weekly or monthly

40

1  basis, we'd like those as well.
2  MR. BARNES:  Yeah, well, I think he's
3  already testified in the earlier depositions that
4  they didn't retain any of that stuff, but they'll
5  look again, I guess.
6  BY MR. GILREATH:
7  Q.  So other than the payroll information
8  maintained by Optimum Construction, which has been
9  produced, and the payroll information through
10  PayStation that you produced, were there any other
11  laborers or employees involved in the
12  Latvian Embassy project that documented their time
13  that you have not produced?
14  **A.  No.**
15  Q.  For example, was there another
16  subcontractor involved?  Did Mr. Raouf maintain
17  daily time entries for his time at the project or
18  any other laborers that are not illustrated in the
19  documents that have been produced today?
20  **A.  I don't think so, no.**
21  Q.  Does Go Pro -- other than the information
22  maintained by PayStation relating to time entries,

**41**

1  does Go Pro maintain any sort of payroll journal
2  for its employees?
3      **A. I'm not sure I understand the question.**
4      Q. Is the only way that Go Pro monitored
5  time at the time the Latvian Embassy was ongoing,
6  was the only time that time was kept was through
7  PayStation?
8      **A. TimeStation.**
9      Q. TimeStation.
10     **A. Time, yes.**
11     Q. Were there any employees that were
12 salaried by Go Pro at the time of the
13 Latvian Embassy project, or was everyone an hourly
14 employee who maintained their time through
15 TimeStation?
16     **A. It runs through TimeStation.**
17     Q. Mr. Elrahimy, were you involved in the
18 Latvian Embassy project yourself specifically?
19     **A. Yes.**
20     Q. Did you maintain your time at the
21 Latvian Embassy project in any way?
22     **A. I don't believe so.**

**42**

1      Q. Were you paid specifically for your time
2  at the Latvian Embassy project?
3      **A. I don't believe so.**
4      Q. So are you an hourly employee or do you
5  just take, like, an annual salary from Go Pro?
6      **A. No, I'm not an hourly employee. I do**
7  **take an annual salary.**
8      Q. Court order also addressed an additional
9  search related to VNI's Document Request Number 27.
10 Request Number 27 seeks documentation relating to
11 the methodology or the calculations of rates,
12 charges, job costs, material costs, overhead, and
13 profit for the project.
14     Did Go Pro conduct an additional search
15 for documentation relating to the methodology or
16 calculation of rates, cost, overhead, and profit
17 for the Latvian Embassy project?
18     **A. Yes.**
19     Q. Were you able to locate any initial
20 documentation relating to those calculations?
21     **A. No additional documentations.**
22     Q. Did you speak with your father,

**43**

1  Raouf Elrahimy, regarding whether or not he had
2  possession of any documents regarding the
3  calculation of rates, charges, cost, overhead or
4  profit?
5      **A. Yes.**
6      Q. And how did he respond, when you asked
7  him about that documentation?
8      **A. Yeah, he said, I will look and prepare**
9  **what I have. He prepared a folder, brought it**
10 **over. We scanned any documents he had and**
11 **submitted them with our documents.**
12     Q. Do you recall specifically which
13 documents were provided by your father that were
14 not already in Go Pro's possession?
15     **A. I don't.**
16     Q. And then, finally, VNI Request Number 30,
17 which was also addressed by the court's August 21,
18 2023 order, VNI Document Request Number 30 seeks
19 all documents relating to Go Pro's original and
20 revised budgets, bids or estimates for either the
21 original or revised scope of work for the project,
22 as well as backup documentation.

**44**

1      It's my understanding that Go Pro did not
2  find any information relating to the original
3  budget, bid or estimate for the Latvian Embassy
4  project; is that correct?
5      **A. Yes. Everything I have, I submitted.**
6      Q. Is it possible that Go Pro, at the time
7  that it was submitted to VNI and prior to the
8  execution of the contract, is it possible that an
9  original budget or a bid estimate or takeoff was
10 prepared by Go Pro or Raouf Elrahimy?
11     **A. Say that again, I'm sorry. The first**
12 **part of that question wasn't clear.**
13     Q. So not looking at now, where you say the
14 documents don't exist, is it possible that a
15 document such as an original budget, a bid, or an
16 estimate existed some previous time between when
17 the bid was prepared and the contract being
18 executed by VNI?
19     **A. Yes, I'm sure we came up with a budget**
20 **somehow, but I don't have information.**
21     MR. BARNES: He's asking you about
22 whether that was one, a document or a writing.

45

1    A.   No, not that I'm aware of.
2    Q.   Who would have -- and it's my
3 understanding Raouf would have been involved in the
4 calculation of any sort of original bid estimate;
5 is that correct?
6    A.   Correct.  Yes.
7    Q.   But Mr. Raouf has not provided you with
8 any documentation, reflecting an original bid or
9 bid estimate that predated --
10   A.   We did have --
11   Q.   -- the execution of the contract?
12   A.   I'm sorry.
13   Q.   I said, your father has not provided you
14 with any sort of document -- documentation
15 reflecting an original bid or bid estimate that
16 predated the execution of the contract?
17   A.   He did not.
18       MR. BARNES:  Counsel, I'm not sure I
19 followed that.  My recollection of our production,
20 there was a proposal that was prepared, and then a
21 contract that was executed that incorporated the
22 proposal.  So I think the proposal would be

46

1 something that preexisted the execution of the
2 contract.  You're asking if there's anything else;
3 is that right?
4       MR. GILREATH:  Correct.  Because I
5 believe the proposal didn't have, like, line item
6 estimates of the cost.  I think it was just a
7 general scope of work documentation.
8       MR. BARNES:  But --
9       MR. GILREATH:  I'm asking, was there any
10 sort of calculation of this line item, this
11 specific aspect of work costs this amount of money.
12       MR. BARNES:  Yeah.  This amount of 2 by
13 4s is going to be used or this amount of -- or this
14 is what it's going to cost, this amount of labor,
15 man-hours, all that kind of stuff?
16       MR. GILREATH:  Correct.
17       MR. BARNES:  That's what you're looking
18 at.  Yeah, okay.
19       You understand, Mr. Elrahimy, that's what
20 you're being asked?
21       THE WITNESS:  Yes, now I do.
22       MR. BARNES:  Okay.

47

1 BY MR. GILREATH:
2    Q.   And you did not locate any of that
3 documentation during your additional search?
4    A.   No.
5    Q.   So in addition to some of the Home Depot
6 receipts like I showed you earlier, there are a
7 number of other invoices that indicate that certain
8 supplies and materials were to be shipped to or
9 paid for by Optimum Construction.  Do you recall
10 that invoicing information?
11   A.   You'd have to show me --
12   Q.   I'll pull it up.
13   A.   -- an example.
14       Could I take an exactly 30-second break.
15 Is that possible?
16   Q.   Let's finish this question and I'll give
17 you a break.  Give me one minute.
18       So I'm going back to Go Pro Number 34.
19 It's identified as Plaintiff's Document Production
20 399.  This is an invoice from TW Perry.
21       You see it at the top where it says, Sold
22 to, Shipped To, and then identifies Optimum

48

1 Construction?
2    A.   Yes.
3    Q.   And do you see where it says, Please pay
4 this amount of $4,426.42?
5    A.   Yes.
6    Q.   It says, Payment method Buyer:
7 Bobbie Onorio.  Do you recognize that name?
8    A.   Yes.  She's the administrator at Optimum
9 Construction.
10       And it says, Charged to account,
11 $4,426.42.  Was that charged to Optimum
12 Construction's account with TW Perry?
13   A.   I believe so, yes.
14   Q.   Was Optimum Construction reimbursed for
15 the cost of this invoice by Go Pro Construction?
16   A.   I don't have recollection of that.
17   Q.   If they had been reimbursed, would they
18 have been reimbursed through the Capital One bank
19 account?
20   A.   Yes.
21   Q.   Is it ordinary practice for Go Pro
22 Construction, when they're reimbursing a

49

1 subcontractor for costs relating to a project, to
2 issue individual payments per reimbursement
3 request, or do they compile everything into one
4 larger payment?
5    **A.  To just a subcontractor?**
6    Q.  For example, if Optimum Construction were
7 to provide this invoice to Go Pro and say, hey,
8 Go Pro, we paid this invoice for the Latvian
9 Embassy project, and then they were to also provide
10 a second invoice, as shown here, Plaintiff's
11 Document Production 400, would Go Pro make two
12 separate payments; one for 4,426.42, and one for
13 $3,078.24, or would it make one lump sum payment to
14 Optimum?
15    **A.  We would most likely make two payments.**
16    Q.  So your bank account records would be
17 able to back up these invoices on whether or not
18 Go Pro reimbursed Optimum for these individual
19 invoices?
20    **A.  I believe so, if we paid them in the**
21 **amounts or the exact amounts, it would be on our**
22 **bank statement.**

50

1    Q.  But you have not cross-referenced the
2 invoices that you produced with your bank
3 statements to date; is that correct?
4    **A.  I don't believe these were paid from**
5 **Capital One to Optimum -- Go Pro to Optimum.**
6    Q.  So you believe that these were costs
7 incurred by Optimum, but were not ever charged to
8 Go Pro for Go Pro to pay Optimum back?
9    **A.  (No verbal response.)**
10    MR. BARNES:  We didn't hear your answer.
11    **A.  I said, yeah, correct.**
12    MR. GILREATH:  Mr. Elrahimy, we can take
13 a break.  Actually, let's take a five-minute break.
14 I don't think I'm going to need that much more
15 time.  But let's meet back at 3:30, if that works
16 for everyone.
17    MR. BARNES:  Okay.  And when we get back,
18 when you're finished, I want to make sure we go
19 through each of these items that you want to
20 supplement on because I want to make sure we're on
21 the same page.
22    MR. GILREATH:  Okay.  We can do that.

51

1    (Recess from 3:24 p.m. until 3:37 p.m.)
2 BY MR. GILREATH:
3    Q.  Mr. Elrahimy, we have walked through the
4 court's August 21, 2023 order and the document
5 request the court identified as being evasive or
6 unresponsive and where Go Pro needed to conduct an
7 additional search.
8    MR. BARNES:  Court said potentially
9 evasive, I didn't think they --
10    MR. GILREATH:  Sure.
11    MR. BARNES:  -- determined it was
12 evasive.
13    MR. GILREATH:  Potentially evasive or
14 unresponsive and ordering that Go Pro conduct an
15 additional search as it related to those specific
16 requests.
17 BY MR. GILREATH:
18    Q.  We walked through what's been produced
19 supplementally, and the search process that Go Pro
20 underwent to identify any sort of documents that
21 were found, you indicated.
22    I just want to step back one more time,

52

1 and make sure I fully understand what Go Pro did,
2 what you and Ms. Conley did to look for the
3 documents identified in the court's August 21st,
4 2023 order, to identify whether or not any
5 additional documentation exists.
6    So, again, you've gone on a Google Drive
7 that's maintained by Go Pro relating to the
8 Latvian Embassy project; is that correct?
9    **A.  Yes.**
10    Q.  And is that a singular folder on the
11 Google Drive for the Latvian Embassy project?
12    **A.  Yes.**
13    Q.  And what is maintained on the Go Pro
14 Google Drive, as it relates to the Latvian Embassy
15 project?  What type of documentation?
16    **A.  Typically, we'd keep any documents**
17 **related to the project, such as the contract, the**
18 **blueprints, receipts, any documents related to the**
19 **project.**
20    Q.  Do you maintain copies of e-mail
21 correspondence with the client, or is that
22 maintained separately through your e-mail account?

53

1    A.  We don't maintain those, it's just in the
2  e-mail account.
3    Q.  Do you maintain proof of payment
4  submitted by Go Pro to a subcontractor or a
5  supplier or anything of that nature?
6    A.  Yes.
7    Q.  I understand that you keep receipts of
8  things you buy, but you also keep proof of, look,
9  this is when we paid something?
10   A.  Yes.
11   Q.  Did you maintain any sort of proof of
12  payment, as it relates to payments made either to
13  Optimum or to your father, Raouf Elrahimy?
14   A.  If I did, they would be on the Drive,
15  yes.
16   Q.  But you stated that you reviewed the
17  Google Drive completely; is that correct?
18   A.  Yes.
19   Q.  And you did not locate anything to that
20  effect?
21   A.  No.
22   Q.  And in addition to the Google Drive

54

1  folder for the Latvian Embassy project, did you
2  also review Go Pro e-mail accounts relating to
3  correspondence on the Latvian Embassy project?
4    A.  Yes.
5    Q.  And correspondence relating to the
6  Latvian Embassy project has been produced to your
7  attorney and provided to us?
8    A.  Yes.
9    Q.  In addition to the e-mail accounts and
10  the Google Drive folder, where else did you look or
11  Ms. Conley look for potentially responsive
12  documentation relating to the Latvian Embassy
13  project?
14   A.  Just with our accountant.
15   Q.  And you stated your -- you stated that
16  Ms. Conley had contacted your accountant and he did
17  not possess any additional documentation that
18  Go Pro did not already have its hands on?
19   A.  Correct.
20   Q.  Did Go Pro look through any hard copies
21  of files or documents at Go Pro's offices?
22   A.  Yes.

55

1    Q.  What type of documents does Go Pro
2  maintain hard copies of?
3    A.  No, we don't maintain hard copies.
4    Q.  So there were no hard copy documents for
5  Go Pro to review, as it relates to the Latvian
6  Embassy project?
7    A.  No.  I'm sorry, maybe I misunderstood.  I
8  thought you said if we looked for hard copies, and
9  we — we looked, I don't have any hard copies.
10   Q.  So you looked for hard copies, but you
11  did not find any hard copies?
12   A.  Yes.
13   Q.  Okay.  We discussed TimeStation as the
14  service utilized by Go Pro to maintain hourly
15  employees' time on a daily basis; is that correct?
16   A.  Yes.
17   Q.  While I understand that you produced
18  TimeStation payroll information for the period in
19  time in which the Latvian Embassy project was
20  ongoing, TimeStation does not allow you to sort
21  time entries by project assigned to an employee?
22   A.  No, I didn't say that.  I just said I

56

1  would have to check to see if that's something
2  that's available on TimeStation.
3    Q.  But you've not done that yet?
4    A.  No.
5    Q.  And is it -- you previously stated that
6  there is a schedule of some sort provided to hourly
7  employees relating to what project they're assigned
8  on a given day, what projects they're assigned to
9  go to on a given day?
10   A.  Correct.  So we maintain an internal text
11  messaging group where the guys are working daily.
12   Q.  So when you say, an internal text
13  messaging group, was there a project manager that
14  was responsible for scheduling for a given project?
15   A.  For the Latvian Embassy?
16   Q.  Correct.
17   A.  I believe that was Jason Kirk with
18  Optimum.
19   Q.  So would Jason be the one on this text
20  message -- these text message threads to tell
21  certain employees to come to the Latvian Embassy
22  project?

---

**57**

1     A.    No.

2     Q.    So how would the text spread the word?

3  Who would send out via text --

4     **A.    That's just our general practice.  It**

5  **would probably be Brandon Smith.**

6     Q.    Is Brandon Smith still an employee of

7  Go Pro?

8     **A.    Yes.**

9     Q.    Have you asked Brandon Smith to review

10 his text messages to determine any scheduling text

11 messages that may be able to provide additional

12 information on the schedule for the Latvian Embassy

13 project on a given day or for a given amount of

14 time?

15    **A.    I haven't, no.**

16    Q.    Other than the text message threads, was

17 there any sort of daily schedule prepared either on

18 a Word document or an Excel spreadsheet that was

19 distributed to all employees, either on a daily

20 basis or a weekly basis or a monthly basis?

21    **A.    For the Latvian Project?**

22    Q.    Correct.

---

**58**

1     A.    No.

2     Q.    And I want to make sure that we get

3  accurate testimony.  Earlier, you had indicated

4  that when an employee enters their starting time

5  into TimeStation, it would tell them where they

6  were assigned; is that correct?

7     **A.    Yeah, that's where the text messaging**

8  **comes in, where the project manager would say, at**

9  **the end of the day, these guys were working at that**

10 **specific project.  So we close out TimeStation**

11 **daily, confirming where everybody was working.**

12    Q.    So you said Brandon -- so for the

13 Latvian Embassy project, Brandon Smith would send a

14 text message at the end of the day saying, this

15 employee got here at this time and left at this

16 time from this project?

17    **A.    Not for the Latvian Embassy because**

18 **Optimum was keeping track of the hours and the**

19 **project management.**

20    Q.    And was Optimum keeping the time entry

21 information for the entirety of the Latvian Embassy

22 project?

---

**59**

1     A.    I believe so, yes.

2     Q.    So if Optimum was responsible for keeping

3  all the time entries for the Latvian Embassy

4  project, then wouldn't only the Optimum payroll

5  documentation that you produced provide the

6  information related to those working at the

7  Latvian Embassy project?

8     **A.    Because we -- I believe we had our Go Pro**

9  **workers there too.**

10    Q.    I guess my question is, if a Go Pro

11 employee was working at the Latvian Embassy

12 project, would their time be maintained by Optimum

13 or would they maintain their time through

14 TimeStation?

15    **A.    If a Go Pro employee, would be on**

16 **TimeStation.**

17    Q.    Does an employee enter their time into

18 TimeStation, or does the employee -- does yourself

19 or someone else --

20    **A.    They --**

21    Q.    -- overseeing the project enter the time?

22    **A.    They clock in and out on TimeStation.**

---

**60**

1     Q.    And is TimeStation an app on a phone or

2  is there some sort of tool to check in on the

3  project site?

4     **A.    It's an app on their phone.**

5     Q.    So for the Latvian Embassy project, would

6  a Go Pro employee clock in on TimeStation, but then

7  also have their time maintained by Optimum?

8     **A.    Yes.**

9     Q.    So there's a possibility that the records

10 that you produced, the Optimum Construction payroll

11 register information and then the TimeStation

12 information is duplicative?

13    **A.    No.  They are two separate payrolls with**

14 **different people.  So you wouldn't have, for**

15 **example, Alex that is on the Go Pro payroll also on**

16 **the Optimum payroll.**

17    Q.    Did Optimum provide any documentation to

18 Go Pro, as it related to time entries for Go Pro

19 employees?

20    **A.    Say that again, I'm sorry.**

21    Q.    I said, did Optimum provide Go Pro with

22 any documentation, as it relates to time entries on

---

61

1 the Latvian Embassy project for Go Pro employees?

2 **A. Not that I --**

3 Q. Or was the only documentation given to Go

4 Pro that information that was maintained in

5 TimeStation?

6 **A. Yeah, not that I have in my possession.**

7 Q. When you say, your possession, are you

8 speaking about yourself individually or are you

9 talking about Go Pro as a whole?

10 **A. Go Pro as a whole.**

11 Q. Do you know if that documentation may

12 exist somewhere in Go Pro's universe or have you

13 not looked for that?

14 **A. I haven't looked for that.**

15 Q. So in addition to your Google Drive, your

16 e-mail, the Go Pro e-mail accounts, hard copies of

17 physical documentation, TimeStation documentation,

18 and potential text messages regarding scheduling

19 for hourly employees at the Latvian Embassy

20 project, what else did you search through to try to

21 identify potentially responsive documents?

22 **A. That should be it.**

62

1 Q. Did you ever text about the

2 Latvian Embassy project with your father or anyone

3 else involved in the Latvian Embassy project?

4 **A. I am not sure. I don't recall. We text**

5 **often, but typically, not about work, so I can't**

6 **exactly say. I would say no.**

7 Q. Did you look through your text messages

8 to confirm or deny whether or not you have any text

9 messages relating to the Latvian Embassy project?

10 **A. Yes.**

11 Q. And you did not locate anything?

12 **A. I'm sorry?**

13 Q. You did not locate any such text

14 messages?

15 **A. I've reviewed my text messages. I don't**

16 **have any record.**

17 Q. And then we previously discussed both the

18 Capital One bank accounts and the American Express

19 credit card. Have you reviewed Capital One bank

20 account statements to determine whether or not

21 Optimum -- or Go Pro issued any payments to Optimum

22 Construction?

63

1 **A. Yes.**

2 Q. You have reviewed your bank statements?

3 **A. Yes.**

4 Q. Did you identify any payments to

5 Optimum Construction?

6 **A. No.**

7 Q. Did you review your Capital One bank

8 statements to assess whether or not Go Pro made any

9 payments to your father, Raouf Elrahimy?

10 **A. Other than the one I mentioned earlier**

11 **or --**

12 Q. Well, you stated that you probably paid

13 him, and that if you did pay him, it would have

14 come from the Capital One bank account.

15 **A. Yeah.**

16 Q. But you did not testify whether or not

17 you reviewed the bank account statements to confirm

18 whether or not that actually took place.

19 **A. Yeah. He was paid from the -- the**

20 **payments that came from the Latvian Embassy that**

21 **came through to Go Pro, he was paid that to him.**

22 Q. Do your bank account statements reflect

64

1 that payment to your father?

2 **A. Yes, as I mentioned, it was a transfer.**

3 Q. But you have not provided your counsel

4 with documentation reflecting that transfer; is

5 that correct?

6 **A. I don't believe so.**

7 Q. And was that transfer made to your father

8 for his work on the Latvian Embassy project?

9 **A. I believe that transfer is made to him so**

10 **he can manage the project.**

11 Q. So is your father responsible for

12 payments relating to the Latvian Embassy project as

13 the project continues?

14 **A. Yes.**

15 Q. Is it typical for Go Pro to issue full

16 and complete payments, transfers of payments from a

17 client to someone like your father on any given

18 project?

19 **A. Can you elaborate more on exactly what**

20 **you mean.**

21 Q. Has your father served as an engineer for

22 a project -- another project other than Latvian

65

1 Embassy for Go Pro?
2    A.   Maybe, I don't recall exactly, but, yes,
3 maybe.  Because you say, serve as an engineer?
4    Q.   Or a project manager.  In any role on
5 behalf of Go Pro, has your father served on another
6 project for Go Pro?
7    A.   He has taken other projects under
8 Go Pro's name, yes.  And because he's my father, he
9 works -- he, you know, he uses -- he's allowed to
10 use my company in commercial projects, using the
11 name of my company and using my company, yes.
12    Q.   And in those other projects, was your
13 father, likewise, transferred payment provided by
14 the client through Go Pro?
15    A.   He has access to Go Pro bank account as
16 well, and so it would depend on the -- on which
17 account the funds were in.  So let's say, for
18 example, if he takes a check made out to Go Pro, he
19 can deposit it into -- directly into his Go Pro
20 bank account, and if a direct deposit, if they sent
21 it in to our main account, I'm able to transfer it
22 to him through Go Pro bank account.

66

1    Q.   So if your father has access to the Go
2 Pro bank account, why do you need to transfer him
3 the money?
4    A.   He has a separate Go Pro bank account as
5 well.
6    Q.   Do you have access to that bank account?
7    A.   I don't.
8    Q.   At the conclusion of a project, is it
9 expected that your father return any amount of
10 money remaining, relating to a project?
11    A.   Yeah.  He would either return it or we
12 have, you know, an internal ledger between us, so I
13 would owe him money, he would owe me money.
14    Q.   Did your father return any of the money
15 transferred to him, as it relates to the Latvian
16 Embassy project?
17    A.   Not that I recall.
18    Q.   Did you maintain a ledger between
19 yourself and your father, as it relates to the
20 Latvian Embassy project?
21    A.   No.
22    Q.   So your father hasn't provided you with

67

1 any proof of payment for anything that he paid, as
2 it relates to the Latvian Embassy project?
3    A.   What he had he said he provided and I --
4 these were the documents I uploaded.
5    Q.   But based on that documentation, you
6 haven't taken the time to put together any sort of
7 ledger, like you discussed, to determine what
8 you're entitled to back from that previous transfer
9 made to him?
10    A.  I haven't, no.
11    Q.   As far as the American Express credit
12 card statement, have you reviewed your American
13 Express statement and cross-referenced it with the
14 invoices you provided, whether it be TW Perry, Home
15 Depot, to confirm payments were made from the Go
16 Pro credit card?
17    A.  I haven't, no.
18        MR. BARNES:  Just let me object.  I think
19 the TW Perry was with Optimum, it was not with Go
20 Pro.
21    Q.   But for the Home Depot invoice that we
22 discussed previously, you have not reviewed the

68

1 American Express statement to confirm if that was
2 paid?
3    A.  No, I haven't.
4        MR. BARNES:  Can I just clarify.  When
5 you say, it was paid, you mean whether American
6 Express was paid or whether Home Depot was paid?
7        MR. GILREATH:  Whether Home Depot was
8 paid.
9        MR. BARNES:  Okay.  Well, the invoices
10 show that Home Depot was paid by American Express.
11       MR. GILREATH:  There are some that say
12 charge to the account.  I know the TW Perry says
13 it, I know that's Optimum's, but there are others
14 that are titled in Go Pro's name, and I want to see
15 if those payments were either made -- that's why
16 the bank account records are important because I
17 want to see what was actually paid, whether it's
18 payable --
19       MR. BARNES:  Well, that's why I was
20 asking because the bank account isn't going to show
21 whether Home Depot was paid, it's going to show
22 whether American Express was paid.  Right?  If

69

1  American Express said -- if the Home Depot account
2  says it's being billed to an American Express card,
3  the bank account isn't going to show a payment to
4  Home Depot, it's going to show a payment to
5  American Express.  So which one are you looking
6  for?
7         MR. GILREATH:  Yeah, but the American
8  Express statement will show that there was a charge
9  from Home Depot for --
10        MR. BARNES:  Right.
11        MR. GILREATH:  So I want to
12 cross-reference both.  I mean, I'm less concerned
13 about whether or not he made his payments to
14 American Express for whatever amount is
15 outstanding; his balance, I don't care about.
16        MR. BARNES:  Right.  Well, that's what I
17 was asking.
18        MR. GILREATH:  When he's testifying that
19 Home Depot was paid on the credit card, I'm asking,
20 did he look at his credit card statements to
21 confirm the payments were made, like, a charge was
22 made -- let me not say payment, a charge was made

70

1  on the credit card, to confirm the invoice.  That's
2  the only reason I'm looking at American Express.
3         MR. BARNES:  I don't think that's --
4  that's a receipt, though, isn't it?  I think that's
5  what that is, that he produced to you, shows that
6  American Express was used to pay that account.
7         MR. GILREATH:  That is correct, but also,
8  as he just testified, he hasn't reviewed the
9  American Express statements.  He may go through
10 those statements and highlight additional charges
11 made on that card that he remembers, oh, that was
12 for the Latvian Embassy project.
13        MR. BARNES:  Oh, I see.  Additional ones
14 not --
15        MR. GILREATH:  Right.
16        MR. BARNES:  -- on the ones that we've
17 produced?
18        MR. GILREATH:  Correct.  I'm trying to
19 get -- that's why I'm looking at that.
20        MR. BARNES:  Okay.
21        MR. GILREATH:  Right now, I have what we
22 believe to be the universe of receipts, but that

71

1  isn't necessarily all the charges for supplies and
2  materials that Go Pro paid.
3         MR. BARNES:  I don't think -- I don't
4  think it is.  I mean, I think there's a lot more
5  lumber out there.
6         MR. GILREATH:  Exactly.  That's why I'd
7  like to see the credit card statements.
8         The bank account records, we have payroll
9  information, but I don't know -- it seems unclear
10 whether or not there was some way, through
11 TimeStation, to figure out if you could separate by
12 project per total amount, the bank records will
13 show what --
14        MR. BARNES:  I'm just talking about the
15 credit card purchase, I was confused by what you
16 were asking.
17        MR. GILREATH:  No.  Yeah, no, I'm not
18 asking for his bank account records.  The Capital
19 One will show if he paid off his American Express,
20 I don't care.  I just need to see --
21        MR. BARNES:  Yeah, because it doesn't
22 matter for -- legally anyway.

72

1         MR. GILREATH:  Correct.
2  BY MR. GILREATH:
3     Q.   So other than the Capital One bank
4  accounts and the credit card maintained with
5  American Express, are there any other charge
6  accounts in the name of Go Pro that would have been
7  utilized for the Latvian Embassy project, whether
8  it be a credit card with another credit card
9  company, a bank account maintained with another
10 financial institution, or is it just Capital One
11 bank accounts and American Express credit card?
12        MR. BARNES:  For Go Pro.
13    A.   Yeah, my father -- sorry?
14        MR. BARNES:  For Go Pro.
15    A.   Yeah, my father has a Go Pro bank
16 account, it's through Capital One as well.
17    Q.   But no other credit cards, other than the
18 American Express credit card?
19    A.   Not that I recall, no.
20    Q.   Who has access to the American Express
21 credit card?
22    A.   I do.

73

1    Q.   Did you ever lend out the credit card to
2   employees for them to pay for supplies or
3   materials?
4   **A.   Yes.  We have -- I have about seven**
5   **different American Express cards that I lent to**
6   **my -- Cindy has one of them.**
7    Q.   And are individuals who utilize the Go
8   Pro American Express credit card instructed to
9   provide receipts back to you or Go Pro for any
10  purchases made on that credit card?
11  **A.   In general or --**
12   Q.   Specifically for the Latvian Embassy
13  project, one of the number of employees that have
14  access to the Go Pro American Express credit card,
15  if they were to make a purchase for the Latvian
16  Embassy project on that American Express credit
17  card, are they instructed to retain a receipt or
18  some sort of invoice showing what was owed and what
19  was paid?
20  **A.   Yes.  But, typically, we would get an**
21  **e-mailed copy of any receipts e-mailed to us.**
22   Q.   Have you reviewed your e-mail accounts

74

1   for any e-mailed copies of receipts as it relates
2   to the Latvian Embassy project?
3   **A.   Not that I recall.**
4   **Can I elaborate on that.**
5    Q.   Yes, you may.
6   **A.   So the e-mail itself doesn't come labeled**
7   **as Latvian Embassy.  So even if I put in the**
8   **search, Latvian Embassy, it wouldn't necessarily**
9   **trigger the Home Depot e-mails to pull up.  And we**
10  **have thousands of receipts for all other projects.**
11   Q.   Did you attempt to go through those
12  numerous e-mails for the dates in which their
13  project commenced to the date Go Pro ceased work on
14  the project, to see if you could identify all the
15  amounts that included the receipts for the Latvian
16  Embassy project?
17  **A.   No, I haven't done so.**
18   Q.   I'm almost finished, Mr. Elrahimy.
19       Mr. Elrahimy, can you see my screen?
20  **A.   Yes.**
21       MR. GILREATH:  So I'm showing you what
22  I'm going to label as Go Pro Number 39.

75

1       (Go Pro Exhibit 39 was marked for
2   identification and was retained by counsel.)
3    Q.   It's titled, Plaintiff's Supplemental
4   Answers to Interrogatories.  There is a
5   verification that says, I do solemnly declare and
6   affirm under the penalties of perjury that the
7   contents of the foregoing Supplemental Answers to
8   Interrogatories are true and correct, to the best
9   of my knowledge, information, and belief, and there
10  is a signature.  Is this your signature?
11  **A.   Yes.**
12   Q.   Have you reviewed this document for
13  accuracy, prior to signing the verification?
14  **A.   Yes.**
15   Q.   So I want to turn your attention to
16  Supplemental Answer to Interrogatory Number 19.
17  Supplemental answer states:  Plaintiff hired
18  Optimum Construction to perform project management
19  oversight services.  Plaintiff does not know the
20  value of same and has never calculated the value.
21       Optimum is owned and operated by the
22  brother of the Plaintiff's owner.  From time to

76

1   time, they perform construction-related services
2   for each other without expecting to be compensated.
3       In addition, Plaintiff directly hired
4   some of Optimum's workers to perform carpentry work
5   on the subject project.
6    Q.   Do you recall which Optimum workers were
7   directly hired by Go Pro to perform carpentry work
8   on the Latvian Embassy project?
9   **A.   I don't.**
10   Q.   Do you recall how those Optimum workers
11  were paid for their time on the Latvian Embassy
12  project?
13  **A.   I don't recall that.**
14   Q.   Do you recall how those Optimum workers
15  maintained their time spent at the Latvian Embassy
16  project?
17  **A.   I don't.**
18   Q.   A little bit further down, it says:  In
19  addition, Plaintiff hired the professional services
20  of J.H. Silcox Engineering & Drafting.  Plaintiff
21  has not received an invoice for these services and
22  had no record of paying anything for these

77

1 services.
2        Do you recall who J.H. Silcox
3 Engineering & Drafting is?
4     **A.   Yes.**
5     Q.   And what services do they provide to Go
6 Pro for the Latvian Embassy project?
7     **A.   Engineering services.**
8     Q.   When you say, engineering services, can
9 you be a little bit more specific?
10    **A.   All --**
11    Q.   Like to a certain aspect of the project.
12    **A.   Regarding J.H. Silcox?**
13    Q.   Yes.
14    **A.   Or regarding the project?**
15    Q.   Yes.
16    **A.   I believe he came out to do a report on**
17 **the existing foundation of the building.**
18    Q.   And it states that Go Pro has not
19 received an invoice for these services.  You
20 maintain that Go Pro has not received any sort of
21 invoicing for J.H. Silcox for the report it
22 prepared?

78

1     **A.   Yes.**
2     Q.   And you have no record of paying anything
3 for those services; is that correct?
4     **A.   Correct.**
5     Q.   When you state that, had you reviewed the
6 Capital One bank account records or the American
7 Express statements that confirm no payments have
8 been issued to J.H. Silcox?
9     **A.   For the Latvian Embassy?**
10    Q.   Correct.
11    **A.   Yes, we have not issued payments for him**
12 **for the Latvian Embassy, but he's issued payments**
13 **for other projects.**
14    Q.   Do you recall whether or not J.H. Silcox
15 was paid directly by VNI?
16    **A.   Not that I'm aware of.**
17    Q.   Drawing your attention to Interrogatory
18 Number 20, it says:  Identify with specificity your
19 original and any revised budget, bids, or estimates
20 for the original and any revised scope of work for
21 the project, including, but not limited to, line
22 item pricing, for each scope of work and the

79

1 overhead and profit estimated or applied by you for
2 the work.
3        And Go Pro's Supplemental Answer Number
4 20 states:  Plaintiff recently created a
5 takeoff/estimate demonstrating the cost to perform
6 all the work depicted on the plans and
7 specifications, and a takeoff/estimate to perform
8 the reduced scope of work identified within the
9 contract and produce the same to defendant with its
10 supplemental response to request for production.
11       You see that?
12    **A.   Yes.**
13    Q.   Previously, we had talked about what was
14 marked, I believe, as Go Pro 35 and 36.  Do you
15 recall Go Pro 35 and 36, the two Excel sheets?
16    **A.   Yes.**
17    Q.   And you had stated that you did not know
18 when they were prepared; is that correct?
19    **A.   Correct, not an exact date, yes.**
20    Q.   Based on your review of this Supplemental
21 Answer Number 20, do you have an idea now of when
22 those two spreadsheets were prepared by Go Pro?

80

1     **A.   That would be the August 27th -- no,**
2 **that's not the August 27th.**
3     Q.   So the Supplemental Answers to
4 Interrogatories are dated -- were served on
5 November 15, 2023.  Supplemental Answer Number 20
6 says:  Plaintiff, quote, recently created a
7 takeoff/estimate, demonstrating the cost of work
8 and a takeoff/estimate to perform a reduced scope
9 of work.
10       I'm asking, do you have a better
11 recollection now, based on the review of
12 Supplemental Answer Number 20, which you verified
13 with your signature, of when those two spreadsheets
14 were created?
15    **A.   Yeah, so it might have been around**
16 **October or so.**
17    Q.   And you previously stated that Raouf
18 created these spreadsheets; is that correct?
19    **A.   Yeah, so it's -- it was someone from the**
20 **office, Paul Duenas, from the office, Mr. Raouf and**
21 **I.**
22    Q.   Is Mr. Raouf an employee of Go Pro

81

1 construction?
2 **A. I would say more of a partner.**
3 Q. Does Go Pro Construction prepare any sort
4 of tax documentation, as it relates to Raouf's
5 involvement with Go Pro Construction?
6 **A. No.**
7 Q. So they don't issue like a W-2 or
8 anything to Raouf?
9 **A. No. He is not a partner of papers,**
10 **but...**
11 Q. But he's treated --
12 **A. And he is not --**
13 Q. He's treated --
14 **A. Yeah.**
15 Q. -- as a partner in practice?
16 **A. That's exactly what I mean, yes.**
17 Q. Does Raouf have delegation authority over
18 Go Pro's employees?
19 **A. What does delegation mean?**
20 Q. Does he have the power to act on behalf
21 of Go Pro, in assigning hourly employees to a
22 project site or instructing them to complete

82

1 certain work?
2 **A. Directly to the workers, no, but he would**
3 **coordinate it with me, and I would set up the work.**
4 Q. One final thing. Previously, you
5 provided, or we discussed the Optimum payroll
6 documentation. Where did you receive the Optimum
7 payroll information from?
8 **A. I would have to double-check with Cindy**
9 **on that.**
10 Q. You previously testified that your
11 brother owns and operates Optimum Construction
12 Incorporated, correct?
13 **A. Yes.**
14 Q. Is it possible that you received this
15 documentation directly from him?
16 **A. From him to me or from him to Cindy?**
17 Q. Either.
18 **A. It's possible from him to Cindy, yes.**
19 Q. Did you discuss with your brother whether
20 or not he had any additional documents relating to
21 the Latvian Embassy project?
22 **A. Yes.**

83

1 Q. And did he have anything else related to
2 the Latvian Embassy project?
3 **A. He wasn't aware if he had anything else.**
4 Q. But to the best of your knowledge, you're
5 not sure whether or not he conducted a thorough
6 review of the documents?
7 **A. Correct, I'm not sure.**
8 MR. GILREATH: Okay. Mr. Elrahimy, I
9 believe that is all I have for you today. I
10 appreciate your time.
11 THE WITNESS: Thank you.
12 EXAMINATION BY COUNSEL FOR THE PLAINTIFF
13 BY MR. BARNES:
14 Q. If you don't mind, I just have a couple
15 of follow-up questions to make sure I understand,
16 or that we all understand some of your earlier
17 testimony.
18 I saw a reference in some documents that
19 were produced earlier, some correspondence back and
20 forth about a software program called BuilderTREND.
21 Are you familiar with BuilderTREND?
22 **A. Yes.**

84

1 Q. Is that a software program that you use
2 on your residential construction projects?
3 **A. This is Optimum Construction uses that**
4 **software, we don't use it.**
5 Q. Okay. Do you know whether Optimum
6 Construction had a BuilderTREND file for this
7 particular project, the Latvian Embassy?
8 **A. Yes, I believe so.**
9 Q. Did you have, or do you have access to
10 Optimum's BuilderTREND software program for this
11 particular project?
12 **A. I don't, no.**
13 Q. Okay. Did your company, at one time,
14 when the project was ongoing have access to the
15 BuilderTREND file, or was that something that was
16 uniquely maintained by Optimum Construction?
17 **A. I want to say that Mr. Raouf did have**
18 **access, but I could be wrong.**
19 Q. Okay. But in the course of your document
20 search, you did not have access or the ability to
21 retrieve any records that would have been stored in
22 the BuilderTREND file for this particular project,

---

85

1 if there even are any?

2 **A. If I recall correctly, Omar had to get**

3 **these documents, the payroll records from**

4 **BuilderTREND.**

5 Q. Okay. So --

6 **A. Which I --**

7 Q. I'm sorry, go ahead.

8 **A. So I do believe he did reach out to Fadi,**

9 **the accountant, to obtain these documents.**

10 Q. Okay. Do you know if there are any other

11 documents that are maintained in the BuilderTREND

12 file for this project that Optimum might have

13 access to?

14 **A. Maybe, but I'm not sure.**

15 Q. Okay. And a moment ago, you were talking

16 about e-mails that you would receive. I couldn't

17 understand whether you were talking about directly

18 from Home Depot with receipts, or whether they

19 would come -- or whether you were talking about

20 getting e-mails from American Express.

21     What were those e-mails that you would

22 receive that would relate to payments for materials

---

86

1 being purchased by your company?

2 **A. So if anyone does a purchase at Home**

3 **Depot and at the checkout, they have to enter our**

4 **phone number and then the purchase would go under**

5 **our account. If that's the case, then Home Depot**

6 **would e-mail us the receipts for that purchase.**

7 **But a lot of the times the guys would not enter the**

8 **phone number or not record that purchase, so we**

9 **wouldn't get the receipt. But most of the time, if**

10 **they enter our phone number and our information,**

11 **then the receipts would come to us.**

12     **There is also the option to put a PO**

13 **number, which is the project number, but, of**

14 **course, the guys also forget -- when I refer to the**

15 **guys, I'm talking about the construction worker or**

16 **the project manager -- they would either put the**

17 **project name, sometimes they would forget to put**

18 **the project name, which later, we would have to sit**

19 **down and try to figure out which receipt is for**

20 **which project.**

21 Q. Okay. All right. I understand.

22     So then -- and then with regard to these

---

87

1 payroll records that have been produced, and there

2 were lists of names, lots of names of people that

3 were on payroll lists, TimeStation reports that you

4 produced in this case, and they were like Alex

5 and -- or Angel and other people. And your

6 testimony was that those were people that you

7 believe were employed by Go Pro during the time

8 period that those records were generated?

9 **A. Yes.**

10 Q. Were any of those people periodically,

11 also people who did hourly work for Optimum

12 Construction as well?

13 **A. Yes. It's possible, yes.**

14 Q. Okay. So some of those people might

15 appear as Optimum employees on Optimum records,

16 while also at the same time appearing as your

17 employees on your records; is that fair to say?

18 **A. Most likely not. If they're on Go Pro,**

19 **they're working on Go Pro full-time, and they would**

20 **just go to Optimum to help and come back, but the**

21 **record would stay on -- on Go Pro.**

22 Q. And there are also occasions where,

---

88

1 similarly, people who are mostly on Optimum's

2 records would occasionally go over and work on your

3 projects, and then for that period of time, they

4 would be on your records; is that fair to say?

5 **A. Yes.**

6     MR. BARNES: Okay. All right. Those are

7 all the question that I have. Thank you.

8     Zach, if you have any follow-up on any of

9 that?

10     MR. GILREATH: Yeah, I've got a couple

11 questions.

12     I'm going to share my screen.

13     (Go Pro Exhibit 15, previously marked for

14 identification, was retained by counsel.)

15     EXAMINATION BY COUNSEL FOR THE DEFENDANT

16 BY MR. GILREATH:

17 Q. I'm showing what was previously marked as

18 Go Pro Number 15.

19     Mr. Elrahimy, do you see Exhibit

20 Number 15?

21 **A. Yes.**

22 Q. And you previously testified this is a

---

89

1 work progress report issued by Go Pro to VNI for
2 the Latvian Embassy project?
3     A.   Yes.
4     Q.   Okay.  Turning your attention to Items 2
5 and 3.  Item 2 states that the owner authorized
6 person is asked to confirm their e-mail address
7 that will be representing the owners to Go Pro; is
8 that correct?
9         MR. BARNES:  Part of it's obscured on
10 mine by the pictures of everybody's faces.
11     A.   Per our Contract, the Owner authorized
12 person is Mr. Rihards, and his e-mail address was
13 the official e-mail for his correspondence.  Please
14 update the name and e-mail address of the official
15 officer who will be representing the owners.
16         Okay.  Yes.
17     Q.   And then you see, Bullet Number 3 says:
18 Once the confirmation of the official officer is
19 received through DocuSign, we will then prepare for
20 additional access to the BuilderTREND system, per
21 your request.
22         You see that?

90

1     A.   Yes.
2     Q.   Am I correct in inferring from this that
3 at the time of this Work Progress Report Number 4,
4 Go Pro had access to the BuilderTREND system for
5 the Latvian Embassy project?
6     A.   Yeah, I'm not sure.  I'm not sure.  I
7 didn't have access to that, to BuilderTREND.
8     Q.   Did your father have access to the
9 BuilderTREND system at this time?
10     A.   Yes, I believe so.
11     Q.   You previously stated your father was
12 operating as a partner for Go Pro, correct?
13     A.   Yes.
14     Q.   Do you have any idea when your father
15 lost access to BuilderTREND or does he still have
16 access to the BuilderTREND system for the Latvian
17 Embassy project?
18     A.   No, I don't -- I don't know when he
19 accessed BuilderTREND last.
20     Q.   But as far as your review, you have not
21 looked to see whether or not your father still has
22 access to BuilderTREND as it relates to the Latvian

91

1 Embassy project?
2     A.   I don't believe we still have access to
3 the BuilderTREND, unless it's -- we request a
4 specific document, but I don't believe Omar still
5 has access to BuilderTREND.
6     Q.   When you say, you don't believe, is that
7 an assumption you're making or did you attempt to
8 confirm whether or not you have access?
9         I'll restate that.
10         Did you attempt to contact BuilderTREND
11 or request that your father attempt to access the
12 BuilderTREND system for the Latvian Embassy
13 project, when conducting this additional search,
14 following the August 21st order?
15     A.   I didn't, no.
16     Q.   Do you know if Cindy Conley did?
17     A.   I don't believe she did.
18     Q.   Just one final follow-up question.
19         The complaint in this matter was filed by
20 Go Pro on June 8th, 2022.  Did Go Pro take any
21 steps at that time, following the complaint, to
22 ensure that documents relating to the Latvian

92

1 Embassy project were properly preserved for this
2 litigation?
3     A.   Sorry, say that again.
4     Q.   I said the complaint filed by Go Pro
5 against VNI was filed on June 8th, 2022.  Were any
6 actions taken by Go Pro at that time to ensure the
7 preservation of documents relating to Latvian
8 Embassy case?
9     A.   Not that I'm aware of.
10     Q.   So other than your typical ordinary
11 business practices of maintaining things on the
12 Google Drive and sending e-mails, there were no
13 steps taken by Go Pro to ensure that certain things
14 were protected, not deleted, maintained for this
15 litigation?
16     A.   Yeah, not that I recall, anything
17 special.
18         MR. GILREATH:  Okay.  That is all I have.
19 Thank you.
20         MR. BARNES:  I have just one follow-up on
21 that.
22         EXAMINATION BY COUNSEL FOR THE PLAINTIFF

93

1 BY MR. BARNES:
2    Q.  Mr. Elrahimy, did Go Pro destroy any
3 projects-related documents since filing the
4 complaint on June 8th, 2022, related to the Latvian
5 Embassy project?
6    **A.  No.**
7        MR. BARNES:  Okay.  I have no other
8 questions.
9        Stephanie, I gave you my e-mail address
10 already.  Would you just send me a Min-U-Script
11 electronically only for this one.
12       THE COURT REPORTER:  Yes.
13       MR. GILREATH:  Are you going to read and
14 sign or are you good?
15       MR. BARNES:  I don't need to read and
16 sign.
17       (Off the record at 4:26 p.m. EST)
18
19
20
21
22

94

1 CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, STEPHANIE L. HUMMON, Registered
3 Professional Reporter and Notary Public, the
4 officer before whom the foregoing deposition was
5 taken, do hereby certify that the foregoing
6 transcript is a true and correct record of the
7 proceedings; that said testimony was taken by me
8 stenographically and thereafter reduced to
9 typewriting under my supervision; and that I am
10 neither counsel for or related to, nor employed by
11 any of the parties to this case and have no
12 interest, financial or otherwise, in its outcome.
13       IN WITNESS WHEREOF, I have hereunto set
14 my hand and affixed my notarial seal this 29th day
15 of January, 2024.
16 My commission expires July 6, 2027.
17
18
19 *Stephanie L. Hummon*
20 _____
21 NOTARY PUBLIC IN AND FOR
22 THE STATE OF MARYLAND

| A |
|---|

**ability**
84:20
**able**
12:22, 18:15,
22:1, 30:10,
31:10, 31:22,
33:8, 42:19,
49:17, 57:11,
65:21
**about**
8:5, 8:15,
14:6, 15:15,
17:6, 17:7,
17:16, 25:13,
32:9, 43:7,
44:21, 61:8,
61:9, 62:1,
62:5, 69:13,
69:15, 71:14,
73:4, 79:13,
83:20, 85:16,
85:17, 85:19,
86:15
**access**
35:8, 36:10,
36:16, 38:5,
65:15, 66:1,
66:6, 72:20,
73:14, 84:9,
84:14, 84:18,
84:20, 85:13,
89:20, 90:4,
90:7, 90:8,
90:15, 90:16,
90:22, 91:2,
91:5, 91:8,
91:11
**accessed**
90:19
**accidentally**
17:18
**according**
4:13, 12:9
**account**
19:10, 19:15,
23:6, 24:22,

28:13, 28:14,
28:17, 30:9,
30:15, 30:16,
31:5, 31:8,
31:11, 31:16,
48:10, 48:12,
48:19, 49:16,
52:22, 53:2,
62:20, 63:14,
63:17, 63:22,
65:15, 65:17,
65:20, 65:21,
65:22, 66:2,
66:4, 66:6,
68:12, 68:16,
68:20, 69:1,
69:3, 70:6,
71:8, 71:18,
72:9, 72:16,
78:6, 86:5
**accountant**
33:17, 33:22,
34:2, 34:15,
34:17, 35:7,
54:14, 54:16,
85:9
**accountant's**
33:3
**accounting**
27:15
**accounts**
29:14, 54:2,
54:9, 61:16,
62:18, 72:4,
72:6, 72:11,
73:22
**accuracy**
75:13
**accurate**
21:16, 58:3
**accurately**
14:5
**act**
81:20
**action**
1:6
**actions**
92:6

**actual**
18:6, 18:19,
30:5, 30:17,
32:4, 34:8,
34:13
**actually**
15:6, 30:4,
32:6, 36:15,
50:13, 63:18,
68:17
**addition**
28:16, 29:13,
47:5, 53:22,
54:9, 61:15,
76:3, 76:19
**additional**
6:1, 7:9, 7:13,
7:16, 7:22,
8:17, 8:22,
9:12, 9:15,
18:3, 32:21,
35:11, 42:8,
42:14, 42:21,
47:3, 51:7,
51:15, 52:5,
54:17, 57:11,
70:10, 70:13,
82:20, 89:20,
91:13
**address**
89:6, 89:12,
89:14, 93:9
**addressed**
42:8, 43:17
**administrator**
48:8
**affirm**
75:6
**affirmed**
5:4
**affixed**
94:14
**after**
8:18, 9:13,
12:20, 15:4
**again**
5:9, 16:20,
32:3, 38:15,

40:5, 44:11,
52:6, 60:20,
92:3
**against**
92:5
**ago**
8:6, 13:12,
85:15
**ahead**
85:7
**alejandro**
25:20
**alex**
60:15, 87:4
**all**
8:9, 9:1, 10:1,
10:4, 10:14,
17:14, 25:7,
26:19, 33:3,
38:4, 43:19,
46:15, 57:19,
59:3, 71:1,
74:10, 74:14,
77:10, 79:6,
83:9, 83:16,
86:21, 88:6,
88:7, 92:18
**allow**
6:9, 55:20
**allowed**
65:9
**almost**
74:18
**already**
5:13, 40:3,
43:14, 54:18,
93:10
**also**
11:6, 13:9,
13:18, 14:7,
16:14, 18:2,
21:13, 24:21,
27:9, 28:18,
29:15, 32:20,
35:8, 35:10,
42:8, 43:17,
49:9, 53:8,
54:2, 60:7,

60:15, 70:7,
86:12, 86:14,
87:11, 87:16,
87:22
**american**
28:11, 28:12,
28:19, 29:1,
29:14, 30:5,
31:8, 62:18,
67:11, 67:12,
68:1, 68:5,
68:10, 68:22,
69:1, 69:2,
69:5, 69:7,
69:14, 70:2,
70:6, 70:9,
71:19, 72:5,
72:11, 72:18,
72:20, 73:5,
73:8, 73:14,
73:16, 78:6,
85:20
**amount**
22:21, 25:16,
25:22, 26:4,
46:11, 46:12,
46:13, 46:14,
48:4, 57:13,
66:9, 69:14,
71:12
**amounts**
17:3, 29:22,
49:21, 74:15
**analysis**
26:20
**angel**
27:5, 87:5
**annual**
34:21, 42:5,
42:7
**another**
12:19, 26:1,
40:15, 64:22,
65:5, 72:8, 72:9
**answer**
6:21, 30:22,
50:10, 75:16,
75:17, 79:3,

79:21, 80:5,
80:12
**answering**
6:10
**answers**
4:16, 75:4,
75:7, 80:3
**any**
6:18, 7:1,
9:14, 9:15,
10:6, 10:12,
10:14, 10:22,
13:7, 13:8,
15:18, 15:22,
16:17, 17:1,
17:16, 17:17,
17:19, 20:2,
26:20, 26:22,
27:14, 31:20,
31:21, 33:6,
34:1, 34:4,
34:19, 35:19,
36:20, 40:4,
40:10, 40:18,
41:1, 41:11,
41:21, 42:19,
43:2, 43:10,
44:2, 45:4,
45:8, 45:14,
46:9, 47:2,
51:20, 52:4,
52:16, 52:18,
53:11, 54:17,
54:20, 55:9,
55:11, 57:10,
57:17, 60:17,
60:22, 62:8,
62:13, 62:16,
62:21, 63:4,
63:8, 64:17,
65:4, 66:9,
66:14, 67:1,
67:6, 72:5,
73:9, 73:21,
74:1, 77:20,
78:19, 78:20,
81:3, 82:20,
84:21, 85:1,

85:10, 87:10,
88:8, 90:14,
91:20, 92:5,
93:2, 94:11
**anyone**
62:2, 86:2
**anything**
11:4, 11:15,
11:17, 34:12,
46:2, 53:5,
53:19, 62:11,
67:1, 76:22,
78:2, 81:8,
83:1, 83:3,
92:16
**anyway**
71:22
**anywhere**
36:14
**apart**
32:12, 39:21
**app**
60:1, 60:4
**appear**
87:15
**appearing**
87:16
**appendices**
33:3
**applied**
79:1
**appreciate**
83:10
**appreciated**
6:17
**april**
38:20, 39:4
**around**
80:15
**ascertain**
26:3, 29:2,
30:10, 31:11
**asked**
32:9, 33:18,
43:6, 46:20,
57:9, 89:6
**asking**
19:1, 21:20,

25:5, 34:12,
44:21, 46:2,
46:9, 68:20,
69:17, 69:19,
71:16, 71:18,
80:10
**aspect**
46:11, 77:11
**assess**
20:1, 21:21,
22:2, 63:8
**assigned**
39:4, 39:9,
55:21, 56:7,
56:8, 58:6
**assigning**
81:21
**assist**
9:9, 15:22
**assistant**
7:18, 7:19
**assisting**
16:16
**associated**
19:16
**assumption**
28:3, 91:7
**attempt**
74:11, 91:7,
91:10, 91:11
**attention**
32:20, 75:15,
78:17, 89:4
**attorney**
38:10, 54:7
**audited**
33:1
**august**
6:3, 7:5, 8:12,
8:19, 9:13,
12:12, 20:15,
31:15, 35:10,
43:17, 51:4,
52:3, 80:1,
80:2, 91:14
**authority**
81:17
**authorized**
89:5, 89:11

available
14:10, 56:2
average
35:16, 35:20,
36:17
avoid
6:15
avoiding
9:7
aware
45:1, 78:16,
83:3, 92:9

**B**

back
13:8, 14:7,
32:16, 38:14,
47:18, 49:17,
50:8, 50:15,
50:17, 51:22,
67:8, 73:9,
83:19, 87:20
backup
29:18, 43:22
baker
3:11
balance
69:15
baltimore
3:6, 3:15
bank
19:10, 19:22,
23:6, 24:22,
28:14, 28:16,
29:5, 29:7,
29:13, 30:9,
30:13, 31:4,
31:5, 31:11,
31:16, 35:5,
48:18, 49:16,
49:22, 50:2,
62:18, 62:19,
63:2, 63:7,
63:14, 63:17,
63:22, 65:15,
65:20, 65:22,
66:2, 66:4,
66:6, 68:16,

68:20, 69:3,
71:8, 71:12,
71:18, 72:3,
72:9, 72:11,
72:15, 78:6
barnes
3:3, 3:4, 4:4,
4:6, 14:4,
14:16, 14:19,
14:22, 25:2,
25:5, 25:10,
29:12, 29:16,
30:20, 31:2,
32:13, 39:12,
39:14, 40:2,
44:21, 45:18,
46:8, 46:12,
46:17, 46:22,
50:10, 50:17,
51:8, 51:11,
67:18, 68:4,
68:9, 68:19,
69:10, 69:16,
70:3, 70:13,
70:16, 70:20,
71:3, 71:14,
71:21, 72:12,
72:14, 83:13,
88:6, 89:9,
92:20, 93:1,
93:7, 93:15
based
8:7, 67:5,
79:20, 80:11
basis
24:18, 34:21,
37:19, 37:21,
40:1, 55:15,
57:20
bates
23:10, 27:19
bearman
3:11
because
25:6, 29:10,
32:3, 32:8,
37:20, 46:4,
50:20, 58:17,

59:8, 65:3,
65:8, 68:16,
68:20, 71:21
been
8:18, 30:10,
30:15, 30:16,
32:2, 34:1,
34:15, 39:8,
40:8, 40:19,
45:3, 48:17,
48:18, 51:18,
54:6, 72:6,
78:8, 80:15,
84:21, 87:1
before
2:16, 5:10,
6:6, 6:10, 7:1,
12:20, 94:4
begin
6:6
beginning
23:10
behalf
3:2, 3:9, 65:5,
81:20
being
5:4, 17:18,
29:14, 31:6,
31:16, 44:17,
46:20, 51:5,
69:2, 86:1
belief
75:9
believe
8:8, 14:3,
14:15, 16:15,
18:21, 19:11,
22:13, 39:10,
41:22, 42:3,
46:5, 48:13,
49:20, 50:4,
50:6, 56:17,
59:1, 59:8,
64:6, 64:9,
70:22, 77:16,
79:14, 83:9,
84:8, 85:8,
87:7, 90:10,

91:2, 91:4,
91:6, 91:17
berkowitz
3:12
best
6:11, 11:10,
14:6, 75:8, 83:4
better
15:16, 19:3,
80:10
between
44:16, 66:12,
66:18
bid
9:2, 9:3,
10:18, 11:1,
11:11, 44:3,
44:9, 44:15,
44:17, 45:4,
45:8, 45:9,
45:15
bids
43:20, 78:19
billed
69:2
bit
23:8, 23:17,
23:20, 76:18,
77:9
blueprints
52:18
bobbie
48:7
both
14:14, 62:17,
69:12
brandon
38:19, 39:3,
39:8, 57:5,
57:6, 57:9,
58:12, 58:13
break
31:19, 47:14,
47:17, 50:13
breakdowns
34:18
brother
20:22, 75:22,

82:11, 82:19
**brought**
17:12, 43:9
**budget**
44:3, 44:9,
44:15, 44:19,
78:19
**budgets**
43:20
**buildertrend**
83:20, 83:21,
84:6, 84:10,
84:15, 84:22,
85:4, 85:11,
89:20, 90:4,
90:7, 90:9,
90:15, 90:16,
90:19, 90:22,
91:3, 91:5,
91:10, 91:12
**building**
77:17
**bullet**
89:17
**bundled**
27:10
**business**
92:11
**buy**
53:8
**buyer**
48:6

**C**

**calculate**
37:6
**calculated**
75:20
**calculation**
35:15, 35:19,
36:16, 38:21,
42:16, 43:3,
45:4, 46:10
**calculations**
42:11, 42:20
**caldwell**
3:12
**calendar**
34:2

**call**
33:17
**called**
83:20
**came**
22:14, 44:19,
63:20, 63:21,
77:16
**can't**
31:19, 62:5
**cannot**
26:3
**capital**
19:10, 19:15,
28:16, 29:13,
30:6, 30:13,
31:4, 48:18,
50:5, 62:18,
62:19, 63:7,
63:14, 71:18,
72:3, 72:10,
72:16, 78:6
**card**
28:12, 28:15,
28:19, 29:1,
29:20, 62:19,
67:12, 67:16,
69:2, 69:19,
69:20, 70:1,
70:11, 71:7,
71:15, 72:4,
72:8, 72:11,
72:18, 72:21,
73:1, 73:8,
73:10, 73:14,
73:17
**cards**
29:17, 30:6,
72:17, 73:5
**care**
69:15, 71:20
**carpentry**
76:4, 76:7
**case**
32:15, 39:16,
86:5, 87:4,
92:8, 94:11
**ceased**
74:13

**certain**
47:7, 56:21,
77:11, 82:1,
92:13
**certainly**
14:10
**certificate**
94:1
**certify**
94:5
**charge**
68:12, 69:8,
69:21, 69:22,
72:5
**charged**
28:11, 32:5,
48:10, 48:11,
50:7
**charges**
29:18, 29:19,
42:12, 43:3,
70:10, 71:1
**check**
13:8, 14:12,
56:1, 60:2,
65:18
**checkout**
86:3
**cindy**
7:18, 7:19,
28:2, 28:4,
28:13, 33:17,
73:6, 82:8,
82:16, 82:18,
91:16
**civil**
1:6
**clarify**
25:8, 68:4
**clear**
44:12
**client**
37:5, 52:21,
64:17, 65:14
**clock**
24:17, 26:14,
59:22, 60:6
**close**
36:6, 36:9,

**58:10**
**closed**
36:4, 36:7
**columbia**
1:2
**combined**
27:1, 27:2
**come**
36:2, 56:21,
63:14, 74:6,
85:19, 86:11,
87:20
**comes**
58:8
**coming**
26:16, 34:20
**commenced**
74:13
**commercial**
65:10
**commission**
94:16
**company**
20:22, 26:18,
28:15, 65:10,
65:11, 72:9,
84:13, 86:1
**compel**
7:6
**compensated**
76:2
**compile**
49:3
**complaint**
91:19, 91:21,
92:4, 93:4
**complete**
8:9, 21:15,
64:16, 81:22
**completed**
7:13, 37:3
**completely**
53:17
**computer**
10:7, 33:15
**concerned**
69:12
**concerning**
9:4

**conclusion**
66:8
**conduct**
7:9, 8:22,
10:7, 10:9,
18:3, 32:21,
33:13, 35:11,
42:14, 51:6,
51:14
**conducted**
1:11, 2:1, 8:9,
33:12, 83:5
**conducting**
91:13
**confirm**
14:8, 21:20,
23:4, 31:22,
39:11, 62:8,
63:17, 67:15,
68:1, 69:21,
70:1, 78:7,
89:6, 91:8
**confirmation**
32:6, 89:18
**confirmed**
33:18
**confirming**
58:11
**confused**
71:15
**conley**
7:18, 14:1,
28:4, 33:17,
33:21, 52:2,
54:11, 54:16,
91:16
**conley's**
7:19, 9:21,
28:13
**connection**
18:7
**constitute**
18:6, 35:14
**construction**
1:4, 4:10,
5:20, 19:18,
20:11, 20:17,
20:21, 21:17,

21:22, 22:7,
28:2, 35:3,
35:17, 40:8,
47:9, 48:1,
48:9, 48:14,
48:15, 48:22,
49:6, 60:10,
62:22, 63:5,
75:18, 81:1,
81:3, 81:5,
82:11, 84:2,
84:3, 84:6,
84:16, 86:15,
87:12
**construction's**
48:12
**construction-rel-
ated**
76:1
**contact**
91:10
**contacted**
33:21, 54:16
**contents**
75:7
**continue**
12:4
**continues**
64:13
**contract**
4:13, 10:18,
11:13, 11:18,
12:9, 44:8,
44:17, 45:11,
45:16, 45:21,
46:2, 52:17,
79:9, 89:11
**contracting**
23:22, 24:1,
24:5, 24:12,
24:14, 24:16,
24:21, 26:8,
26:10, 26:11,
26:12, 26:18,
27:4
**control**
8:10, 36:21
**conversation**
17:7

**conversations**
32:11
**coordinate**
82:3
**copies**
9:20, 52:20,
54:20, 55:2,
55:3, 55:8,
55:9, 55:10,
55:11, 61:16,
74:1
**copy**
33:15, 55:4,
73:21
**corporate**
5:19
**correct**
5:20, 6:4,
7:11, 10:19,
12:17, 17:10,
19:11, 19:19,
20:17, 21:1,
22:3, 22:20,
26:2, 27:12,
27:21, 28:3,
28:5, 35:9,
38:22, 44:4,
45:5, 45:6,
46:4, 46:16,
50:3, 50:11,
52:8, 53:17,
54:19, 55:15,
56:10, 56:16,
57:22, 58:6,
64:5, 70:7,
70:18, 72:1,
75:8, 78:3,
78:4, 78:10,
79:18, 79:19,
80:18, 82:12,
83:7, 89:8,
90:2, 90:12,
94:6
**correctly**
19:8, 85:2
**correspondence**
52:21, 54:3,
54:5, 83:19,

89:13
**cost**
9:2, 9:11,
10:22, 11:11,
17:3, 18:9,
18:13, 32:4,
34:8, 34:13,
42:16, 43:3,
46:6, 46:14,
48:15, 79:5,
80:7
**costs**
18:7, 18:10,
18:14, 18:19,
19:16, 20:2,
22:17, 30:17,
42:12, 46:11,
49:1, 50:6
**could**
5:10, 6:16,
15:21, 23:17,
25:17, 26:6,
27:10, 27:12,
37:7, 47:14,
71:11, 74:14,
84:18
**couldn't**
12:19, 33:16,
85:16
**counsel**
4:8, 5:7, 5:15,
11:22, 12:16,
14:4, 15:8,
20:9, 20:14,
29:16, 45:18,
64:3, 75:2,
83:12, 88:14,
88:15, 92:22,
94:10
**counter-plaintiff**
5:15
**couple**
8:5, 83:14,
88:10
**course**
84:19, 86:14
**court**
1:1, 6:3, 6:12,

7:5, 7:8, 7:14,
8:20, 18:2,
20:15, 32:20,
35:10, 42:8,
51:5, 51:8,
93:12
**court's**
6:3, 7:5, 8:12,
12:12, 31:15,
43:17, 51:4,
52:3
**cover**
22:17
**created**
13:6, 37:20,
79:4, 80:6,
80:14, 80:18
**credit**
28:19, 29:1,
29:17, 29:20,
62:19, 67:11,
67:16, 69:19,
69:20, 70:1,
71:7, 71:15,
72:4, 72:8,
72:11, 72:17,
72:18, 72:21,
73:1, 73:8,
73:10, 73:14,
73:16
**cross-reference**
69:12
**cross-referenced**
50:1, 67:13
**currently**
36:12
**custody**
8:10
**customer**
27:20, 28:1,
28:7

**D**

**daily**
24:18, 26:15,
37:19, 37:21,
39:22, 40:17,
55:15, 56:11,

57:17, 57:19,
58:11
**date**
13:5, 13:9,
13:10, 13:11,
13:13, 13:14,
13:17, 37:1,
37:2, 37:3,
39:9, 50:3,
74:13, 79:19
**dated**
80:4
**dates**
74:12
**day**
8:4, 27:11,
38:7, 56:8,
56:9, 57:13,
58:9, 58:14,
94:14
**days**
8:3, 8:5
**declare**
75:5
**defendant**
1:8, 3:9, 5:7,
5:15, 79:9,
88:15
**delegation**
81:17, 81:19
**deleted**
17:19, 92:14
**demonstrating**
79:5, 80:7
**deny**
62:8
**depend**
65:16
**depicted**
79:6
**deposed**
5:18
**deposit**
22:5, 65:19,
65:20
**deposition**
1:10, 2:1, 4:9,
8:16, 10:16,

12:2, 19:9,
19:13, 32:9,
94:4
**depositions**
40:3
**depot**
27:21, 34:11,
47:5, 67:15,
67:21, 68:6,
68:7, 68:10,
68:21, 69:1,
69:4, 69:9,
69:19, 74:9,
85:18, 86:3,
86:5
**designee**
5:19
**destroy**
93:2
**detail**
9:17, 18:18
**detailed**
18:8
**determination**
30:14
**determine**
26:21, 27:15,
57:10, 62:20,
67:7
**determined**
51:11
**different**
27:13, 60:14,
73:5
**direct**
22:5, 65:20
**directed**
15:16, 18:2,
35:11
**directly**
22:17, 24:8,
24:13, 30:17,
65:19, 76:3,
76:7, 78:15,
82:2, 82:15,
85:17
**discoverable**
30:19, 31:13

**discuss**
31:1, 82:19
**discussed**
34:7, 55:13,
62:17, 67:7,
67:22, 82:5
**discussions**
12:15
**distributed**
57:19
**district**
1:1, 1:2
**document**
7:10, 9:6,
11:12, 12:11,
12:13, 13:2,
13:6, 13:11,
13:20, 14:2,
14:6, 14:18,
15:1, 15:2,
15:4, 15:11,
15:20, 16:1,
16:11, 16:14,
16:19, 17:2,
17:4, 18:11,
20:13, 20:18,
22:2, 22:4,
23:10, 23:14,
26:4, 27:19,
32:22, 38:16,
42:9, 43:18,
44:15, 44:22,
45:14, 47:19,
49:11, 51:4,
57:18, 75:12,
84:19, 91:4
**documentation**
10:6, 17:8,
17:17, 17:19,
35:1, 36:21,
38:9, 38:17,
39:7, 39:13,
42:10, 42:15,
42:20, 43:7,
43:22, 45:8,
45:14, 46:7,
47:3, 52:5,
52:15, 54:12,

54:17, 59:5,
60:17, 60:22,
61:3, 61:11,
61:17, 64:4,
67:5, 81:4,
82:6, 82:15
**documentations**
42:21
**documented**
40:12
**documents**
6:2, 7:10, 8:8,
8:10, 8:11,
8:17, 9:3, 9:12,
9:16, 9:18,
10:2, 10:14,
11:2, 17:14,
17:15, 18:4,
18:5, 18:16,
18:19, 19:2,
20:16, 21:3,
23:9, 33:5,
35:12, 35:13,
40:19, 43:2,
43:10, 43:11,
43:13, 43:19,
44:14, 51:20,
52:3, 52:16,
52:18, 54:21,
55:1, 55:4,
61:21, 67:4,
82:20, 83:6,
83:18, 85:3,
85:9, 85:11,
91:22, 92:7,
93:3
**docusign**
89:19
**dollar**
17:4
**done**
10:1, 20:4,
27:17, 56:3,
74:17
**donelson**
3:11
**double-check**
29:10, 82:8

**down**
23:8, 23:17,
23:20, 27:18,
31:19, 32:14,
76:18, 86:19
**drafting**
76:20, 77:3
**drawing**
78:17
**drive**
10:3, 10:14,
11:7, 11:8,
13:3, 13:4,
13:16, 13:21,
17:13, 19:6,
52:6, 52:11,
52:14, 53:14,
53:17, 53:22,
54:10, 61:15,
92:12
**duenas**
80:20
**duly**
5:4
**dumbarton**
3:5
**duplicative**
60:12
**during**
10:16, 12:2,
12:16, 13:2,
19:9, 19:13,
19:21, 30:6,
32:8, 33:9,
37:5, 47:3, 87:7

**E**

**e-mail**
10:3, 10:11,
52:20, 52:22,
53:2, 54:2,
54:9, 61:16,
73:22, 74:6,
86:6, 89:6,
89:12, 89:13,
89:14, 93:9
**e-mailed**
73:21, 74:1

**e-mails**
74:9, 74:12,
85:16, 85:20,
85:21, 92:12
**each**
37:18, 50:19,
76:2, 78:22
**earlier**
40:3, 47:6,
58:3, 63:10,
83:16, 83:19
**earned**
32:2
**easier**
6:13, 26:17
**effect**
53:20
**efforts**
6:2, 9:17,
18:18
**either**
13:6, 17:18,
17:21, 18:13,
18:15, 22:16,
31:11, 33:7,
33:9, 35:2,
43:20, 53:12,
57:17, 57:19,
66:11, 68:15,
82:17, 86:16
**elaborate**
64:19, 74:4
**electronically**
93:11
**elrahimy**
1:10, 2:1, 4:2,
5:3, 5:9, 5:12,
7:4, 10:17,
12:5, 15:10,
22:19, 22:22,
28:2, 32:19,
35:3, 41:17,
43:1, 44:10,
46:19, 50:12,
51:3, 53:13,
63:9, 74:18,
74:19, 83:8,
88:19, 93:2

**elrahimy's**
30:8
**else**
11:15, 34:13,
46:2, 54:10,
59:19, 61:20,
62:3, 83:1, 83:3
**employed**
87:7, 94:10
**employee**
7:20, 32:1,
37:15, 38:7,
41:14, 42:4,
42:6, 55:21,
57:6, 58:4,
58:15, 59:11,
59:15, 59:17,
59:18, 60:6,
80:22
**employees**
21:9, 21:12,
21:17, 21:22,
22:6, 22:7,
22:11, 22:17,
23:16, 24:17,
25:14, 26:9,
26:21, 27:6,
30:15, 37:21,
40:11, 41:2,
41:11, 55:15,
56:7, 56:21,
57:19, 60:19,
61:1, 61:19,
73:2, 73:13,
81:18, 81:21,
87:15, 87:17
**end**
36:5, 58:9,
58:14
**engineer**
64:21, 65:3
**engineering**
76:20, 77:3,
77:7, 77:8
**enough**
25:6
**ensure**
91:22, 92:6,

92:13
**entail**
9:22
**enter**
59:17, 59:21,
86:3, 86:7,
86:10
**entered**
25:20
**enters**
58:4
**entirety**
58:21
**entitled**
67:8
**entries**
23:12, 23:16,
24:13, 25:15,
31:17, 40:17,
40:22, 55:21,
59:3, 60:18,
60:22
**entry**
39:2, 39:5,
58:20
**especially**
31:14
**esquire**
3:3, 3:10
**est**
1:13, 93:17
**establish**
29:19
**estimate**
11:1, 11:11,
11:17, 44:3,
44:9, 44:16,
45:4, 45:9,
45:15, 79:5,
79:7, 80:7, 80:8
**estimated**
79:1
**estimates**
9:2, 9:12,
43:20, 46:6,
78:19
**evasive**
51:5, 51:9,

51:12, 51:13
**even**
30:13, 74:7,
85:1
**ever**
22:10, 36:16,
50:7, 62:1, 73:1
**every**
19:7, 26:15,
26:16, 36:5,
37:18, 38:1
**everybody**
58:11
**everybody's**
89:10
**everyone**
6:14, 37:7,
41:13, 50:16
**everything**
10:9, 10:15,
11:6, 17:9,
18:22, 19:5,
26:22, 27:2,
44:5, 49:3
**exact**
49:21, 79:19
**exactly**
9:21, 37:8,
47:14, 62:6,
64:19, 65:2,
71:6, 81:16
**examination**
4:2, 5:7,
83:12, 88:15,
92:22
**examined**
5:6
**example**
25:20, 27:5,
31:22, 38:16,
40:15, 47:13,
49:6, 60:15,
65:18
**excel**
16:4, 16:17,
16:22, 57:18,
79:15
**executed**
44:18, 45:21

**execution**
10:19, 11:13,
44:8, 45:11,
45:16, 46:1
**exhibit**
4:10, 4:12,
4:14, 4:16,
4:20, 11:21,
14:15, 15:7,
20:8, 27:18,
75:1, 88:13,
88:19
**exhibits**
4:9, 9:8, 12:2,
12:4, 33:3
**exist**
44:14, 61:12
**existed**
17:19, 44:16
**existing**
77:17
**exists**
17:18, 52:5
**expect**
36:2, 36:16
**expected**
66:9
**expecting**
76:2
**expended**
35:15
**expenditure**
29:22
**expires**
94:16
**explain**
16:3
**explaining**
13:18
**express**
28:12, 28:19,
29:1, 29:14,
30:5, 31:8,
62:18, 67:11,
67:13, 68:1,
68:6, 68:10,
68:22, 69:1,
69:2, 69:5,

69:8, 69:14,
70:2, 70:6,
70:9, 71:19,
72:5, 72:11,
72:18, 72:20,
73:5, 73:8,
73:14, 73:16,
78:7, 85:20

**F**

**faces**
89:10
**fact**
25:20, 33:16,
39:17
**fadi**
33:18, 85:8
**fair**
32:17, 87:17,
88:4
**false**
25:11
**familiar**
83:21
**far**
16:6, 16:12,
24:20, 67:11,
90:20
**farther**
23:8
**father**
10:17, 10:21,
15:14, 15:16,
15:22, 16:14,
17:7, 17:17,
42:22, 43:13,
45:13, 53:13,
62:2, 63:9,
64:1, 64:7,
64:11, 64:17,
64:21, 65:5,
65:8, 65:13,
66:1, 66:9,
66:14, 66:19,
66:22, 72:13,
72:15, 90:8,
90:11, 90:14,
90:21, 91:11

few
23:21
figure
37:8, 71:11,
86:19
file
9:20, 84:6,
84:15, 84:22,
85:12
filed
12:21, 91:19,
92:4, 92:5
files
10:8, 54:21
filing
93:3
final
82:4, 91:18
finally
43:16
financial
33:2, 33:6,
33:8, 33:19,
34:1, 34:4,
34:7, 72:10,
94:12
find
9:18, 19:4,
33:16, 44:2,
55:11
fine
14:22, 30:11
finish
6:10, 47:16
finished
50:18, 74:18
first
5:4, 6:8,
20:16, 20:18,
23:21, 32:8,
32:10, 39:14,
44:11
five
20:18
five-minute
50:13
focus
8:16

folder
10:14, 13:8,
13:10, 43:9,
52:10, 54:1,
54:10
folders
10:3
follow-up
83:15, 88:8,
91:18, 92:20
followed
45:19
following
91:14, 91:21
follows
5:6
foregoing
75:7, 94:4,
94:5
foreman
26:18
forget
86:14, 86:17
format
14:11, 16:4,
16:5
formatting
16:16, 16:22
forth
6:3, 12:4,
83:20
found
11:12, 13:1,
26:17, 51:21
foundation
77:17
full
64:15
full-time
87:19
fully
52:1
funds
65:17
further
76:18

G

gave
93:9

general
4:15, 16:13,
19:18, 25:3,
25:4, 46:7,
57:4, 73:11
generated
26:11, 87:8
getting
85:20
gilreath
3:10, 4:3, 4:5,
5:8, 5:14,
11:19, 12:1,
14:13, 14:17,
14:20, 15:9,
20:5, 25:5,
25:8, 25:12,
29:12, 30:8,
30:21, 31:10,
32:18, 39:12,
39:20, 40:6,
46:4, 46:9,
46:16, 47:1,
50:12, 50:22,
51:2, 51:10,
51:13, 51:17,
68:7, 68:11,
69:7, 69:11,
69:18, 70:7,
70:15, 70:18,
70:21, 71:6,
71:17, 72:1,
72:2, 74:21,
83:8, 88:10,
88:16, 92:18,
93:13
give
21:15, 47:16,
47:17
given
22:15, 27:11,
34:15, 37:15,
37:16, 38:7,
39:3, 56:8,
56:9, 56:14,
57:1, 61:3,
64:17
goes
30:16

going
6:6, 6:9, 8:14,
8:16, 9:8, 12:3,
20:6, 29:21,
30:7, 30:8,
31:6, 31:20,
34:20, 46:13,
46:14, 47:18,
50:14, 68:20,
68:21, 69:3,
69:4, 74:22,
88:12, 93:13
gone
52:6
good
31:20, 31:21,
93:14
google
10:13, 11:7,
11:8, 13:3,
13:4, 13:16,
13:21, 19:6,
52:6, 52:11,
52:14, 53:17,
53:22, 54:10,
61:15, 92:12
gross
22:5
ground
6:7
group
56:11, 56:13
guess
19:7, 40:5,
59:10
guys
17:14, 56:11,
58:9, 86:7,
86:14, 86:15

H

hand
94:14
hands
54:18
hard
9:20, 33:15,
54:20, 55:2,

55:3, 55:4,
55:8, 55:9,
55:10, 55:11,
61:16
**hear**
50:10
**hearing**
32:10, 39:15
**help**
87:20
**helping**
16:21
**here**
5:22, 25:19,
29:11, 38:19,
49:10, 58:15
**here's**
31:18
**hereby**
94:5
**hereunto**
94:13
**hey**
49:7
**highlight**
70:10
**hired**
75:17, 76:3,
76:7, 76:19
**home**
27:21, 34:11,
47:5, 67:14,
67:21, 68:6,
68:7, 68:10,
68:21, 69:1,
69:4, 69:9,
69:19, 74:9,
85:18, 86:2,
86:5
**hourly**
41:13, 42:4,
42:6, 55:14,
56:6, 61:19,
81:21, 87:11
**hours**
21:21, 24:19,
25:20, 38:21,
58:18

**however**
6:21
**hummon**
1:22, 2:17,
94:2

**I**

**idea**
79:21, 90:14
**identification**
11:22, 15:8,
20:9, 75:2,
88:14
**identified**
8:11, 18:13,
24:11, 27:4,
33:6, 47:19,
51:5, 52:3, 79:8
**identifies**
47:22
**identify**
9:13, 19:2,
39:2, 51:20,
52:4, 61:21,
63:4, 74:14,
78:18
**illustrated**
40:18
**important**
32:7, 68:16
**impression**
25:11
**inc**
4:10, 20:11,
20:21
**include**
9:19, 21:12,
29:7
**included**
16:7, 17:1,
25:18, 27:10,
27:12, 74:15
**includes**
21:9, 22:4
**including**
18:8, 33:2,
78:21
**incorporated**
45:21, 82:12

**incurred**
18:7, 18:19,
20:2, 30:17,
32:4, 34:9,
34:13, 50:7
**indicate**
47:7
**indicated**
51:21, 58:3
**indicates**
39:18
**individual**
10:8, 18:10,
18:14, 26:17,
28:14, 49:2,
49:18
**individually**
61:8
**individuals**
24:11, 27:3,
73:7
**inferring**
90:2
**information**
10:6, 13:5,
15:18, 15:19,
16:6, 16:7,
16:18, 17:1,
17:16, 21:5,
21:11, 22:2,
22:5, 22:6,
28:1, 30:22,
34:1, 34:5,
34:8, 34:10,
34:19, 35:4,
35:6, 35:18,
36:1, 36:3,
36:7, 36:8,
36:11, 36:14,
37:4, 37:11,
38:6, 40:7,
40:9, 40:21,
44:2, 44:20,
47:10, 55:18,
57:12, 58:21,
59:6, 60:11,
60:12, 61:4,
71:9, 75:9,

82:7, 86:10
**initial**
12:2, 42:19
**initially**
13:19
**instead**
26:16
**institution**
72:10
**instructed**
73:8, 73:17
**instructing**
81:22
**interest**
94:12
**internal**
9:2, 10:22,
56:10, 56:12,
66:12
**interrogatories**
4:17, 75:4,
75:8, 80:4
**interrogatory**
30:22, 75:16,
78:17
**introduced**
5:13
**invoice**
26:11, 26:12,
26:14, 47:20,
48:15, 49:7,
49:8, 49:10,
67:21, 70:1,
73:18, 76:21,
77:19
**invoices**
47:7, 49:17,
49:19, 50:2,
67:14, 68:9
**invoicing**
47:10, 77:21
**involved**
10:13, 10:18,
21:10, 25:14,
34:17, 40:11,
40:16, 41:17,
45:3, 62:3
**involvement**
81:5

ipasumi
1:7, 5:16
**issue**
22:10, 28:18,
37:5, 49:2,
64:15, 81:7
**issued**
22:18, 27:20,
62:21, 78:8,
78:11, 78:12,
89:1
**it'll**
29:22
**item**
46:5, 46:10,
78:22, 89:5
**items**
17:12, 50:19,
89:4
**itself**
16:22, 74:6

**J**

**january**
1:12, 94:15
**jason**
56:17, 56:19
**job**
1:20, 6:13,
18:9, 18:13,
34:18, 42:12
**journal**
18:9, 18:14,
41:1
**july**
5:18, 94:16
**june**
91:20, 92:5,
93:4

**K**

**keep**
24:18, 37:3,
52:16, 53:7,
53:8
**keeping**
58:18, 58:20,
59:2

**kept**
27:8, 36:11,
36:13, 41:6
**kind**
46:15
**kirk**
56:17
**know**
6:16, 6:20,
14:1, 14:9,
15:10, 18:1,
34:5, 34:18,
37:18, 61:11,
65:9, 66:12,
68:12, 68:13,
71:9, 75:19,
79:17, 84:5,
85:10, 90:18,
91:16
**knowledge**
11:11, 75:9,
83:4
**knows**
14:9

**L**

**label**
24:2, 37:22,
74:22
**labeled**
24:8, 74:6
**labor**
26:19, 27:15,
46:14
**laborers**
40:11, 40:18
**larger**
49:4
**last**
13:17, 90:19
**later**
86:18
**law**
3:4
**lawsuit**
12:21
**least**
30:21, 31:22

**leave**
25:11
**ledger**
18:10, 18:14,
66:12, 66:18,
67:7
**left**
58:15
**legally**
71:22
**lend**
73:1
**lent**
73:5
**less**
69:12
**let's**
47:16, 50:13,
50:15, 65:17
**letters**
33:4
**letvian**
4:14
**light**
3:13, 31:14
**likely**
49:15, 87:18
**likewise**
27:3, 65:13
**limited**
4:12, 12:8,
18:8, 78:21
**line**
12:3, 46:5,
46:10, 78:21
**lists**
87:2, 87:3
**litigation**
12:17, 92:2,
92:15
**little**
23:8, 23:17,
23:20, 27:18,
76:18, 77:9
**llc**
1:4
**locate**
18:15, 18:18,

33:8, 42:19,
47:2, 53:19,
62:11, 62:13
**longer**
17:18, 17:20
**look**
10:8, 14:8,
21:16, 30:1,
32:14, 32:16,
39:17, 40:5,
43:8, 52:2,
53:8, 54:10,
54:11, 54:20,
62:7, 69:20
**looked**
30:12, 33:15,
55:8, 55:9,
55:10, 61:13,
61:14, 90:21
**looking**
21:3, 30:4,
38:15, 44:13,
46:17, 69:5,
70:2, 70:19
**looks**
23:11, 27:20
**lost**
90:15
**lot**
6:13, 32:4,
71:4, 86:7
**lots**
87:2
**lumber**
71:5
**lump**
31:18, 49:13

**M**

**madam**
12:1
**made**
19:14, 23:2,
26:9, 29:8,
29:11, 31:6,
35:2, 53:12,
63:8, 64:7,
64:9, 65:18,

67:9, 67:15,
68:15, 69:13,
69:21, 69:22,
70:11, 73:10
**main**
22:13, 65:21
**maintain**
27:14, 35:19,
36:20, 40:16,
41:1, 41:20,
52:20, 53:1,
53:3, 53:11,
55:2, 55:3,
55:14, 56:10,
59:13, 66:18,
77:20
**maintained**
19:10, 25:19,
28:18, 37:11,
39:7, 40:8,
40:22, 41:14,
52:7, 52:13,
52:22, 59:12,
60:7, 61:4,
72:4, 72:9,
76:15, 84:16,
85:11, 92:14
**maintaining**
92:11
**make**
6:12, 14:10,
28:19, 30:13,
31:2, 31:21,
49:11, 49:13,
49:15, 50:18,
50:20, 52:1,
58:2, 73:15,
83:15
**making**
91:7
**man-hour**
34:10
**man-hours**
27:16, 35:15,
35:16, 35:20,
36:17, 37:1,
37:7, 46:15
**manage**
64:10

**management**
58:19, 75:18
**manager**
56:13, 58:8,
65:4, 86:16
**many**
37:1
**mark**
20:7
**marked**
11:20, 11:21,
12:6, 15:7,
20:8, 75:1,
79:14, 88:13,
88:17
**marking**
12:4, 14:14,
14:20
**maryland**
2:19, 3:6,
3:15, 94:22
**material**
42:12
**materials**
19:15, 28:7,
28:20, 29:8,
47:8, 71:2,
73:3, 85:22
**matter**
5:16, 71:22,
91:19
**maybe**
8:6, 19:7,
55:7, 65:2,
65:3, 85:14
**mean**
17:4, 19:5,
25:2, 32:14,
32:17, 34:4,
64:20, 68:5,
69:12, 71:4,
81:16, 81:19
**meet**
5:9, 50:15
**mentioned**
63:10, 64:2
**message**
56:20, 57:16,

58:14
**messages**
57:10, 57:11,
61:18, 62:7,
62:9, 62:14,
62:15
**messaging**
56:11, 56:13,
58:7
**metadata**
13:16, 13:20,
14:2, 14:8,
14:14
**method**
48:6
**methodology**
42:11, 42:15
**might**
30:14, 80:15,
85:12, 87:14
**min-u-script**
93:10
**mind**
83:14
**mine**
89:10
**minute**
47:17
**misapprehension**
39:16
**misunderstood**
55:7
**mixture**
21:8
**modified**
13:17
**moment**
85:15
**monday**
1:12
**money**
46:11, 66:3,
66:10, 66:13,
66:14
**monitored**
41:4
**monthly**
26:11, 35:16,

35:20, 36:17,
39:22, 57:20
**more**
23:17, 50:14,
51:22, 64:19,
71:4, 77:9, 81:2
**most**
32:7, 49:15,
86:9, 87:18
**mostly**
88:1
**motion**
7:6
**mouth**
37:14
**much**
6:17, 9:8,
21:21, 26:21,
27:15, 32:1,
36:22, 37:15,
50:14
**myself**
5:13

## N

**name**
5:11, 10:12,
48:7, 65:8,
65:11, 68:14,
72:6, 86:17,
86:18, 89:14
**name's**
5:14
**names**
23:18, 23:21,
87:2
**native**
14:11
**nature**
25:19, 53:5
**necessarily**
25:16, 71:1,
74:8
**necessary**
35:16
**need**
37:6, 50:14,
66:2, 71:20,

93:15
**needed**
35:20, 36:17,
51:6
**negotiation**
10:19
**neither**
94:10
**nekustamie**
1:7, 5:16
**never**
75:20
**new**
14:18
**next**
24:12
**nice**
5:9
**nonverbal**
6:15
**notarial**
94:14
**notary**
2:18, 94:1,
94:3, 94:21
**notes**
33:3
**nothing**
5:5
**notice**
2:16
**november**
25:21, 80:5
**number**
9:1, 9:11,
9:19, 12:6,
16:12, 18:4,
18:5, 20:7,
20:10, 23:9,
23:10, 27:19,
32:22, 33:1,
35:12, 35:13,
35:14, 38:15,
42:9, 42:10,
43:16, 43:18,
47:7, 47:18,
73:13, 74:22,
75:16, 78:18,

79:3, 79:21,
80:5, 80:12,
86:4, 86:8,
86:10, 86:13,
88:18, 88:20,
89:17, 90:3
**numbers**
17:4
**numerous**
27:11, 74:12

### O

**object**
67:18
**obscured**
89:9
**obtain**
85:9
**obviously**
33:19, 39:19
**occasionally**
88:2
**occasions**
87:22
**october**
80:16
**office**
17:12, 37:7,
80:20
**officer**
89:15, 89:18,
94:4
**offices**
54:21
**official**
89:13, 89:14,
89:18
**often**
62:5
**oh**
70:11, 70:13
**okay**
7:4, 20:5,
32:13, 32:19,
35:6, 46:18,
46:22, 50:17,
50:22, 55:13,
68:9, 70:20,

83:8, 84:5,
84:13, 84:19,
85:5, 85:10,
85:15, 86:21,
87:14, 88:6,
89:4, 89:16,
92:18, 93:7
**omar**
85:2, 91:4
**once**
89:18
**one**
6:19, 8:4,
8:21, 12:19,
14:16, 19:11,
19:15, 24:3,
28:16, 29:13,
30:6, 30:13,
31:4, 44:22,
47:17, 48:18,
49:3, 49:12,
49:13, 50:5,
51:22, 56:19,
62:18, 62:19,
63:7, 63:10,
63:14, 69:5,
71:19, 72:3,
72:10, 72:16,
73:6, 73:13,
78:6, 82:4,
84:13, 91:18,
92:20, 93:11
**one's**
15:1
**ones**
70:13, 70:16
**ongoing**
20:1, 41:5,
55:20, 84:14
**online**
9:20, 23:3
**only**
13:17, 41:4,
41:6, 59:4,
61:3, 70:2,
93:11
**onorio**
48:7

**open**
13:10, 13:13
**operated**
20:22, 75:21
**operates**
82:11
**operating**
90:12
**optimum**
4:10, 20:11,
20:17, 20:21,
21:4, 21:17,
21:22, 22:7,
22:9, 22:11,
22:16, 23:16,
25:13, 35:3,
40:8, 47:9,
47:22, 48:8,
48:11, 48:14,
49:6, 49:14,
49:18, 50:5,
50:7, 50:8,
53:13, 56:18,
58:18, 58:20,
59:2, 59:4,
59:12, 60:7,
60:10, 60:16,
60:17, 60:21,
62:21, 63:5,
67:19, 75:18,
75:21, 76:6,
76:10, 76:14,
82:5, 82:6,
82:11, 84:3,
84:5, 84:16,
85:12, 87:11,
87:15, 87:20
**optimum's**
68:13, 76:4,
84:10, 88:1
**option**
86:12
**order**
6:3, 7:5, 7:8,
8:12, 8:20,
12:12, 18:2,
20:15, 28:10,
31:15, 32:20,

35:10, 42:8,
43:18, 51:4,
52:4, 91:14
**ordering**
51:14
**ordinary**
48:21, 92:10
**original**
43:19, 43:21,
44:2, 44:9,
44:15, 45:4,
45:8, 45:15,
78:19, 78:20
**originally**
15:5
**other**
11:14, 11:16,
16:16, 16:21,
17:11, 19:16,
21:13, 23:18,
25:18, 26:1,
33:14, 37:4,
40:7, 40:10,
40:18, 40:21,
47:7, 57:16,
63:10, 64:22,
65:7, 65:12,
72:3, 72:5,
72:17, 74:10,
76:2, 78:13,
85:10, 87:5,
92:10, 93:7
**others**
68:13
**otherwise**
94:12
**out**
24:18, 26:16,
30:1, 34:21,
36:6, 36:8,
36:10, 37:8,
57:3, 58:10,
59:22, 65:18,
71:5, 71:11,
73:1, 77:16,
85:8, 86:19
**outcome**
94:12

**outstanding**
69:15
**over**
6:11, 6:12,
8:3, 43:10,
81:17, 88:2
**overhead**
42:12, 42:16,
43:3, 79:1
**overseeing**
59:21
**oversight**
75:19
**owe**
66:13
**owed**
73:18
**own**
17:10, 26:18
**owned**
20:22, 75:21
**owner**
75:22, 89:5,
89:11
**owners**
89:7, 89:15
**owns**
82:11

---
**P**
---

**pa**
3:4
**page**
4:2, 20:13,
50:21
**pages**
1:21, 4:11,
20:17, 20:18,
23:21
**paid**
22:7, 22:16,
22:17, 22:21,
24:13, 24:14,
24:15, 24:17,
26:8, 30:15,
30:16, 32:2,
32:3, 32:6,
32:9, 32:10,

32:11, 42:1,
47:9, 49:8,
49:20, 50:4,
53:9, 63:12,
63:19, 63:21,
67:1, 68:2,
68:5, 68:6,
68:8, 68:10,
68:17, 68:21,
68:22, 69:19,
71:2, 71:19,
73:19, 76:11,
78:15
**paper**
17:12, 33:15
**papers**
9:3, 81:9
**paperwork**
9:20, 11:9,
37:10
**parentheses**
23:21
**part**
17:15, 24:9,
44:12, 89:9
**participate**
16:8, 16:10
**participated**
7:16
**particular**
8:4, 35:21,
84:7, 84:11,
84:22
**parties**
10:13, 94:11
**partner**
81:2, 81:9,
81:15, 90:12
**paul**
80:20
**pay**
48:3, 50:8,
63:13, 70:6,
73:2
**payable**
68:18
**paycheck**
26:15, 26:16

**paying**
76:22, 78:2
**payment**
19:14, 22:11,
22:14, 22:18,
23:2, 23:5,
23:6, 26:9,
31:18, 32:8,
48:6, 49:4,
49:13, 53:3,
53:12, 64:1,
65:13, 67:1,
69:3, 69:4,
69:22
**payments**
24:20, 24:21,
28:18, 28:19,
29:2, 29:8,
29:11, 30:11,
31:6, 34:20,
35:2, 49:2,
49:12, 49:15,
53:12, 62:21,
63:4, 63:9,
63:20, 64:12,
64:16, 67:15,
68:15, 69:13,
69:21, 78:7,
78:11, 78:12,
85:22
**payroll**
19:16, 20:16,
21:5, 21:11,
22:4, 23:15,
34:10, 35:17,
40:7, 40:9,
41:1, 55:18,
59:4, 60:10,
60:15, 60:16,
71:8, 82:5,
82:7, 85:3,
87:1, 87:3
**payrolls**
60:13
**paystation**
38:6, 38:17,
39:7, 39:21,
40:10, 40:22,

**pc**
3:12
**penalties**
75:6
**people**
60:14, 87:2,
87:5, 87:6,
87:10, 87:11,
87:14, 88:1
**perform**
75:18, 76:1,
76:4, 76:7,
79:5, 79:7, 80:8
**period**
30:6, 31:5,
31:9, 37:16,
55:18, 87:8,
88:3
**periodically**
87:10
**perjury**
75:6
**perry**
47:20, 48:12,
67:14, 67:19,
68:12
**person**
5:14, 26:17,
37:19, 38:1,
89:6, 89:12
**pertain**
18:6, 35:14
**phone**
60:1, 60:4,
86:4, 86:8,
86:10
**physical**
61:17
**pictures**
89:10
**place**
8:1, 8:3, 8:18,
10:10, 63:18
**plaintiff**
1:5, 3:2,
75:17, 75:19,
76:3, 76:19,

76:20, 79:4,
80:6, 83:12,
92:22
**plaintiff's**
4:16, 23:10,
27:19, 38:16,
47:19, 49:10,
75:3, 75:22
**plans**
4:15, 16:13,
79:6
**please**
5:11, 6:9,
6:20, 48:3,
89:13
**po**
86:12
**point**
6:18, 15:4,
18:21
**position**
28:6
**possess**
35:1, 35:7,
54:17
**possession**
8:10, 10:2,
11:5, 17:8,
17:21, 17:22,
34:16, 36:3,
43:2, 43:14,
61:6, 61:7
**possibility**
60:9
**possible**
9:8, 25:21,
44:6, 44:8,
44:14, 47:15,
82:14, 82:18,
87:13
**potential**
61:18
**potentially**
34:12, 51:8,
51:13, 54:11,
61:21
**power**
81:20

**practice**
48:21, 57:4,
81:15
**practices**
92:11
**predated**
45:9, 45:16
**predominantly**
8:16
**preexisted**
46:1
**preparation**
16:10
**prepare**
26:7, 43:8,
81:3, 89:19
**prepared**
9:4, 10:22,
11:13, 12:13,
12:16, 12:18,
12:20, 15:3,
15:6, 15:10,
16:14, 43:9,
44:10, 44:17,
45:20, 57:17,
77:22, 79:18,
79:22
**preparing**
15:19, 16:1
**preservation**
92:7
**preserved**
92:1
**previous**
8:15, 10:16,
12:3, 44:16,
67:8
**previously**
5:18, 8:15,
8:20, 17:6,
28:17, 30:12,
56:5, 62:17,
67:22, 79:13,
80:17, 82:4,
82:10, 88:13,
88:17, 88:22,
90:11
**pricing**
9:3, 11:1,

11:12, 78:22
**prior**
11:13, 11:18,
44:7, 75:13
**pro's**
6:1, 8:7,
17:21, 19:17,
19:18, 19:22,
20:5, 23:6,
24:22, 28:6,
33:1, 34:16,
43:14, 43:19,
54:21, 61:12,
65:8, 68:14,
79:3, 81:18
**probably**
57:5, 63:12
**proceedings**
94:7
**process**
10:18, 19:2,
51:19
**produce**
79:9
**produced**
8:18, 12:11,
18:12, 19:3,
20:6, 20:14,
30:19, 31:14,
33:5, 34:10,
34:11, 38:9,
38:18, 39:22,
40:9, 40:10,
40:13, 40:19,
50:2, 51:18,
54:6, 55:17,
59:5, 60:10,
70:5, 70:17,
83:19, 87:1,
87:4
**production**
15:4, 18:12,
20:6, 23:11,
27:19, 38:16,
45:19, 47:19,
49:11, 79:10
**professional**
2:17, 76:19,

94:3
**profit**
42:13, 42:16,
43:4, 79:1
**program**
16:17, 16:22,
83:20, 84:1,
84:10
**progress**
4:20, 89:1,
90:3
**projects**
21:13, 25:18,
27:11, 27:13,
38:4, 39:3,
39:8, 56:8,
65:7, 65:10,
65:12, 74:10,
78:13, 84:2,
88:3
**projects-related**
93:3
**proof**
53:3, 53:8,
53:11, 67:1
**properly**
92:1
**proposal**
45:20, 45:22,
46:5
**protected**
92:14
**provide**
13:5, 13:16,
13:17, 15:2,
16:9, 16:17,
17:1, 49:7,
49:9, 57:11,
59:5, 60:17,
60:21, 73:9,
77:5
**provided**
16:9, 16:18,
17:3, 21:11,
30:22, 34:1,
43:13, 45:7,
45:13, 54:7,
56:6, 64:3,

65:13, 66:22,
67:3, 67:14,
82:5
**providing**
16:8
**public**
2:18, 94:1,
94:3, 94:21
**pull**
9:5, 38:14,
47:12, 74:9
**purchase**
71:15, 73:15,
86:2, 86:4,
86:6, 86:8
**purchased**
86:1
**purchases**
73:10
**pursuant**
2:16
**put**
9:8, 67:6,
74:7, 86:12,
86:16, 86:17

---
**Q**
---

**quality**
36:21
**question**
6:9, 6:10,
6:21, 6:22,
19:8, 21:19,
25:6, 34:6,
41:3, 44:12,
47:16, 59:10,
88:7, 91:18
**questions**
6:19, 7:1,
15:15, 83:15,
88:11, 93:8
**quote**
18:5, 80:6

---
**R**
---

**raouf**
10:17, 15:12,
15:13, 15:14,

22:15, 22:16,
22:19, 22:22,
30:14, 32:8,
32:11, 35:3,
40:16, 43:1,
44:10, 45:3,
45:7, 53:13,
63:9, 80:17,
80:20, 80:22,
81:8, 81:17,
84:17
**raouf's**
17:21, 81:4
**rates**
42:11, 42:16,
43:3
**reach**
85:8
**read**
9:6, 93:13,
93:15
**reason**
70:2
**recall**
7:22, 12:13,
12:18, 13:1,
20:4, 22:21,
23:2, 43:12,
47:9, 62:4,
65:2, 66:17,
72:19, 74:3,
76:6, 76:10,
76:13, 76:14,
77:2, 78:14,
79:15, 85:2,
92:16
**receipt**
27:20, 28:7,
70:4, 73:17,
86:9, 86:19
**receipts**
10:3, 17:11,
34:11, 47:6,
52:18, 53:7,
70:22, 73:9,
73:21, 74:1,
74:10, 74:15,
85:18, 86:6,

86:11
**receive**
82:6, 85:16,
85:22
**received**
76:21, 77:19,
77:20, 82:14,
89:19
**recently**
79:4, 80:6
**recess**
51:1
**recognize**
48:7
**recollection**
45:19, 48:16,
80:11
**record**
5:11, 25:9,
62:16, 76:22,
78:2, 86:8,
87:21, 93:17,
94:6
**records**
4:11, 21:4,
25:13, 25:18,
30:10, 30:13,
31:12, 31:17,
32:1, 32:5,
49:16, 60:9,
68:16, 71:8,
71:12, 71:18,
78:6, 84:21,
85:3, 87:1,
87:8, 87:15,
87:17, 88:2,
88:4
**reduced**
79:8, 80:8,
94:8
**refer**
5:16, 18:6,
35:14, 86:14
**reference**
83:18
**reflect**
25:16, 63:22
**reflected**
24:22

**reflecting**
45:8, 45:15, 64:4
**regard**
6:1, 86:22
**regarding**
10:12, 10:21, 15:18, 43:1, 43:2, 61:18, 77:12, 77:14
**regards**
7:5
**register**
60:11
**registered**
2:17, 94:2
**reimburse**
22:10
**reimbursed**
48:14, 48:17, 48:18, 49:18
**reimbursement**
49:2
**reimbursing**
48:22
**reiterate**
8:14
**relate**
18:6, 30:11, 35:14, 85:22
**related**
20:2, 27:9, 29:2, 29:8, 42:9, 51:15, 52:17, 52:18, 59:6, 60:18, 83:1, 93:4, 94:10
**relates**
11:2, 11:17, 18:3, 28:7, 31:12, 35:2, 52:14, 53:12, 55:5, 60:22, 66:15, 66:19, 67:2, 74:1, 81:4, 90:22
**relating**
18:19, 21:5,

32:21, 34:14, 34:20, 35:12, 36:21, 40:22, 42:10, 42:15, 42:20, 43:19, 44:2, 49:1, 52:7, 54:2, 54:5, 54:12, 56:7, 62:9, 64:12, 66:10, 82:20, 91:22, 92:7
**remaining**
66:10
**remembers**
70:11
**renew**
13:13
**renews**
13:10
**rephrase**
6:20
**report**
4:20, 18:9, 18:13, 77:16, 77:21, 89:1, 90:3
**reported**
1:22
**reporter**
2:18, 12:1, 93:12, 94:1, 94:3
**reporter's**
6:12
**reports**
34:8, 37:4, 87:3
**represented**
14:5
**representing**
89:7, 89:15
**request**
7:10, 8:22, 9:1, 9:6, 9:11, 9:14, 9:18, 14:13, 18:4, 18:5, 29:13,

32:17, 32:22, 33:1, 35:12, 35:13, 39:12, 42:9, 42:10, 43:16, 43:18, 49:3, 51:5, 79:10, 89:21, 91:3, 91:11
**requested**
9:1, 33:1, 35:13
**requests**
8:21, 51:16
**required**
7:14
**residential**
84:2
**respond**
43:6
**response**
50:9, 79:10
**responses**
6:15
**responsible**
56:14, 59:2, 64:11
**responsive**
6:2, 7:10, 8:11, 9:14, 9:18, 18:4, 35:12, 54:11, 61:21
**restate**
91:9
**retain**
40:4, 73:17
**retained**
4:8, 11:22, 15:8, 20:9, 75:2, 88:14
**retrieve**
84:21
**return**
66:9, 66:11, 66:14
**returned**
34:16
**review**
7:4, 8:7,

19:21, 33:5, 54:2, 55:5, 57:9, 63:7, 79:20, 80:11, 83:6, 90:20
**reviewed**
13:5, 13:20, 14:1, 17:5, 18:11, 28:22, 29:5, 29:14, 29:15, 30:9, 39:13, 53:16, 62:15, 62:19, 63:2, 63:17, 67:12, 67:22, 70:8, 73:22, 75:12, 78:5
**revised**
43:20, 43:21, 78:19, 78:20
**reyes**
27:5
**right**
31:3, 38:14, 46:3, 68:22, 69:10, 69:16, 70:15, 70:21, 86:21, 88:6
**rihards**
89:12
**road**
3:5
**roderick**
3:3
**role**
65:4
**rpr**
1:22
**rules**
6:7
**runs**
41:16

**S**

**said**
15:3, 15:13, 16:21, 31:16, 36:15, 43:8,

45:13, 50:11,
51:8, 55:8,
55:22, 58:12,
60:21, 67:3,
69:1, 92:4, 94:7
**sake**
9:7
**salah**
33:18
**salaried**
41:12
**salary**
42:5, 42:7
**same**
13:11, 15:1,
31:8, 31:17,
35:4, 50:21,
75:20, 79:9,
87:16
**sameh**
1:10, 2:1, 4:2,
5:3, 5:12
**saved**
10:3, 11:6,
13:9, 13:11,
13:12, 17:13
**saw**
83:18
**say**
8:5, 10:5,
11:16, 12:19,
16:20, 21:7,
23:3, 36:2,
36:9, 44:11,
44:13, 49:7,
55:22, 56:12,
58:8, 60:20,
61:7, 62:6,
65:3, 65:17,
68:5, 68:11,
69:22, 77:8,
81:2, 84:17,
87:17, 88:4,
91:6, 92:3
**saying**
39:6, 58:14
**says**
38:19, 47:21,

48:3, 48:6,
48:10, 68:12,
69:2, 75:5,
76:18, 78:18,
80:6, 89:17
**scanned**
17:13, 43:10
**schedule**
37:20, 56:6,
57:12, 57:17
**schedules**
38:5, 39:21
**scheduling**
56:14, 57:10,
61:18
**scope**
4:12, 4:15,
12:9, 16:13,
43:21, 46:7,
78:20, 78:22,
79:8, 80:8
**screen**
9:9, 74:19,
88:12
**scroll**
23:17
**scrolled**
23:20
**seal**
94:14
**search**
6:2, 7:9, 7:14,
7:17, 7:22, 8:9,
8:18, 8:22,
9:13, 9:21,
10:1, 10:7,
10:9, 10:10,
13:2, 18:3,
19:21, 32:21,
33:10, 33:12,
33:13, 35:11,
42:9, 42:14,
47:3, 51:7,
51:15, 51:19,
61:20, 74:8,
84:20, 91:13
**searched**
10:5, 10:11,

10:13
**searches**
33:14
**searching**
9:19
**second**
47:14, 49:10
**see**
6:14, 6:15,
9:6, 12:5,
14:17, 20:10,
30:2, 32:14,
47:21, 48:3,
56:1, 68:14,
68:17, 70:13,
71:7, 71:20,
74:14, 74:19,
79:11, 88:19,
89:17, 89:22,
90:21
**seeks**
42:10, 43:18
**seems**
20:15, 71:9
**seen**
11:17, 17:4
**send**
57:3, 58:13,
93:10
**sending**
92:12
**sense**
31:21
**sent**
15:4, 65:20
**separate**
32:12, 39:20,
39:21, 49:12,
60:13, 66:4,
71:11
**separately**
52:22
**series**
8:3
**serve**
65:3
**served**
64:21, 65:5,

80:4
**service**
55:14
**services**
13:15, 75:19,
76:1, 76:19,
76:21, 77:1,
77:5, 77:7,
77:8, 77:19,
78:3
**set**
6:2, 20:16,
20:19, 23:8,
23:9, 31:11,
82:3, 94:13
**seven**
73:4
**share**
88:12
**sheet**
16:4
**sheets**
79:15
**shipped**
47:8, 47:22
**shorthand**
94:1
**should**
30:19, 31:14,
32:2, 61:22
**show**
11:19, 23:6,
29:17, 29:18,
31:17, 32:1,
32:5, 37:11,
38:6, 39:8,
47:11, 68:10,
68:20, 68:21,
69:3, 69:4,
69:8, 71:13,
71:19
**showed**
47:6
**showing**
11:20, 20:11,
73:18, 74:21,
88:17
**shown**
49:10

**shows**
34:13, 70:5
**sign**
93:14, 93:16
**signature**
75:10, 80:13
**signature-mig2k**
94:19
**signing**
75:13
**silcox**
76:20, 77:2,
77:12, 77:21,
78:8, 78:14
**similar**
25:19, 33:14
**similarly**
88:1
**since**
93:3
**singular**
52:10
**sit**
37:7, 86:18
**site**
60:3, 81:22
**six-page**
15:1
**smith**
38:19, 39:3,
39:8, 57:5,
57:6, 57:9,
58:13
**software**
13:15, 83:20,
84:1, 84:4,
84:10
**sold**
47:21
**solemnly**
75:5
**some**
15:4, 17:11,
19:14, 25:22,
26:6, 29:10,
44:16, 47:5,
56:6, 60:2,
68:11, 71:10,

73:18, 76:4,
83:16, 83:18,
83:19, 87:14
**somehow**
44:20
**someone**
59:19, 64:17,
80:19
**something**
13:12, 13:19,
39:18, 46:1,
53:9, 56:1,
84:15
**sometimes**
86:17
**somewhere**
61:12
**sorry**
16:20, 25:4,
37:13, 44:11,
45:12, 55:7,
60:20, 62:12,
72:13, 85:7,
92:3
**sort**
10:22, 26:20,
27:14, 36:20,
37:10, 41:1,
45:4, 45:14,
46:10, 51:20,
53:11, 55:20,
56:6, 57:17,
60:2, 67:6,
73:18, 77:20,
81:3
**sought**
18:5
**speak**
10:21, 42:22
**speaking**
61:8
**special**
92:17
**specific**
25:16, 26:22,
31:10, 35:22,
46:11, 51:15,
58:10, 77:9,

91:4
**specifically**
19:17, 21:4,
21:5, 21:7,
21:16, 21:18,
25:2, 26:4,
27:6, 27:9,
41:18, 42:1,
43:12, 73:12
**specifications**
79:7
**specificity**
78:18
**spent**
21:16, 21:22,
25:17, 25:22,
26:4, 26:13,
26:22, 27:16,
36:22, 37:1,
37:16, 76:15
**spoken**
17:6
**spread**
57:2
**spreadsheet**
4:14, 16:7,
57:18
**spreadsheets**
79:22, 80:13,
80:18
**st**
8:12, 8:19,
9:13, 20:15,
31:15, 35:10,
52:3, 91:14
**started**
5:10, 7:2
**starting**
58:4
**state**
2:18, 5:10,
6:16, 78:5,
94:22
**stated**
8:20, 8:21,
14:5, 17:9,
19:14, 53:16,
54:15, 56:5,

63:12, 79:17,
80:17, 90:11
**statement**
33:2, 33:7,
35:5, 49:22,
67:12, 67:13,
68:1, 69:8
**statements**
19:22, 23:6,
24:22, 29:1,
29:5, 29:7,
29:15, 30:5,
31:5, 31:8,
33:8, 33:19,
50:3, 62:20,
63:2, 63:8,
63:17, 63:22,
69:20, 70:9,
70:10, 71:7,
78:7
**states**
1:1, 28:1,
28:10, 75:17,
77:18, 79:4,
89:5
**stating**
32:20
**stay**
12:3, 87:21
**stenographically**
94:8
**step**
51:22
**stephanie**
1:22, 2:17,
93:9, 94:2
**steps**
91:21, 92:13
**still**
24:17, 38:5,
57:6, 90:15,
90:21, 91:2,
91:4
**stored**
84:21
**street**
3:13
**stuff**
30:2, 40:4,

46:15
**subcontractor**
24:5, 24:7,
24:9, 40:16,
49:1, 49:5, 53:4
**subcontractors**
24:4
**subject**
76:5
**submitted**
10:4, 10:15,
11:7, 11:8,
11:14, 11:16,
17:13, 17:15,
18:22, 19:6,
38:12, 43:11,
44:5, 44:7, 53:4
**subsequent**
12:12, 20:14
**subsequently**
32:2
**substantive**
16:18
**suite**
3:14
**sum**
31:18, 49:13
**summaries**
9:3
**superior**
23:22, 24:5,
24:12, 24:14,
24:16, 24:21,
26:8, 26:10,
26:11, 26:12,
26:18, 27:4
**supervision**
94:9
**supplement**
50:20
**supplemental**
4:16, 18:11,
20:6, 75:3,
75:7, 75:16,
75:17, 79:3,
79:10, 79:20,
80:3, 80:5,
80:12

**supplementally**
51:19
**supplier**
53:5
**supplies**
19:15, 28:20,
29:8, 47:8,
71:1, 73:2
**supposed**
38:7
**sure**
13:7, 15:5,
25:7, 30:3,
31:2, 41:3,
44:19, 45:18,
50:18, 50:20,
51:10, 52:1,
58:2, 62:4,
83:5, 83:7,
83:15, 85:14,
90:6
**suspect**
39:15
**sworn**
5:4
**system**
17:10, 89:20,
90:4, 90:9,
90:16, 91:12

────── **T** ──────

**take**
8:3, 10:10,
26:6, 32:13,
42:5, 42:7,
47:14, 50:12,
50:13, 91:20
**taken**
65:7, 67:6,
92:6, 92:13,
94:5, 94:7
**takeoff**
11:1, 11:11,
11:18, 44:9,
79:5, 79:7,
80:7, 80:8
**takeoffs**
9:2, 9:12

**takes**
65:18
**talk**
6:11, 6:12
**talked**
8:15, 25:13,
79:13
**talking**
61:9, 71:14,
85:15, 85:17,
85:19, 86:15
**tax**
81:4
**tell**
11:4, 29:21,
29:22, 56:20,
58:5
**telling**
37:15
**terms**
10:10, 21:11,
27:15
**testified**
5:6, 10:17,
19:9, 28:17,
30:12, 30:14,
40:3, 70:8,
82:10, 88:22
**testify**
5:4, 6:1, 30:9,
63:16
**testifying**
69:18
**testimony**
58:3, 83:17,
87:6, 94:7
**text**
56:10, 56:12,
56:19, 56:20,
57:2, 57:3,
57:10, 57:16,
58:7, 58:14,
61:18, 62:1,
62:4, 62:7,
62:8, 62:13,
62:15
**th**
25:21, 38:20,

**39:4, 80:1,
80:2, 94:14
**thank**
83:11, 88:7,
92:19
**thereafter**
94:8
**thing**
31:17, 32:7,
82:4
**things**
8:14, 19:4,
53:8, 92:11,
92:13
**think**
9:15, 14:8,
15:3, 29:16,
29:17, 29:20,
30:18, 31:13,
32:7, 32:17,
40:2, 40:20,
45:22, 46:6,
50:14, 51:9,
67:18, 70:3,
70:4, 71:3, 71:4
**thorough**
8:9, 83:5
**thought**
55:8
**thousands**
74:10
**threads**
56:20, 57:16
**three-page**
15:2
**through**
6:7, 9:19,
10:8, 10:11,
10:13, 17:18,
20:18, 38:13,
40:9, 41:6,
41:14, 41:16,
48:18, 50:19,
51:3, 51:18,
52:22, 54:20,
59:13, 61:20,
62:7, 63:21,
65:14, 65:22,

70:9, 71:10,
72:16, 74:11,
89:19
**thrown**
17:19
**tied**
25:7
**time**
6:8, 6:18,
13:5, 13:9,
17:20, 19:22,
21:13, 21:16,
21:21, 23:15,
24:12, 24:13,
24:15, 25:15,
25:16, 25:21,
25:22, 26:1,
26:4, 26:6,
26:12, 26:21,
27:8, 30:6,
31:5, 31:17,
32:1, 37:15,
37:17, 40:12,
40:17, 40:22,
41:5, 41:6,
41:10, 41:12,
41:14, 41:20,
42:1, 44:6,
44:16, 50:15,
51:22, 55:15,
55:19, 55:21,
57:14, 58:4,
58:15, 58:16,
58:20, 59:3,
59:12, 59:13,
59:17, 59:21,
60:7, 60:18,
60:22, 67:6,
75:22, 76:1,
76:11, 76:15,
83:10, 84:13,
86:9, 87:7,
87:16, 88:3,
90:3, 90:9,
91:21, 92:6
**times**
26:9, 86:7
**timestation**
23:11, 37:22,

38:11, 38:13,
41:8, 41:9,
41:15, 41:16,
55:13, 55:18,
55:20, 56:2,
58:5, 58:10,
59:14, 59:16,
59:18, 59:22,
60:1, 60:6,
60:11, 61:5,
61:17, 71:11,
87:3
**titled**
12:8, 20:10,
68:14, 75:3
**today**
6:1, 6:14,
11:10, 13:13,
33:6, 40:19,
83:9
**today's**
13:14
**together**
27:10, 67:6
**told**
14:9
**took**
8:1, 8:18,
63:18
**tool**
60:2
**top**
47:21
**total**
22:21, 28:11,
71:12
**totals**
22:5
**towards**
15:16
**track**
24:18, 32:14,
58:18
**transcript**
94:6
**transfer**
23:3, 64:2,
64:4, 64:7,

64:9, 65:21,
66:2, 67:8
**transferred**
65:13, 66:15
**transfers**
64:16
**treated**
81:11, 81:13
**trigger**
74:9
**true**
75:8, 94:6
**truth**
5:5, 5:6
**try**
6:15, 8:14,
9:17, 12:3,
61:20, 86:19
**trying**
19:3, 21:21,
70:18
**tuesday**
38:20
**turn**
75:15
**turning**
32:19, 89:4
**tw**
47:20, 48:12,
67:14, 67:19,
68:12
**two**
8:5, 26:15,
49:11, 49:15,
60:13, 79:15,
79:22, 80:13
**type**
52:15, 55:1
**types**
18:16
**typewriting**
94:9
**typical**
64:15, 92:10
**typically**
13:8, 13:15,
34:17, 36:5,
52:16, 62:5,

73:20

| U |
|---|

**unclear**
71:9
**under**
24:3, 26:19,
39:16, 65:7,
75:6, 86:4, 94:9
**undergo**
26:20
**understand**
5:22, 6:19,
19:1, 34:5,
41:3, 46:19,
52:1, 53:7,
55:17, 83:15,
83:16, 85:17,
86:21
**understanding**
12:15, 14:7,
19:4, 19:8,
32:15, 44:1,
45:3
**understood**
6:22, 7:8
**underwent**
51:20
**uniquely**
84:16
**united**
1:1
**universe**
61:12, 70:22
**unless**
91:3
**unresponsive**
51:6, 51:14
**until**
23:18, 32:4,
51:1
**update**
89:14
**uploaded**
13:6, 13:19,
67:4
**use**
22:11, 65:10,

84:1, 84:4
**uses**
65:9, 84:3
**using**
10:9, 29:21,
65:10, 65:11
**utilize**
73:7
**utilized**
55:14, 72:7

**V**

**vague**
25:6
**valsts**
1:7, 5:16
**value**
75:20
**various**
19:16
**vendor**
30:1
**verbal**
50:9
**verbally**
6:16
**verification**
75:5, 75:13
**verified**
80:12
**verify**
32:16
**via**
57:3
**villegas**
27:5
**virtually**
1:11, 2:2
**vni**
5:17, 18:4,
43:16, 43:18,
44:7, 44:18,
78:15, 89:1,
92:5
**vni's**
7:6, 7:10,
32:22, 42:9

**W**

**w-2**
81:7

**walked**
51:3, 51:18
**want**
9:5, 14:7,
14:11, 23:3,
25:10, 31:3,
31:4, 50:18,
50:19, 50:20,
51:22, 58:2,
68:14, 68:17,
69:11, 75:15,
84:17
**way**
12:19, 15:22,
17:19, 41:4,
41:21, 71:10
**we'll**
14:22, 15:2,
32:13, 32:16,
39:17
**we're**
50:20
**we've**
8:15, 10:1,
34:7, 36:22,
37:1, 37:3,
70:16
**week**
8:6
**weekly**
39:22, 57:20
**weeks**
8:6, 26:15
**went**
6:7, 15:19,
30:1, 38:13
**whatever**
11:7, 69:14
**whereof**
94:13
**whereupon**
5:2
**whether**
10:22, 12:20,
17:16, 20:1,
33:22, 43:1,
44:22, 49:17,
52:4, 62:8,

62:20, 63:8,
63:16, 63:18,
67:14, 68:5,
68:6, 68:7,
68:17, 68:21,
68:22, 69:13,
71:10, 72:7,
78:14, 82:19,
83:5, 84:5,
85:17, 85:18,
85:19, 90:21,
91:8
**whole**
5:5, 61:9,
61:10
**within**
79:8
**without**
27:4, 76:2
**witness**
14:9, 15:5,
46:21, 83:11,
94:13
**word**
37:14, 57:2,
57:18
**work**
4:13, 4:15,
4:20, 12:9,
16:13, 19:18,
24:3, 24:8,
24:10, 27:10,
30:7, 31:6,
32:11, 37:2,
38:7, 39:21,
43:21, 46:7,
46:11, 62:5,
64:8, 74:13,
76:4, 76:7,
78:20, 78:22,
79:2, 79:6,
79:8, 80:7,
80:9, 82:1,
82:3, 87:11,
88:2, 89:1, 90:3
**worked**
16:2, 16:3,
21:12, 37:19,

38:1, 39:18
**worker**
86:15
**workers**
59:9, 76:4,
76:6, 76:10,
76:14, 82:2
**working**
37:8, 56:11,
58:9, 58:11,
59:6, 59:11,
87:19
**works**
19:17, 50:15,
65:9
**worksheet**
11:1, 11:12,
11:18
**worksheets**
9:2
**wouldn't**
12:22, 21:7,
21:15, 22:1,
59:4, 60:14,
74:8, 86:9
**writing**
44:22
**wrong**
84:18

**Y**

**yeah**
10:1, 10:11,
15:5, 15:14,
18:21, 19:5,
23:18, 25:10,
29:11, 39:14,
40:2, 43:8,
46:12, 46:18,
50:11, 58:7,
61:6, 63:15,
63:19, 66:11,
69:7, 71:17,
71:21, 72:13,
72:15, 80:15,
80:19, 81:14,
88:10, 90:6,
92:16

**year**
13:12, 33:7,
34:2
**yearly**
33:1
**years**
33:9, 33:20
**yep**
14:19
**yourself**
41:18, 59:18,
61:8, 66:19

**Z**

**zach**
5:14, 88:8
**zachary**
3:10

**$**

**$237.50**
38:22
**$3,078.24**
49:13
**$4,426.42**
48:4, 48:11

**0**

**01643**
1:7
**02**
38:21

**1**

**1--cv--rcl**
1:7
**100**
3:13
**11**
4:12, 25:21
**1120**
3:16
**12**
38:20, 39:4
**15**
4:14, 4:20,
80:5, 88:13,
88:18, 88:20

**152**
4:11, 20:13
**18**
7:10, 9:1,
9:11, 9:19
**19**
75:16
**1900**
3:14
**1911**
3:7

**2**

**2**
1:13
**20**
4:10, 78:18,
79:4, 79:21,
80:5, 80:12
**2021**
25:21, 33:2,
33:7, 34:3,
34:14
**2022**
33:2, 33:8,
34:3, 34:14,
38:20, 39:4,
91:20, 92:5,
93:4
**2023**
5:19, 6:3, 7:5,
12:12, 20:15,
35:10, 43:18,
51:4, 52:4, 80:5
**2024**
1:12, 94:15
**2027**
94:16
**21**
6:3, 7:5, 8:12,
8:19, 9:13,
12:12, 20:15,
31:15, 35:10,
43:17, 51:4,
52:3, 91:14
**21202**
3:6, 3:15
**22**
1:7

**228.72**
28:11
**23**
7:11, 18:4,
18:5
**24**
7:11, 32:22,
33:1, 51:1
**25**
7:11, 35:13
**26**
5:18, 7:11,
93:17
**267**
23:11
**27**
7:11, 42:9,
42:10, 80:1,
80:2
**280**
38:16
**29**
1:12, 94:14

**3**

**3**
50:15, 51:1
**30**
7:11, 12:1,
43:16, 43:18,
47:14, 50:15
**3086**
28:12
**31**
1:13, 38:20
**34**
4:10, 20:7,
20:8, 20:10,
23:9, 27:18,
38:15, 47:18
**35**
4:12, 11:20,
11:21, 12:6,
14:15, 14:16,
79:14, 79:15
**36**
4:14, 14:17,
14:21, 15:7,

**16:12, 79:14,**
79:15
**37**
51:1
**383**
27:19
**39**
4:16, 74:22,
75:1
**399**
47:20

**4**

**4**
38:21, 93:17
**4,426.42**
49:12
**400**
49:11
**410**
3:7, 3:16
**417**
3:5
**4s**
46:13

**5**

**523435**
1:20

**6**

**6**
38:20
**615**
3:7
**685**
3:16

**7**

**75**
4:16

**8**

**83**
4:4
**88**
4:5, 4:20
**8th**
91:20, 92:5,

93:4
**9**

**9.5**
38:21
**94**
1:21, 4:6